### In re INITIATIVE PETITIONS NOS. 112, 114, 117, 118.

Nos. 23082, 23084, 23087, 23088. Opinion Filed Dec. 16, 1931.

Freeling & Box and Owen & Looney, for protestant.

J. Berry King, Atty. Gen., for Frank Carter, State Auditor.

Gov. Wm. H. Murray and W. D. Humphrey, amici curiae.

HEFNER, J. This is an application for an injunction against the State Auditor. The object is to prevent him from paying out funds in connection with the holding of an election on December 18, 1931, on the above initiated petitions.

The petitions were filed in the office of the Secretary of State within the time provided by law. From an order of the Secretary of State upholding the petitions, an appeal was prosecuted to this court and, during the pendency of the appeal, this application for injunctive relief has been made.

In the case of McAlester, Sec. of State Election Board, v. State ex rel. Short, Atty. Gen., 95 Okla. 200, 219 Pac. 134, this court said:

"When the Legislature authorizes the submission of a proposed amendment to the Constitution to the people, it merely places in motion the process of the people's exercising their reserved legislative power, and a court of equity will not assume, in advance, jurisdiction to determine whether the proposed amendment, if adopted, is submitted and adopted in accordance with the law governing the same."

The same rule was announced in the case of McAlester v. State ex rel. Walton, 96 Okla. 143, 221 Pac. 779. We think the case at bar comes within the rule announced in the above cases.

When the copy of the petitions were filed in the office of the Secretary of State, and thereafter signed by what seemed to be a sufficient number of the voters of the state to initiate the measure, it placed in motion the process of the people's exercising their reserved legislative power, and a court of equity, as a general rule, will not assume, in advance, jurisdiction to determine whether the proposed act, if adopted, is submitted and adopted in accordance with the law governing the same.

The validity or sufficiency of the proceedings is now pending before the court for future determination, and at this time we express no opinion as to the validity thereof.

If the State Auditor should authorize the paying out of any funds before the final determination of the proceedings herein, and it should finally be held that the election was illegal and void, it can then be determined whether or not the Auditor and his bondsmen are liable. At this time we express no opinion thereon.

On the showing made, we refuse to issue the injunction.

LESTER, C. J., CLARK, V. C. J., and McNEILL and KORNEGAY, JJ., concur.

RILEY, CULLISON, SWINDALL, and ANDREWS, JJ., dissent.

LESTER, C. J. (concurring). I desire to specially concur in the clear and lucid opinion of Mr. Justice Hefner. This opinion is supported by former decisions of this court.

In Re Initiative Petition No. 23, 35 Okla. 49, 127 P. 862, this court said:

"These petitions, therefore, and the signatures thereto, are presumed to be valid, and the presumption obtains on the filing of the objections in the office of the Secretary of State that those who have signed them are legal voters of the state of Oklahoma, and this is the one provision that is the sine qua non, the substantial material element necessary in every case to constitute a valid signature, and the burden of proof to overcome this presumption should be and is, in every instance, upon the protestant, and, in the absence of any evidence of fraud, forgery, or other improper or wrongful conduct in securing the signers to the petition sufficient to throw discredit upon the entire petition or upon a sufficient number, the same, in keeping with the presumption above noted, will be held valid. We do not mean to hold that the circulator's affidavit can be dispensed with, but that technical defects therein will not destroy the petition. Nor is the conclusion to which we have here come wanting in sanction in the statute. Section 3694, Comp. Laws 1909, contained in the act along with the other provisions of this law, provided as follows:"

The protest, in my judgment, is insufficient in that it fails to state facts sufficient to state a cause of action, and in the absence of any evidence on the part of the protestant that there is a probability of the initiative petition being insufficient. Not a line of evidence is offered to support the allegations in the application for an injunction, and in the face of the fact that this court has held that initiative petitions on their face, in the absence of proof, is presumptively established. This court is asked to overcome this presumption without a line of evidence and to issue an injunction that has for its purpose interference with an election.

In the case of Cress v. Estes et al., 43 Okla. 213, 142 P. 411, this court in the second paragraph of the syllabus stated:

"The power to propose and adopt a proposition of any nature and to amend their Constitution is vested in the people of the state, and in the exercise of such power they constitute the legislative branch of the government and are not subject to interference or control by the judiciary."

Time and again the Supreme Court of Oklahoma has held that the court has no

power to interfere with the holding of an election.

---

CLARK, V. C. J. (concurring). I concur in the majority opinion for the reason that this court has no authority or jurisdiction to directly or indirectly interfere in matters of a purely political nature.

It was admitted by the attorney for the protestant seeking the injunction that an injunction could not be granted against holding the election, but that an injunction granted against the State Auditor and the election board would have the same effect. The protestant was seeking to secure an injunction that would prevent the free exercise of suffrage by the people of the state of Oklahoma in an election called by the Governor of this state to be held on December 18, 1931.

The Constitution of Oklahoma, sec. 1 of art. 2, provides:

"All political power is inherent in the people; and government is instituted for their protection, security, and benefit, and to promote their general welfare; and they have the right to alter or reform the same whenever the public good may require it; Provided, such change be not repugnant to the Constitution of the United States."

I am of the opinion that this court, and its existence as a court, depends upon the will of the people in this state. We are not masters and cannot control, nor deny the people the right to vote, nor have we jurisdiction or authority over matters of a purely political nature.

We are authorized by the Constitution to pass upon civil or property rights of the people of Oklahoma, and then only when our jurisdiction is invoked in a manner prescribed by law. We have neither legislative nor executive power. The court over which we preside was created by the Constitution, and each member of this court was commissioned by the people of Oklahoma to perform certain duties prescribed and limited by the Constitution of Oklahoma. We have no authority nor jurisdiction beyond the limitations imposed upon us by the Constitution of Oklahoma, the great charter of the people's liberties.

Section 4 of article 2 of the Constitution provides:

"No power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage by those entitled to such right."

Under this section of the Constitution we have no authority to interfere with the free exercise of the right of suffrage to those entitled to such right, and every qualified voter in Oklahoma is entitled to such right; and to grant an injunction prohibiting or interfering in any way with the election called would be an attempt to prevent the free exercise of the right of suffrage.

Section 7 of article 3 of the Constitution provides:

"No power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage, and electors shall, in all cases, except for treason, felony, and breach of the peace, be privileged from arrest during their attendance on elections and while going to and from the same."

Under this section of the Constitution it is an inhibition against this court to attempt in any way, either directly or indirectly, to interfere with the rights of the people. This Constitution is binding on this court. We must not assume that the Supreme Court is the supreme power in the state of Oklahoma. The people are the supreme power. We cannot say to the citizens when they shall vote and when they shall not vote.

Section 1 of article 4 of the Constitution provides:

"The powers of the government of the state of Oklahoma shall be divided into three separate departments: The legislative, executive, and judicial; and except as provided in this Constitution, the legislative, executive, and judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."

The judicial, executive, and legislative departments of government shall be separate and distinct, and neither shall exercise the power properly belonging to the other, is a mandate of the people in the Constitution and binding on this court. When the people initiate measures, or constitutional amendments, they are acting in a legislative capacity, and when the Governor of the state calls the election he is obeying the mandate of the people expressed in the Constitution.

Section 3 of article 5 of the Constitution provides in part:

"* * * Petition and orders for the initiative and for the referendum shall be filed with the Secretary of State and addressed to the Governor of the state, who shall submit the same to the people. * * *"

So the people are acting in a legislative capacity when they are operating under the Constitution and the laws relating thereto,

and acting in that capacity this court, under the Constitution, cannot interfere with them.

The sovereign citizens of this state, by section 1 of article 5 of the Constitution, reserved to themselves the authority to propose laws and to enact the same independent of the Legislature, and by the inhibition that no power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage, they have the authority to propose and enact laws independent of the courts of this state.

The case of McAlister, Sec. of State Election Board, et al. v. State ex rel. Short, Attorney General, 95 Okla. 200, 219 Pac. 134, was an action begun in the district court of Oklahoma county by the Attorney General by direction of the Governor against the State Election Board and the State Board of Affairs to enjoin the holding of an election called by the Governor of Oklahoma to be held on the 2nd day of October, 1923, at which election several constitutional amendments were being submitted by proclamation of the Governor of the state of Oklahoma. It was alleged in the petition in the latter case that all of said amendments were not submitted at the time and in the manner and by the authority prescribed by the laws and Constitution of Oklahoma, and that the State Board of Affairs would incur an expense in excess of $100,000 in holding said election, and said election would be invalid when held. The trial court granted the injunction and on appeal to this court this court held that said injunction could not be granted for the reason that this court could not enjoin matters of purely political nature. And in the 2nd paragraph of the syllabus this court said:

"When the Legislature authorizes the submission of a proposed amendment to the Constitution to the people, it merely places in motion the process of the people's exercising their reserved legislative power, and a court of equity will not assume, in advance, jurisdiction to determine whether the proposed amendment, if adopted, is submitted and adopted in accordance with the law governing the same."

This case cited with approval many cases from Kansas and also cases from this court.

In Pomeroy's Equity Jurisprudence (4th Ed.) sec. 1753, it is said:

"An injunction will not issue, as a general rule, for the purpose of restraining the holding of an election, or of directing or controlling the mode in which, or of determining the rules of law in pursuance of which an election shall be held. An election is a political matter, with which courts of equity have nothing to do. Moreover, the effect of interference in such matters might often result in the destruction of the government."

The Supreme Court of Kansas in the case of Duggan v. City of Emporia, 114 Pac. 235, at page 236, quoted from an Illinois case as follows:

"In Walton et al. v. Develing et al., 61 Ill. 201, it was held that the court had no power to enjoin the holding of a township election to determine whether a majority of the voters were in favor of subscribing to the stock of a railroad company, and that the defendants who had violated the order were not liable for contempt of court for disobedience to the writ. In the opinion it is said: 'But the attempt to check free expression of opinion, to forbid the peaceable assemblage of the people, to obstruct the freedom of elections, if successful, would result in the overthrow of all liberty regulated by law. The mere effort to assume such power is dangerous to the rights of the citizens. If the courts can dictate to the officers of the people that they shall not hold an election from fear of some imaginary wrong, then people and officers are entirely subservient to the courts, and the consequences are too fearful to contemplate. The principle which would authorize the mighty mandate of a court of chancery, in this case, would justify it in every election to be held by the people, and thus the whole administration of the government might be obstructed, and all power and authority placed at the footstool of the judge'."

The Supreme Court of Montana in State v. Alderson, 142 Pac. 210, at page 216, said:

"So long as human agencies are to be employed in carrying out the constitutional scheme of amendment, slight errors and defects in procedure are certain to occur, and to impose the rule of literal compliance would, for all practical purposes, render the adoption of any amendment absolutely impossible and defeat one of the very purposes of the Constitution itself. We ought not, by any strained construction, make the language of our Constitution mean something altogether different from what the people had in contemplation in its adoption. No rule of construction should be invoked which will trammel the people in their efforts to exercise the right reserved to themselves to change their Constitution by popular vote.

"In speaking of a slight deviation from the constitutional method of proposing an amendment, the Supreme Court of Mississippi said:

" 'This objection would have more force if the act of itself operated as an alteration of the Constitution. But it is merely a proposition to be submitted to the action of the people. It is a means provided by which the people may exercise their sovereign right of declaring whether they will change their Constitution or not, thereby establishing the

mode in which the government shall be changed, instead of leaving it to unregulated popular impulse. The proposition is presumed to emanate from the people through their representatives, and is regularly submitted for the action of the whole people. There is nothing in the nature of the submission which should cause the free exercise of it to be obstructed, or that could render it dangerous to the stability of the government; because the measure derives all its vital force from the action of the people at the ballot box, and there can never be danger in submitting, in an established form, to a free people, the proposition whether they will change their fundamental law. The means provided for the exercise of their sovereign right of changing their Constitution should receive such a construction as not to trammel the exercise of the right. Difficulties and embarrassments in its exercise are in derogation of the right of free government, which is inherent in the people; and the best security against tumult and revolution is the free and unobstructed privilege to the people of the state to change their Constitution in the mode prescribed by the instrument.' Green v. Weller, 32 Miss. 650."

The Constitution and the decided cases sustain the holding that the injunction should be denied.

McNEILL, J. (concurring). This case presents an appeal to this court from the decision of the Secretary of State on Initiative Petition No. 112, State Question No. 167, relative to a proposed act known as the Oklahoma Income Tax Law. Said petition was circulated and was filed in the office of said Secretary of State, on the 31st day of October, 1931, purporting to be signed by 121,401 legal signers. On the 9th day of November, 1931, a protest to said initiative petition and said state question was filed in said office of the Secretary of State by the Honorable S. P. Freeling, a qualified and legal voter and citizen of the state of Oklahoma. Said protest being as follows:

"Before the Honorable R. A. Sneed, Secretary of the State of Oklahoma.

"In re: Initiative Petition No. 112, State Question No. 167,

Being designated as the initiative petition filed by the Hon. Baxter Taylor, to enact as a law of the state of Oklahoma, the proposed act contained in said Initiative Petition No. 112, State Question No. 167.

"Protest.

"To the Honorable R. A. Sneed, Secretary of State of the state of Oklahoma, and to the Honorable Baxter Taylor, who filed said Initiative Petition No. 112, State Question No. 167, and to others who may be interested:

"Comes now S. P. Freeling, a qualified and legal voter and citizen of the state of Oklahoma, and protests and objects to the said Initiative Petition No. 112, State question No. 167, filed herein, for the following reasons, to wit:

"1. Said Initiative Petition No. 112 was not filed in the time and manner provided by law.

"2. Said petition was not signed by a sufficient number of qualified voters of the state of Oklahoma, or by 8 per cent. of the total number of votes cast for Governor at the last election, and was not signed by 8 per centum of the legal voters of said state.

"3. Said petition contains large numbers of duplicate signatures, that is, the names of persons who have signed said petition more than once, the exact number of such duplicate signatures being at this time to this protestant unknown.

"4. Said petition contains the names of fictitious persons and persons not residents of the state of Oklahoma.

"5. Large numbers of purported signers did not give their post office address, and the post office address is not contained in said petition following the names of the purported signers.

"6. Large numbers of purported signers did not give their street address, although purporting to reside in a city of the first class, and in cities and towns where the United States mail is delivered by carrier, and for the reason that said large numbers of purported signers did not give their street address they cannot be traced, and their purported signatures should not be counted.

"7. Said petition is not in the form provided by law.

"8. The verification of circulators was not in the form provided by law, and is insufficient in law.

"9. Many of the verifications did not give the name of the county in which said petitions were circulated.

"10. Said petitions were not properly acknowledged by the circulators.

"11. Said purported verifications, where given, did not on many of the petitions contain the post office address of the circulator, or of the notary taking the acknowledgment.

"12. Many thousands of names on said petition did not represent registered voters or persons having the qualifications of voters.

"13. Thousands of signers of said petition did not know the nature of the instrument they were signing.

"14. Many of said petitions were not acknowledged in any manner.

"15. The purported address of the said signers was written after their signature, by the circulator, or by other persons after the signature, and in many such cases was written by persons unacquainted with the facts.

"16. Many of said petitions were signed by circulators with names contained thereon the signatures of which said circulators did not witness.

"17. That when the said illegal and improper signatures are considered and disregarded, there will not remain a sufficient inumber of legal signatures on said petition to constitute a legal petition in law, and that the signatures on said petition were not procured and certified in the manner provided by law.

"18. Because the parties submitted such proposition did not file a copy of the same with the Attorney General of the state at the time the same was filed with the Secretary of State.

"19. Because the ballot title filed with the said measure is improper and not according to the law of the state of Oklahoma.

"20. Because the circulators of said petition did not rewrite the names of the signers on the back of said petition.

"Wherefore, the protestant prays that said petition be disregarded, and said purported Initiative Measure No. 112, State Question No. 167, be dismissed.

"S. P. Freeling, Protestant.

"State of Oklahoma, Oklahoma County, ss.

"S. P. Freeling, being first duly sworn, upon oath deposes and says: That he is familiar with the statements and allegations in the foregoing protest, and believes the same to be true.

"S. P. Freeling

"Subscribed and sworn to before the undersigned authority on this 9th day of November, 1931.

"(Seal)    Hallie Whitaker, Notary Public.

"My commission expires Mar. 2, 1933."

A hearing was had thereon before the Honorable R. A. Sneed, Secretary of State, and said Secretary of State, on the 20th day of November, 1931, made his decision, the same being  as follows:

"Before the Secretary of State of the State of Oklahoma.

"In the Matter of State Question No. 167, Initiative Petition No. 112.

### "Decision.

"This matter coming on to be heard before me, the undersigned Secretary of State, upon the protest by S. P. Freeling to said Initiative Petition No. 112, and the protestant being present in person and by his attorney, E. M. Box, and the circulator of said petition, Baxter Taylor, being present in person and by his attorneys, T. J. Leahy, and W. D. Humphrey, the Secretary finds, as follows:

"1. That, on October 13, 1931, at 5:30 p. m. Baxter Taylor did file in the office of the Secretary of State a true and exact copy of Initiative Petition No. 112.

"2. That thereafter, on October 31, 1931, at 5:30 o'clock p. m., the said Baxter Taylor did file the original of said Initiative Petition No. 112 in the office of the Secretary of State in the presence of the Governor of the state of Oklahoma, which was thereupon received and filed by the Secretary of State, in the manner provided by law.

"3. That thereafter, on November 2, 1931, the Secretary of State did issue for publication in the Blue Valley Farmer, a newspaper of general circulation within the state, a notice setting forth the date of such filing, and notifying any citizen of the state, that, within ten days, protests might be received against the same, as by law provided.

"4. That thereafter, on the 9th day of November, 1931, S. P. Freeling did give notice to R. A. Sneed, Secretary of State, and the said Baxter Taylor, that he had filed with the Secretary of State a protest against said initiative petition, and that he did, on the 9th day of November, 1931, at 3:10 o'clock p. m., file with the Secretary of State a protest against said initiative petition.

"5. That thereafter, on the 10th day of November, 1931, the Secretary of State notified the said protestant that he would hear testimony and argument for and against the sufficiency of said petition on November 18, 1931, at the hour of 8 o'clock a. m., and that such hearing would continue from day to day until the same was concluded.

"6. That thereafter, on the 18th day of November, 1931, at the hour of 8 o'clock a. m., the said hearing was continued until the hour of one o'clock of said day.

"7. That thereafter, on the said 18th day of November, 1931, this matter came on for hearing before the Secretary of State, and the appearances being as above set forth, protestant requested the Secretary of State to cause the issuance of subpoena to certain sundry witnesses. The Secretary of State thereupon refused to cause the issuance of said subpoena, for the reason that no authority existed in law for this action, by reason whereof such action would amount to a usurpation of authority and power by the Secretary of State.

"8. Thereupon, the protestant adduced the testimony of various and sundry witnesses, and the hearing was adjourned until 8:30 o'clock a. m., on November 19, 1931.

"9. That thereafter, on the said 19th day

of November, 1931, this matter came on again for hearing, with appearances as above set out, the Secretary of State declared the nature of the testimony which he would consider as valid objections to the said petition, and protestant was requested to state whether or not he could establish the invalidity of sufficient signatures on said petition to make the legal signatures on said petition less than the number required by law for submission of said petition; that unless the protestant can show enough forgeries, duplications, or entire lack of addresses or other fatal incorrectness of the petition at this hearing, the Secretary of State need continue this hearing no further. If protestant can do this, the Secretary is prepared to enable him to do so. Thereupon the protestant, S. P. Freeling, made the following statement:

"'In view of the holding just announced and in view of the further fact that 'the protestant has a right by trial de novo in the Supreme Court to establish any right he might have, he agrees that it is useless to proceed further before this trial.'

"10. Thereupon, the Secretary of State declared that he had caused to be tabulated, in the manner provided by law, the signatures to the said Initiative Petition No. 112, and that he found said petition contained a total of 121,401 signatures, and that, under the laws and Constitution of the state, it is his duty to decide whether such petition be in form as required by law.

"And, now, being fully advised in the matter, and having ascertained that there are more than enough signers on said petition, as required by law, and that said petition is in conformity to the requirements of law, I, R. A. Sneed do hereby decide that said petition is in due form of law and amply sufficient in all things, and that said question thereby proposed should be certified to the Governor, to the end that the same may be submitted to the electors of the state, as is provided by law.

"Witness my hand, this 20th day of November, 1931.

"(Seal)     R. A. Sneed, Secretary of State."

The appeal was lodged in this court on the 23rd day of November, 1931, and on the 25th day of November, 1931, the Chief Justice convened this court for the hearing on such appeal. This court on its own motion raised the question of the sufficiency of the protest filed before the Secretary of State. The same was set for hearing in open court for the 28th day of November, 1931. On the day of said hearing the Honorable Baxter Taylor on behalf of petitioners filed a motion to dismiss said appeal, on the ground that the same was insufficient in law, which motion was overruled by a constitutional majority of said court, and the court set December 9, 1931, as the date for hearing

said appeal. On the 7th day of December, 1931, there was filed with the Clerk of the Supreme Court in Re Initiative Petition No. 112, an application by the Honorable S. P. Freeling for injunction or writ of prohibition against the Honorable Frank C. Carter, as Auditor of the state of Oklahoma, and the State Election Board, which application is as follows:

"In the Supreme Court of the State of Oklahoma.

"In re Initiative Petition No. 112, State Question No. 168.          No. 23,082

"Application.

"Comes now S. P. Freeling, the protestant in the above-styled cause, and represents and shows to the court:

"1. That on the 31st day of October, 1931, Honorable Baxter Taylor, a citizen of Oklahoma, filed with the Honorable R. A. Sneed, Secretary of State of the state of Oklahoma, an original petition designated as Initiative Petition No. 112, purported to have been signed by numerous citizens and legal voters of the state of Oklahoma, requesting that 'the same shall be submitted to the legal voters of the state for approval or rejection at the next election held throughout the state.'

"2. That thereafter, on the 9th day of November, 1931, and within ten (10) days of the filing of said petition, said protestant, a citizen of Oklahoma, filed his written notice of protest to said question and petition, and with the said Secretary of State, which is filed in this cause, and which is embodied herein the same as if entirely rewritten.

"3. That on the 20th day of November, 1931, the said R. A. Sneed, Secretary of State, after an alleged hearing, made a finding and rule that 'said petition is in due form of law and sufficient in all things.'

"4. That, on the 23rd day of November, 1931, the protestant herein perfected an appeal to the Supreme Court of Oklahoma, by filing with the Secretary of State a written notice thereof, which said appeal was duly filed in this court.

"5. That on the 28th day of November, 1931, the petitioner, Baxter Taylor, filed a motion to dismiss said appeal, alleging that the same was insufficient in law, and on said day and date, the court took the same under advisement, and thereafter the court made its finding and ruling on said motion, overruling said motion and holding the said protest to be sufficient in law, and set December 9, 1931, as a proper time and date for the court to hear evidence on the protest challenging the validity of said petition. That ever since said appeal was filed in this court, the said cause has been pending therein, and is now pending in said court

awaiting the hearing as above ordered and the final determination of the cause.

"6. The protestant further says that after the filing of said appeal, and after the transmission of all the documents and papers relating to said cause by the Secretary of State to this court, the said Secretary of State had no other or further duties to perform in connection therewith until the final determination of said cause by this court, and any act or deed performed by the said Secretary of State during the pendency of said cause undetermined in this court would be and is unlawful and void. That notwithstanding, the said Secretary of State, on the 25th day of November, 1931, transmitted to the Hon. Wm. H. Murray, Governor of Oklahoma, and to Hon. J. Wm. Cordell, Secretary of the State Election Board, each an attested copy of the pending proposition, including therewith the alleged approved ballot title, all of which acts were illegal, void, unauthorized by law, and of no legal effect.

"7. The protestant further says that, on the 5th day of December, 1931, the said Hon. Wm. H. Murray, as Governor of the state of Oklahoma, issued over his signature and the seal of the state of Oklahoma, his public proclamation, setting out the acts and things above mentioned herein, and proclaiming that the ballot title of said measure was as stated therein, and further proclaiming the substance of said proposed measure, and further proclaiming that said proposed measure 'shall be submitted to the qualified electors of the state of Oklahoma for their approval or rejection at an election to be held on the 18th day of December, 1931,' and authorizing and directing the regular election officials whose duty it is to hold and conduct such elections, to hold said election on said State Question No. 167, Initiative Petition No. 112, on said date, to wit: December 18, 1931. That said proclamation was issued at a time when this cause was pending and determined in this court, all of which act and proclamation was without authority of law, and void, and of no legal effect.

"8. The protestant further says that the Legislature of Oklahoma, at its 1931 Session, at pages 296 and 297 of said Session Laws, made an appropriation to and in favor of the State Election Board, in the sum of $110,000, to be used by it in defraying the expenses of any special election which the Governor might call during the biennium thereof. That said sum of money is now in the treasury of the state of Oklahoma, has not been used for any election or other expense, and is subject to the orders of the State Election Board, when legally made.

"9. That the Election Board of the state of Oklahoma consists of Hon. J. Wm. Cordell, Secretary, of Oklahoma City, Okla., Hon. John W. Hayson, of Oklahoma City, and Hon. Reford Bond, of Chickasha, Grady county, Okla., and that since the action of the Secretary of State in illegally certifying said measure, together with its ballot title, to the Governor, and since the unlawful issuance of the proclamation of the Governor, calling said election, the said Election Board has threatened and is threatening, and will, unless enjoined, restrained, or otherwise prohibited by this court, use said sum or a portion thereof for the purpose of holding said election, the printing of the ballots in connection therewith, including the printing of this measure thereon, and also in transmitting ballots to the various voting precincts of the state, paying the officers of said election, canvassing the returns thereof, and all other incidental and necessary expenses in connection with holding said election.

"That said acts and things so threatened, if carried into effect, would be illegal, without authority of law, and a violation of the rights of this protestant and all other citizens of the state similarly situated.

"That said Election Board has already advertized for bids of the printing of approximately 1,250,000 ballots, and will proceed to receive and accept bids on said printing, and incur other expenses in connection with said election unless prohibited by the process of this court.

"10. That Hon. Frank C. Carter is the duly elected, qualified, and acting Auditor of the state of Oklahoma, and that his duties consist in issuing warrants for the payment of legal claims against the state of Oklahoma, and that the said Hon. Frank C. Carter has threatened to and will, unless enjoined, restrained, or otherwise prohibited by this court, issue warrants drawn by said Election Board against appropriations of the state of Oklahoma now in its treasury, to pay said illegal claims as above set out.

"11. The protestant further says that, under the law of Oklahoma, it is made mandatory that the registrars of the several precincts in said state shall, not less than twenty (20) days before the election throughout the state, open the registration books for the purpose of registering the voters becoming qualified since the last preceding registration, and that said registrars shall close said books not less than ten (10) days prior to the said election, the purpose of which was to afford said newly qualified voters the opportunity to register and exercise the right of suffrage as citizens of the state.

"That if said election is held under the proclamation above stated, it will be impossible for said registrars to comply with the law, and impossible for newly qualified voters to register and exercise the right of suffrage as citizens of the state, and will be deprived of said right.

"12. The protestant further says that he and all other citizens similarly situated have no adequate remedy at law for the

protection of the rights above claimed and stated, and he further says that having assumed jurisdiction of this case, that this court has plenary power and authority to make and issue orders to all parties who have any duties to perform or proceeding to to take in connection with carrying out the commands and directions in said proclamation, and the protestant therefore files this, his application, for the protection of his rights as a citizen, and the rights of all other citizens similarly situated, and for the protection and upholding of the proper and lawful jurisdiction of this court.

"13. The protestant says that he is entitled to an order issued out of and from this court directed to the said Election Board and to the said Frank C. Carter as Auditor, for a protection of his rights as a citizen of said state.

"Wherefore, the premises considered, the protestant prays:

"First: That the State Election Board, J. Wm. Cordell, John W. Hayson, and Reford Bond, and the Hon. Frank C. Carter, State Auditor, be made parties defendant to this application, by proper order of this court.

"Second: That the court, by its proper orders and processes, enjoin, restrain, or otherwise prohibit the State Election Board, J. Wm. Cordell, John W. Hayson, and Reford Bond, from incurring any expense in connection with the printing of any ballots to be used in said election, or incurring any obligation for any expense or payment concerning the printing of this measure on said ballots or doing any other act or thing which would expend or cause to be expended any sum from any appropriation now available for election purposes in the state of Oklahoma, in connection therewith.

"Third: That the court, by its proper orders and processes, enjoin, restrain, or otherwise prohibit the said Frank C. Carter as Auditor of the state of Oklahoma, from issuing any warrant for the payment of any sum or sums incurred by said Election Board in connection with the printing of any ballots for said election, or the printing of this measure on any ballots to be used in said election, or the incurring of any other expense in connection with said election.

"S. P. Freeling, Protestant.
"By Owen & Looney,
"J. R. Keaton,
"Freeling & Box, His Attorneys.

"State of Oklahoma, Oklahoma County, ss:

"S. P. Freeling, of lawful age, being first duly sworn, on oath says: That he is the protestant in the above-entitled cause; that he has read and is familiar with the statements and allegations in the above and foregoing application, and that said statements and allegations are true and correct, as he verily believes.

"S. P. Freeling,

"Subscribed and sworn to before me this 7 day of December, 1931.
"(Seal)         Hallie Whitaker, Notary Public.
"My commission expires Mar. 2, 1933."

On the 25th of November, 1931, the Secretary of State, under his hand and seal, made a certification to the Honorable Wm. H. Murray, Governor of the State of Oklahoma, as follows:

"In the Matter of State Question No. 167, Initiative Petition No. 112.

"To His Excellency, Honorable Wm. H. Murray,

"Governor of the State of Oklahoma;

"I, R. A. Sneed, the undersigned Secretary of State of the state of Oklahoma, do hereby certify that on the 31st day of October, 1931, there was filed in the office of the Secretary of State of the state of Oklahoma, Initiative Petition No. 112, State Question No. 167.

"I further certify that after said Initiative Petition was filed, I caused due legal notice of the filing thereof to be published as required by law, and that thereafter I found that said petition was in all things sufficient and in compliance with the Constitution and laws of the state of Oklahoma relating to such proceedings.

"I further certify that I found 121,401 legal signers on said petition and that the same constituted more than the percentage of legal voters, voting at the last general election held in the state of Oklahoma required by law for the submission of said state question, and found that the said initiative petition was, therefore, sufficient.

"I further certify that, on the 24th day of November, 1931, I did transmit all the papers and documents on file in my office, relating to such petition, to the Supreme Court of Oklahoma, pursuant to notice of appeal served upon me, as by law provided.

"I further certify that, on the 23rd day of November, 1931, the Attorney General of the state of Oklahoma caused to be filed in my office, the attached ballot title of said Initiative Petition No. 112, State Question No. 167, as the ballot title approved for such state question.

"I further certify that there is also attached a true and correct copy of the said initiative bill.

"In witness whereof, I have hereunto set my hand and caused the great seal to be attached this 25th day of November, 1931.

"R. A. Sneed,
"(Seal)                    Secretary of State."

It is the duty of this court to determine the question of its jurisdiction on its own motion and it will not ignore a want of jurisdiction because the question is not raised or discussed by either party. Jones v.

Toomey, 115 Okla. 169, 241 P. 1105; Howard v. Arkansas, 59 Okla. 206, 158 P. 437. An examination of the protest shows that the same was verified on belief. It sets forth 20 separate paragraphs of protest. There are no definite allegations of any facts in any of said paragraphs or causes of action therein set forth. Said protest consists of generalities and conclusions. Section 262, C. O. S. 1921, provides:

"The pleadings are the written statements, by the parties, of the facts constituting their respective claims and defenses."

Section 265, C. O. S. 1921, provides, in part, that a petition must contain:

"Second. A statement of the facts constituting the cause of action, in ordinary and concise language, and without repetition."

Section 527 provides:

"A trial is a judicial examination of the issues, whether of law or fact, in an action."

Section 528 provides as follows:

"Issues arise on the pleadings, where a fact or conclusion of law is maintained by one party, and controverted by the other. There are two kinds: First, of law. Second, of fact."

Section 529 provides:

"An issue of law arises upon a demurrer to the petition, answer or reply, or to some part thereof."

Section 530 provides:

"An issue of fact arises: First, upon a material allegation in the petition, controverted by the answer; or, second upon new matter in the answer, controverted by the reply; or, third, upon new matter in the reply, which shall be considered as controverted by the defendant without further pleading."

49 Corpus Juris, page 137, in paragraph 141, announced the following rule:

"It is, however, necessary that the allegations should be sufficient to show to the court that a good cause of action actually exists, and if such allegations go no further than to show that such a cause of action might exist, the pleading is insufficient."

In 21 R. C. L. page 440, in paragraph 5, it is said:

"It is a well-settled rule that legal conclusions are not to be pleaded, for it is the duty of the courts to declare the conclusions and of the parties to state the premises."

And again, 21 R. C. L. on page 448, in paragraph 11, it is said:

"As a corollary of the rule that facts, not conclusions, must be averred, it is also a rule that facts must be pleaded directly and positively and not by way of recital."

The only paragraph of said protest which approaches the dignity of a fact is paragraph 2, being as follows:

"Said petition was not signed by a sufficient number of qualified voters of the state of Oklahoma, or by 8 per cent. of the total number of votes cast for Governor at the last election, and was not signed by 8 per centum of the legal voters of said state."

It is on the strength of this paragraph of the protest that protestant contends he has stated facts sufficient to protest the initiative petition in question. How is it possible for petitioners to meet an issue of this kind and character in the absence of any allegation of fact contained therein? No particular portion of the state, nor the name of any county, nor any particular precinct of any city or county of the state is designated, nor is there any allegation as to the number of illegal and improper signatures. The protest consists of conjecture and conclusions and does not present any issue of fact which the petitioners could be called upon to meet.

In the case of Ramer v. Wright, 159 Pac. 1145, the Supreme Court of Colorado passed upon the sufficiency of an initiative and referendum petition under protest, and in the first paragraph of the syllabus of said case said:

"Under Laws 1913, p. 311, sec. 3, providing that all initiative and referendum petitions shall be deemed sufficient unless a protest in writing under oath shall be filed, a written protest to a petition to refer, the verifying certificate of the officer reading, 'Subscribed to before me this 10th day of July, 1915,' etc., was insufficient, as not showing that the signers swore to the instrument before the officer."

In the body of the opinion, the court said:

"The petition therefore is required to be under oath, and it is but just that such a petition should be met with a protest likewise under oath, as the statute requires. The Legislature has treated both the petition and the protest as very serious matters, and has required that both shall be under oath. If the oath in the one case may be omitted, then it may also be omitted in the other, and there would remain no protection to the public from fraudulent referendum petitions. The statute provides a severe penalty in both cases.

"The constitutional amendment authorized the Legislature to adopt a special procedure in such case, and the Legislature has enacted a statute in apparent harmony with the constitutional provision. This statute

declares that all petitions properly verified shall be deemed and held sufficient if they appear to be signed by the requisite number of signers, and that such signers shall be deemed and held to be qualified electors unless otherwise determined under the specific procedure provided.

"The procedure requires also that a protest shall be filed with the Secretary of State within 15 days from the date of the filing of the referendum petition. It is further declared that such protest shall set forth specifically the grounds of such protest and the names protested. The further specific requirement is that such protest must be under oath. These requirements are clearly jurisdictional, and the Secretary of State is without power to act in the absence of a substantial compliance with these requirements of the statute. We have held in this case that the protest under consideration was vitally defective in one respect at least, in that it was not under oath. Therefore the proceedings of the Secretary of State upon and under such insufficient protest were without authority of law, and are without force or effect."

The statutes of Colorado are different from the provisions of our statute, in reference to the verification of the protest. It is not necessary under our statute that the protest should be under oath, but, in my opinion, it should contain definite facts setting forth specific grounds of protest.

A written protest partakes of the nature of a pleading. Pleadings are for the purpose of presenting the issues to the court, and are defined by section 262, C. O. S. 1921, supra, as follows:

"The pleadings are the written statements, by the parties, of the facts constituting their respective claims and defenses."

Pleadings should be framed as our statutes provide so that they contain a statement of the facts constituting a cause of action in ordinary and concise language. The protest in question has been attempted to be verified, not upon information and belief, but upon belief. In other words, the protestant believes the conclusions stated in paragraph second to be true. Litigants on appeal to this court ought not to be permitted to astutely refrain from stating facts upon which issues may be joined. The signers of the initiative petition in question were confronted with a solemn warning placed at the head of the petition in bold type, that it is a felony for any one to sign an initiative or referendum petition with any name other than his own, or knowingly to sign his name more than once for the measure, or to sign such petition when he is not a legal voter, and before his signature the following language appears:

"I have personally signed this petition; I am a legal voter of the state of Oklahoma, and of the county of ____; my residence and post office address are correctly written after my name."

Loose forms of pleading, such as the protest in the case at bar, if sanctioned and approved, would tend to encourage the purpose of those who seek to defeat bona fide legislative enactment. If any citizen desires to protest an initiative petition, there should be no valid reason why he should not be required to set forth in explicit terms the facts upon which he bases his grounds of protest under a solemn verification that the facts therein stated are true. Courts should not tolerate nor permit evasive pleadings in proceedings of this character, which may be designed and used for the purpose of interfering with legislative enactment.

Section 1 of article 5 of the Constitution provides in reference to the initiative or referendum under the legislative department as follows:

"The legislative authority of the state shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature."

Section 3 of article 5 of the Constitution provides, in part, as follows:

"* * * Petitions and orders for the initiative and for the referendum shall be filed with the Secretary of State and addressed to the Governor of the state, who shall submit the same to the people. The Legislature shall make suitable provisions for carrying into effect the provisions of this article."

From these sections it appears that the Legislature shall make suitable provisions for carrying into effect the provisions of this article.

The procedure provided for by the Legislature is found in section 6631, C. O. S. 1921. This section provides that:

"Any citizen of the state may, within ten days, by written notice to the Secretary of State and to the party, or parties, who filed such petition, protest against the same, at which time he will hear testimony and arguments for and against the sufficiency of such petition. * * * After such hearing, the Secretary of State shall decide whether such petition be in form as required by the statutes, and his decision shall be subject to appeal to the Supreme Court of the state. * * *"

From this section of the statute, it appears that there is no provision for a trial "de novo" in this court. There is no other section of the statutes which relates to an appeal from the decision of the Secretary of State to this court. From a close reading of this section it is to be observed that this section provides for a hearing. Such hearing is not and cannot be considered as a judicial examination of issues, as in the case of a trial in a court of record. The office of the Secretary of State is not a judicial tribunal performing judicial functions. The Secretary of State has no authority to issue subpoenas, to enforce the attendance of witnesses, nor to compel the production of books, papers, and documents. He has been designated by the Legislature in initiative and referendum matters for the determination of the sufficiency of initiative and referendum petitions filed in his office addressed to the Governor of this state. He is called upon to do this official or administrative duty in making an investigation of the sufficiency of the petitions presented to him, and he must act accordingly on his best judgment from the best sources obtainable. The appeal referred to in said section 6631 does not provide for any stay of proceedings, abeyance, or suspension of the powers or duties of the Secretary of State relative to an initiative petition pending the appeal therefrom to the Supreme Court.

The protestant was given the opportunity to offer proof concerning the sufficiency of the petitions. The Secretary in his decision states, in part, as follows:

"That thereafter, on the said 19th day of November, 1931, this matter came on again for hearing, with appearances as above set out, the Secretary of State declared the nature of the testimony which he would consider as valid objections to the said petition, and protestant was requested to state whether or not he could establish the invalidity of sufficient signatures on said petition to make the legal signatures on said petition less than the number required by law for submission of said petition; that unless the protestant can show enough forgeries, duplications, or entire lack of addresses, or other fatal incorrectness of the petition at this hearing, the Secretary of State need continue this hearing no further. If protestant can do this, the Secretary is prepared to enable him to do so. Thereupon the protestant, S. P. Freeling, made the following statement:

" 'In view of the holding just announced and in view of the further fact that the protestant has a right by trial de novo in the Supreme Court to establish any right he might have, he agrees that it is useless to proceed further before this tribunal,'

"10. Thereupon, the Secretary of State declared that he had caused to be tabulated, in the manner provided by law, the signatures to the said Initiative Petition No. 112, and that he found that said petition contained a total of 121,401 signatures, and that, under the laws and Constitution of the state, it is his duty to decide whether such petition be in form as required by law."

Protestant does not show or even intimate that the Secretary did not afford him such fair and impartial hearing as is contemplated by the statute, but relies solely and primarily upon the theory that he had the right to come into this court and try his protest de novo. It is my opinion that it was never within the contemplation of the framers of our Constitution, nor does it come within the purview of the aforesaid section 6631, supra, that a protestant should come into this court on appeal from the Secretary of State on an initiative petition as in an original action for the purpose of a trial, without first offering some evidence before the Secretary reasonably tending to support his contentions of protest. It was never intended that there should be an original trial in this court. The statute specifically provides:

"After such hearing the Secretary of State shall decide whether such petition be in form as required by the statutes, and his decision shall be subject to appeal to the Supreme Court of the state, and such court shall give such cause precedence over all others, provided such appeal must be taken within ten days after the decision of the Secretary of State has been made. If the court be at the time adjourned, the Chief Justice shall immediately convene the same for such hearing."

Section 527, C. O. S. 1921, provides:

"A trial is a judicial examination of the issues, whether of law or fact, in an action."

A hearing is different. The Secretary was empowered to pass judgment on the sufficiency of the petition from the best source obtainable. If in this he acts arbitrarily and refuses to perform his official duty, redress may be had. In the instant case, the Honorable R. A. Sneed, as Secretary, requested of protestant to make a showing relative to the fatal incorrectness of the petition. This the protestant refused to do.

Section 6635, C. O. S. 1921, is as follows:

"Whenever a petition is accepted and its title has been decided upon, the Secretary of State shall, in writing, notify the Governor, who forthwith shall issue a proclamation setting forth the substance of the

measure and the date of the referendum vote."

There is nothing in the statute nor in the Constitution relative to the initiative and referendum provisions which prohibits the Secretary of State from accepting the petition after its title has been decided upon, notwithstanding an appeal to this court. After the petition has been accepted and its title has been decided upon, it is the duty of the Secretary of State to so notify the Governor. There is no provision in the Constitution, nor in the statutes, authorizing any stay in the proceedings on the part of the Secretary of State or the Governor pending an appeal to this court on behalf of a protestant. Such provisions relative to appeals are legislative and not judicial.

"Appeals have no existence at common law, and any right of appeal must be based on some provision of Constitution or statute." Pacific Gas Radiator Co. v. Superior Court (Cal.) 232 Pac. 995.

Under the procedure for appeals from the justice of peace, provision has been made that an appeal may be perfected by the filing of an appeal bond, and the cause is thereafter tried de novo in the appellate court. If such appeal bond has been approved, no proceedings may be had in the inferior tribunal pending such appeal. However, if the appeal is by bill of exceptions and petition in error, as provided for by sections 999, 1000, and 1001, C. O. S. 1921, the judgment is not stayed.

In reference to appeals from the district, superior, or county courts to the Supreme Court, appeals will lie without entering into a supersedeas bond and an appeal from an order vacating a judgment and granting a new trial does not stay further proceedings in the trial court unless a supersedeas bond is granted or allowed. Pennsylvania Co. v. Potter, 108 Okla. 49, 233 P. 700. The only purpose or effect of such supersedeas bond is to stop execution or to stay other proceedings to enforce the judgment. Hutchings v. Windsor, 92 Okla. 37, 207 P. 1044. Starr v. McClain, 50 Okla. 738, 150 P. 666. The procedure for appeals in all cases is by constitutional or statutory provisions, and no litigant as a matter of right is entitled to an appeal except as provided for therein.

In the absence of any constitutional or statutory provision for a stay of proceedings, the Secretary of State was not only authorized, but, in fact, it was his official duty to notify the Governor as was done in the instant case. Had protestants desired to prevent such notification, we need not determine whether they were without

remedy in a court of equity. In reference to procedure on appeals in initiative and referendum matters, it is not the province of this court to legislate on this question.

In the case of State ex rel. Carson, Dist. Atty, v. Hoss, 292 P. 324, the Supreme Court of Oregon held that:

"Circulation of valid referendum petition held proper, notwithstanding pending appeal from ballot title prepared by Attorney General."

This cause was brought by the state of Oregon, on the relation of the district attorney of Marion county, against Hal E. Hoss, as Secretary of State, praying for a decree enjoining the Secretary of State from printing upon the ballot of the next general election to be held in that state any ballot title referring to the people the legislative act designated as chapter 193, General Laws of Oregon 1929, and requiring that officer to cancel the filing of that certain referendum petition filed by William F. Woodward, and holding the attempt to invoke the referendum on that legislative act to be ineffectual and void. From a decree dismissing the complaint, plaintiff appeals to that court. In the body of the opinion, the court says:

"It is contended that the referendum petition was unlawfully circulated among the voters because it was circulated pending the appeal to this court from the ballot title prepared by the Attorney General. It is true that it was circulated prior to the determination of the appeal. However, the petition so circulated was in proper form. It contained proper matter, and the ballot titles prepared by the Attorney General were properly printed thereon. Moreover, no person could have been injured or deceived by the circulation of this petition prior to the decision of this court on the appeal. Oregon Laws, sec. 4100, as amended by chapter 255, General Laws of Oregon 1927, was fully complied with. The law grants no stay in the proceedings pending an appeal to this court from a ballot title prepared by the Attorney General. As stated by the Attorney General at the argument, this view is not without precedent.

"The powers of government flow from the people. And the people of Oregon, after vesting legislative authority in the Legislative Assembly, reserved to themselves the power to propose laws, and to enact or reject them at the polls, and also reserved power at their own option to approve or reject at the polls any act of the Legislative Assembly." Or. Const. art. 4, sec. 1.

"From the facts in this cause, we have not the right to enjoin the Secretary of State from taking the necessary steps, as provided

by law, to submit the 'two additional circuit judges bill, to the people for their approval or rejection on November 4, 1930.'"

I am of the opinion that this case is decisive of the question herein relative to procedure. It is immaterial in the instant case whether the case was pending in this court, on appeal, at the time the Secretary of State made his notification to the Governor. We have no statute in this state that stays proceedings of the Secretary of State pending an appeal to this court for a determination of the sufficiency of an initiative petition.

Section 1, art. 4, under "Distribution of Powers," the Constitution of Oklahoma, provides that:

"The powers of the government of the state of Oklahoma shall be divided into three separate departments: The legislative, executive, and judicial; and except as provided in this Constitution, the legislative, executive, and judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."

Section 1 of article 2, Bill of Rights, provides as follows:

"All political power is inherent in the people; and government is instituted for their protection, security, and benefit, and to promote their general welfare; and they have the right to alter or reform the same whenever the public good may require it; Provided, such change be not repugnant to the Constitution of the United States."

Under this provision, incorporated under the Bill of Rights, it was specifically provided that the government was instituted for the protection, security, and benefit of the people, and to promote their general welfare, and that they had a right to change the form of same whenever the public good required it, provided that such change was not repugnant to the Constitution of the United States.

It was the purpose of the Constitution to permit the people to change the fundamental law in a plain, simple manner, without interference from the executive or judicial branch of the government.

The Supreme Court of Mississippi, in the case of Green v. Weller, 32 Miss. 650, in speaking of the right of the people to change their Constitution in the mode prescribed therein, in forceful language says:

"This objection would have more force if the act of itself operated as an alteration of the Constitution. But it is merely a proposition to be submitted to the action of the people. It is a means provided by which the people may exercise their sovereign right of declaring whether they will change their Constitution or not, thereby establishing the mode in which the government shall be changed, instead of leaving it to unregulated popular impulse. The proposition is presumed to emanate from the people, through their representatives, and is regularly submitted for the action of the whole people. There is nothing in the nature of the submission which should cause the free exercise of it to be obstructed, or that could render it dangerous to the stability of the government; because the measure derives all its vital force from the action of the people at the ballot box, and there can never be danger in submitting, in an established form, to a free people, the proposition whether they will change their fundamental law. The means provided for the exercise of their sovereign right of changing their Constitution should receive such a construction as not to trammel the exercise of the right. Difficulties and embarrassments in its exercise are in derogation of the right of free government, which is inherent in the people; and the best security against tumult and revolution is the free and unobstructed privilege to the people of the state to change their Constitution in the mode prescribed by the instrument."

Under section 4, art. 2 of the state Bill of Rights, there is the following provision:

"No power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage by those entitled to such right."

This section of the Bill of Rights is no metaphor. The words therein are explicit, positive, and permit no caviling as to their true intent and purpose.

In the case of Gottstein v. Lister, Governor, 153 Pac. 595, the Supreme Court of Washington said:

"There are those who seem to regard the courts as the sole guardian of the Constitution, and that nothing wrongfully or mistakenly done or left undone by those charged with constitutional duties can escape the correcting power of the courts. That this is fallacious needs little reflection to demonstrate. Of course, when it comes to considering individual rights, such as are protected by the guaranties, that the right to trial by jury shall remain inviolate, that no person shall be deprived of life, liberty, or property without due process of law, that no law shall grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens, and many other constitutional guaranties that look to protection of personal rights, the courts have ample power, and will go to any length, within the limits of judicial procedure, to protect such constitutional guaranties. * * *

"Those vested with legislative and executive powers of the state have duties and

obligations resting upon them by the mandates of the Constitution for the performance of which they are answerable alone to their own consciences and to the people; just as the courts have duties and obligations resting upon them by the mandates of the Constitution for the performance of which the judges are answerable alone to their own consciences and to the people. It will not do to say that, because there may be no correcting remedy for neglect of legislative or executive duties, the courts by that fact alone acquire some correcting power over legislative and executive acts. Our Constitution is not framed upon the assumption that official integrity resides alone in the courts. Some things, though mandatory, are intrusted for their performance to the legislative and executive branches of the state government, branches coequal, within their spheres, with the courts."

In the case of Worman v. Hagan, 78 Md. 152, 165, 27 Atl. 616, cited by the Washington court in 153 Pac. 595, states as follows:

"It may be asked what is to be done in case the Governor should violate his duty, and wrongfully proclaim an amendment as adopted which in point of fact had been rejected. It would not be becoming in this court to suppose that such a contingency would ever happen. The courtesy due to the executive department forbids us to entertain such a conjecture. But if, unhappily, in future times, it ever should occur, assuredly a sufficient remedy will be found. The resources of a free government are ample, and will always be found adequate to punish and redress offenses against its sovereignty."

Since the appeal was lodged in this court, an application was filed in this case in which the protestant asked that the State Auditor and the State Election Board be made parties defendant, and that said Election Board be restrained and enjoined from incurring any expense in printing ballots or in doing any other act which would cause the expenditure of funds, and that the State Auditor be restrained and enjoined from issuing warrants to pay the expenses of the election. This court, by a constitutional majority, made said parties defendants. Since doing so, however, this court reconsidered its order and denied said application in so far as it applied to the State Election Board. The protest filed with the Secretary of State deals with the sufficiency of the petition. The application for injunction deals with an entirely separate and distinct question. It seeks relief against other departments of our government whose duties are entirely separate and apart from the office of the Secretary of State. Wrongful expenditure of public funds should be most strongly condemned, and should be prevented whenever and wherever possible. In this case, however, to make the State Auditor a party defendant and to enjoin him as prayed for in said application would interfere with the free and orderly holding of the election called for December 18, 1931. This court is enjoined by law not to interfere with elections directly or indirectly.

The Supreme Court of Kansas, in the case of Duggan v. City of Emporia, 114 Pac. 235, which was an action to enjoin the calling and holding of an election under the initiative and referendum as applied to cities of the second class on the ground of alleged irregularity in the petition and because the proposed ordinance to be submitted to the electors purported to authorize the city to perform an act which it was claimed was ultra vires, said in paragraphs 1 and 2 of the syllabus as follows:

"1. It is a principle of general application that courts will not enjoin the calling and holding of an election.

"2. Injunction, being an extraordinary remedy, will not be granted unless it be made to appear to the satisfaction of a court of equity that some substantial and positive injury will occur; acts which, though irregular and unauthorized, can have no injurious result, constitute no ground for the relief."

In the body of the opinion, the court said:

"In Walton v. Develing, 61 Ill. 201, it was held, that the court had no power to enjoin the holding of a township election to determine whether a majority of the voters were in favor of subscribing to the stock of a railroad company, and that the defendants who had violated the order were not liable for contempt of court for disobedience to the writ. In the opinion it is said: 'But the attempt to check free expression of opinion, to forbid the peaceable assemblage of the people, to obstruct the freedom of elections, if successful, would result in the overthrow of all liberty regulated by law. The mere effort to assume such power is dangerous to the rights of the citizens. If the court can dictate to the officers of the people that they shall not hold an election from fear of some imaginary wrong, then people and officers are entirely subservient to the courts, and the consequences are too fearful to contemplate. The principle which would authorize the mighty mandate of a court of chancery, in this case, would justify it in every election to be held by the people, and thus the whole administration of the government might be obstructed, and all power and authority placed at the footstool of the judge.'

"In the language of the Supreme Court of Pennsylvania: 'The power ought to be plain, indeed, to authorize courts to forbid municipal elections when ordered by the Legislature. It is not plain, nor do we think

it exists.' Smith v. McCarthy, 56 Pa. 359, * * *

"On the other hand, in State ex rel. Cramer v. Thorson, 9 S. D. 149, 68 N. W. 202, 33 L. R. A. 582, which was an action brought to enjoin the Secretary of State from certifying a joint resolution proposing an amendment to the Constitution, the relator alleged that he would be injured as a taxpayer by the unnecessary expense; but it was said in the opinion that 'any additional burden which might result to relator, as a taxpayer, by reason of submitting this question at a general election, is too trifling, fanciful, and speculative for serious consideration.' * * *

"One of the grounds urged for the injunction is that the ordinances are unconstitutional because of some defect in their title; but this gives a court of equity no jurisdiction to enjoin the passage of an ordinance. No one would claim that the Legislature could be enjoined from the enactment of an unconstitutional law, or that the electors could be enjoined from attempting in an unwarranted manner to amend the Constitution. It is a familiar principle that injunction will not lie to prevent legislative actions by a municipal corporation. New Orleans Waterworks v. New Orleans, 164 U. S. 471, 17 Sup. Ct. 161, 41 L. Ed. 518; Cape May & Schellenger's Landing R. R. Co. v. City of Cape May, 35 N. J. Eq. 419; State ex rel. Rose v. Superior Court of Milwaukee County, 105 Wis. 651, 81 N. W. 1046, 48 L. R. A. 819. * * *

"The futility of the proceedings to enjoin the submission of the proposed ordinances is likewise obvious when we reflect that the people may not adopt them, and the court ought not be called upon to anticipate conditions which may never arise."

In the case of City Council of City of McAlester v. Milwee, 31 Okla. 620, 122 P. 173, this court, in the first paragraph of the syllabus, stated:

"A court of equity has no jurisdiction to restrain the holding of an election, since the right involved is a political one."

In the body of the opinion, the court said:

"Many applications have been made to this court to interfere with the holding of elections of one kind or another by the exercise of some of the high prerogative writs over which original jurisdiction has been vested in this court by the Constitution, all of which have been consistently refused. As the question is jurisdictional, we cannot overlook the uniform practice merely because counsel do not wish to make that point. Courts of equity are only conversant with matters of property and the maintenance of civil rights and will not interfere to enforce or protect purely political rights."

In this case no order was made on said State Auditor to show cause why he should not be made a party defendant, but this court determined in advance, without any hearing or evidence adduced by either side, that said State Auditor was a necessary party defendant. It was stated in open court by counsel for protestant that this court had no right to enjoin an election, but that, if this court did make said State Auditor and the election board parties defendant and granted the injunction prayed for, it would stop the election. This would be doing indirectly what this court cannot do directly. The Constitution has spoken otherwise. In the case of Thompson v. Haskell, 24 Okla. 70, 102 P. 700, cited in Consolidated School District No. 97 v. Sloan, 135 Okla. 29, 273 P. 271, this court said:

"When a party seeks the intervention of a court of equity to stay the administration and execution of the law by the executive department of state, he must bring himself clearly within the rule, and show an irreparable injury, or otherwise a clear right thereto, before equity will lend its strong arm to stay the administration or work of the co-ordinate branch of government."

The protestant in the absence of any definite statement of fact in his protest, which is the basis of his application to make the State Auditor a party defendant and for an injunction against said auditor, has failed to bring himself within the foregoing rule.

The provisions of the Constitution of this state requiring the Legislature to provide the procedure by which the initiative or referendum might be called into force and effect are mandatory. The Legislature has not seen fit, up to this time, to limit or restrict this procedure with cumbersome details. The procedure, however, is directed toward a speedy disposition of such matters. The granting of an injunction in this case upon the application filed herein, in my opinion, would have the effect of embarrassing election officials and indirectly interfering with the election which has been called for December 18, 1931. We cannot anticipate the result of the election, but if the measures are carried, and if the same are illegal and void, and an attempt is made to enforce the same, then the courts are still open for the purpose of testing their validity, as guaranteed by section 6 of the Bill of Rights:

"The courts of justice of the state shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice."

KORNEGAY, J. (concurring). The terms of the Constitution and the acts of the Legislature are the safeguards we have for the determination of the matters that are before us. The executive officers involved are the Governor of the state, whose powers are defined by the Constitution, and the Secretary of State, the State Auditor, and the State Election Board. Incidentally our own jurisdiction is involved. Our jurisdiction is defined in the Constitution. Section 1, art. 7, is as follows:

"Sec. 1. The judicial power of this state shall be vested in the Senate, sitting as a court of impeachment, a Supreme Court, district courts, county courts, courts of justices of the peace, municipal courts, and such other courts, commissions or boards, inferior to the Supreme Court, as may be established by law."

Section 2 of article 7 is as follows:

"Sec. 2. The appellate jurisdiction of the Supreme Court shall be co-extensive with the state, and shall extend to all civil cases at law and in equity, and to all criminal cases until a Criminal Court of Appeals with exclusive appellate jurisdiction in criminal cases shall be established by law. The original jurisdiction of the Supreme Court shall extend to a general superintending control over all inferior courts and all commissions and boards created by law. The Supreme Court shall have power to issue writs of habeas corpus, mandamus, quo warranto, certiorari, prohibition, and such other remedial writs, as may be provided by law, and to hear and determine the same; and the Supreme Court may exercise such other and further jurisdiction as may be conferred upon it by law. Each of the Justices shall have power to issue writs of habeas corpus to any part of the state upon petition by or on behalf of any person held in actual custody, and make such writs returnable before himself, or before the Supreme Court, or before any district court, or judge thereof, in the state."

Our jurisdiction in this case does not arise directly from the constitutional grant, but whatever jurisdiction we have comes from the legislative enactment, acting under the grant above—"and the Supreme Court may exercise such other and further jurisdiction as may be conferred upon it by law."

The division of governmental power in our Constitution is not left to inference, as in some Constitutions, like the federal, but is specific. Article 4, found on page 127, C. O. S. 1921, reads as follows:

"Sec. 1. The powers of the government of the state of Oklahoma shall be divided into three separate departments: The legislative, executive, and judicial; and except as provided in this Constitution, the legislative, executive, and judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the other."

Article 5 defines the legislative power, and the sections here applicable are as follows:

"Sec. 1. The legislative authority of the state shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature.

"Sec. 2. The first power reserved by the people is the initiative, and eight per centum of the legal voters shall have the right to propose any legislative measure, and fifteen per centum of the legal voters shall have the right to propose amendments to the Constitution by petition, and every such petition shall include the full text of the measure so proposed. The second power is the referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health, or safety), either by petition signed by five per centum of the legal voters or by the Legislature as other bills are enacted. The ratio and per centum of legal voters hereinbefore stated shall be based upon the total number of votes cast at the last general election for the state office receiving the highest number of votes at such election.

"Sec. 3. Referendum petitions shall be filed with the Secretary of State not more than ninety days after the final adjournment of the session of the Legislature which passed the bill on which the referendum is demanded. The veto power of the Governor shall not extend to measures voted on by the people. All elections on measures referred to the people of the state shall be had at the next election held throughout the state, except when the Legislature or the Governor shall order a special election for the express purpose of making such reference. Any measure referred to the people by the initiative shall take effect and be in force when it shall have been approved by a majority of the votes cast in such election. Any measure referred to the people by the referendum shall take effect and be in force when it shall have been approved by the majority of the votes cast thereon and not otherwise.

"The style of all bills shall be: 'Be it Enacted By The People of the State of Oklahoma.'

"Petitions and orders for the initiative and for the referendum shall be filed with the Secretary of State and addressed to the Governor of the state, who shall submit the same to the people. The Legislature shall make suitable provisions for carrying into effect the provisions of this article.

"Sec. 4. The referendum may be demanded by the people against one or more items, sections, or parts of any act of the Legislature in the same manner in which such power may be exercised against a complete act. The filing of a referendum petition against one or more items, sections, or parts of an act shall not delay the remainder of such act from becoming operative.

"Sec. 5. The powers of the initiative and referendum reserved to the people by this Constitution for the state at large, are hereby further reserved to the legal voters of every county and district therein, as to all local legislation or action, in the administration of county and district government in and for their respective counties and districts. The manner of exercising said powers shall be prescribed by general laws, except that boards of county commissioners may provide for the time of exercising the initiative and referendum powers as to local legislation in their respective counties and districts.

"The requisite number of petitioners for the invocation of the initiative and referendum in counties and districts shall bear twice, or double, the ratio to the whole number of legal voters in such county or district, as herein provided therefor in the state at large.

"Sec. 6. Any measure rejected by the people, through the powers of the initiative and referendum, cannot be again proposed by the initiative within three years thereafter by less than twenty-five per centum of the legal voters.

"Sec. 7. The reservation of the powers of the initiative and referendum in this article shall not deprive the Legislature of the right to repeal any law, propose or pass any measure, which may be consistent with the Constitution of the state and the Constitution of the United States.

"Sec. 8. Laws shall be provided to prevent corruption in making, procuring, and submitting initiative and referendum petitions."

It will be observed that section 3 vests in the Governor no specific powers connected with the matter of initiated matters that are state-wide, while as to local matters, covered in section 5, the Constitution does not go into details as in case of state-wide matters, but leaves it to the Legislature to make general laws.

The veto power allowed the Governor in matters passed by the Legislature is forbidden in matters "voted on by the people," but the power to order a special election is conferred upon the Legislature and also on the Governor by section 3. That section also provides that "petitions" and "orders" shall be filed with the Secretary of State, and shall be addressed to "the Governor of the state, who shall submit the same to the people." Ordinarily a constitutional requirement of this kind is considered mandatory, and the judgment of the officer named is the standard as to when the necessity for action, as well as the propriety of action, arises.

The Legislature was required to make suitable provisions to carry into effect the provisions of the entire article. However, under ordinary rules, a provision already made could not be changed by Legislative enactment, it being confined to acting when provisions were not already made. Section 5 clearly left it to the Legislature to provide the entire machinery for ascertaining the will of the voters in local matters. Article 4 made an exception in the distribution of power by reference to other parts of the Constitution. Most clearly, under art. 5, sec. 3, when the Constitution conferred upon the Governor the power to be the one to whom the referendum petitions were addressed, though filed in the office of the Secretary of State, the usual rule would follow of that power, passing upon the sufficiency, but when the other provision, imposing on the Governor in mandatory terms the duty to call the election, is studied, it would seem to be that this court should not interfere with the Governor, and while there has accumulated, by the lack of attention to the distinctions made by the Constitution itself, a line of cases that indicate, in a limited degree, that there can be interference by this court, they do not seem to be very well considered in the light of the provisions of the Constitution that are plain. However, any interference by this court must come from a conferring by the Legislature upon it of power to act, as the express provisions of the Constitution are negative. In making an effort to make suitable provisions for carrying into effect the provisions of the article, and pursuant to the provision to pass laws to prevent corruption in making, procuring, and submitting initiative petitions, the Legislature has passed some statutes. It is not thought that the Legislature, under the general rules of constitutional interpretation, in passing those laws, undertook to confer upon an inferior executive officer, namely the Secre-

tary of State, judicial power. His duties are defined by section 17, article 6, of the Constitution, which are as follows:

"Sec. 17. The Secretary of State shall keep a register of the official acts of the Governor, and when necessary, shall attest them, and shall lay copies of the same, together with copies of all papers relative thereto, before either house of the Legislature when required to do so. He shall also perform such other duties as shall be prescribed by law."

The latter part of it, about his performing other duties, such as might be prescribed by law, in view of the fact that he is made a part of the executive branch of the government, is undoubtedly controlled by article 6, and it is beyond the power of the Legislature, therefore, to confer upon the Secretary of State judicial power, and the Legislature, each member of which was under an oath to support the Constitution, is not presumed to have deliberately vested in an executive officer judicial power, when the Constitution forbade, and especially when the Constitution had already, in large measure, placed that power in someone else by name.

Article 6 of the Constitution is the part dealing with the executive department, which seems to have been placed ahead of the judicial, either by the committee on style or by virtue of the importance attached by the Constitution makers to the distribution of power, the judicial power being put the last in order, both by language contained in article 4, on the distribution of power, and also by the location in order. Section 1 of article 6 is as follows:

"Sec. 1. The executive authority of the state shall be vested in a Governor, Lieutenant Governor, Secretary of State, State Auditor, Attorney General, State Treasurer, Superintendent of Public Instruction, State Examiner and Inspector, Chief Mine Inspector, Commissioner of Labor, Commissioner of Charities and Corrections, Commissioner of Insurance, and other officers provided by law and this Constitution, each of whom shall keep his office and public records, books, and papers at the seat of government, and shall perform such duties as may be designated in this Constitution or prescribed by law."

Section 2 of article 6 is as follows:

"Sec. 2. The supreme executive power shall be vested in a chief magistrate, who shall be styled 'The Governor of the State of Oklahoma'."

Section 8 of article 6 is as follows:

"Sec. 8. The Governor shall cause the laws of the state to be faithfully executed, and shall conduct in person or in such manner as may be prescribed by law, all intercourse and business of the state with other states and with the United States, and he shall be a conservator of the peace throughout the state."

Section 11 of article 6 is as follows:

"Sec. 11. Every bill which shall have passed the Senate and House of Representatives, and every resolution requiring the assent of both branches of the Legislature, shall, before it becomes a law, be presented to the Governor; if he approve, he shall sign it; if not, he shall return it with his objections to the house in which it shall have originated, who (which) shall enter the objections at large in the journal and proceed to reconsider it. If, after such reconsideration, two-thirds of the members elected to that house shall agree to pass the bill or joint resolution, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered; and, if approved by two-thirds of the members elected to that house, it shall become a law, notwithstanding the objections of the Governor. In all such cases, the vote in both houses shall be determined by yeas and nays, and the names of the members voting shall be entered on the journal of each house respectively. If any bill or resolution shall not be returned by the Governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Legislature shall, by their adjournment, prevent its return, in which case it shall not become a law without the approval of the Governor. No bill shall become a law after the final adjournment of the Legislature, unless approved by the Governor within fifteen days after such adjournment."

There are various other sections connecting the Governor with duties, but none of them seem to be more specific than the one that we find in the article on the subject of legislation, that has been heretofore referred to.

The first act of the Legislature on the subject of initiative and referendum may have undertaken to confer upon the Secretary of State power prohibited by the Constitution, but not necessarily so, if by construction we can make the act apply and comport with the Constitution. The first enactment on the subject is the statute of 1907-08, found in the Session Laws of 1907-08, page 440. The first section provides a form for a petition for referendum. The second section is the initiative petition. An initiative petition is involved here. The form of the peti-

tion follows the language in the Constitution, by making it an order of the signers to the Governor. It further provides a statement from the voter himself, of having personally signed it, and of being a legal voter of the state, and that his residence and post office address is correctly written after his name. The time for filing, set forth therein, is nine months from the time of the filing of copy in the case of the state, and three months in the case of a county. The question to be submitted is to be set out, and a copy of the measure, followed by 20 lines of signatures. Provision is made for pamphlets, and on the outer page of each pamphlet there was required to be printed the word "WARNING," and underneath that, in ten-point type, the words: "It is a felony for any one to sign an initiative or referendum petition, with any name other than his own, or knowingly to sign his name more than once for the measure, or to sign such petition when he is not a legal voter." It was further provided that when the petition was offered for filing, that the Secretary of State, in the presence of the Governor and in the presence of the persons offering the same for filing, should detach the sheets containing the signatures and affidavits and cause them all to be attached to one or more printed copies of the measure. There was a further provision about the size of the printing, and binding them in two or more volumes, and it was provided that the detached copies of the measure should be delivered to the person offering the same for filing. It is further provided that if the measure should be approved at the ensuing election, by the people, the preserved copies and the sheets of signatures, and affidavits, and a certified copy of the Governor's proclamation declaring the same to have been approved by the people, shall be bound together in such form that they may be conveniently identified and preserved. It was further provided that the Secretary of State "shall cause every such measure approved by the people to be printed with the general laws enacted by the next ensuing session of the Legislature, with the date of the Governor's proclamation declaring the same to have been approved by the people."

It is further provided that every sheet of the petition containing signatures should be verified on the back by the person who circulated the sheet, by an affidavit to the effect that the individuals signed the petition in the presence of the person making the affidavit, and that he believed that he had signed his name and post office address and residence correctly, and that he also

believed that he was a legal voter. It is prescribed that the title and the signature of the officer before whom the oath was made and post-office address should be given. There is a section about the filing and numbering of petitions, and section 6 is as follows:

"Sec. 6. (Sufficiency of Petition—Right of Appeal—Speedy Trial Assured.) Whenever an initiative petition or referendum petition shall be filed with the Secretary of State, he shall at once proceed to examine into its sufficiency. If any one desires to appear for or against it he shall receive testimony and arguments. Whenever such petition applies to a measure upon which the initiative or the referendum is invoked for the state at large, his decision may be appealed from to the Supreme Court of the state, and the case shall have precedence over all others. If the court is adjourned it shall be immediately convened. In all other cases said appeal shall be to the district court of any county in which a petition was circulated, and said district court may hear and determine same, in term time or vacation.

"The appellants shall serve upon the Secretary of State written notice of appeal, and said Secretary of State shall thereupon transmit to the clerk of the court such of the original papers and documents in the case as may be specified by the appellant or appellee. In case the court shall decide the petition is insufficient, it shall state in what respect it is insufficient and return the petition to the committee of petitioners for correction, which corrections may be made and the petition returned to the Secretary of State within five days, and when so corrected and returned, the petition shall be considered filed as of the date that the original petition was presented for filing. No objection to the sufficiency of any petition shall be considered unless the same shall have been made in writing and filed within five days after the filing of the petition."

It will be observed that if the court decided the petition was insufficient, it should point out in what respect it was insufficient, and should return the petition to the committee of petitioners for correction. It is further provided that within five days correction could be made, and the corrected petition should be returned to the Secretary of State, and when so corrected and returned, the petition should be considered filed as of the date when the original petition was presented for filing. It is further provided that no objection to the sufficiency of any petition should be considered unless the same should have been made in writing and filed within five days after the filing

of the petition. There is a further provision, that when the petition was filed, the Secretary of State should forthwith transmit to the Attorney General a copy of it, and the Attorney General in ten days should provide and return to the Secretary of State a ballot title for said measure, and that this ballot title should be printed with the number of the measure on the printed ballot. The Attorney General is required to be impartial in the matter, whether for or against the measure, and it is provided that any person dissatisfied could ask the Supreme Court for a different title by giving his reasons why the title prepared by the Attorney General is insufficient or unfair. It is further provided that five days is the limit for taking this appeal, and service should be made forthwith, and the court should examine the measure, and hear arguments, and in its decision thereon, the court should certify to the Secretary of State a ballot title for the measure in accord with the intent of this section. .

By section 8, the Secretary of State was required, whenever a petition was accepted and its title decided upon, to notify the Governor in writing, and the Governor was required to forthwith issue a proclamation setting forth the substance of the measure and the date of the referendum vote. Publication was required as soon as practicable. When measures come from the Legislature, arguments were provided for, and they are provided to be completed in not less than two weeks after the Governor's announcement of submission of the measure.

In section 17 the provision for procedure in municipalities is provided, and it is provided that the duties required by the Governor and Secretary of State by the act should be performed by the chief executive and chief clerk. Section 20 is as follows:

"Sec. 20. (Who May File Petitions and Vote—Penalties.) Every person who is a qualified elector of the state of Oklahoma may sign a petition for the referendum or for the initiative for any measure for which he is legally entitled to vote upon. Any person signing any name other than his own to any petition, or knowingly signing his name more than once for the measure at one election, or who is not at the time of signing the same a legal voter of this state, or whoever falsely makes or willfully destroys a petition or any part thereof, or who signs or files any certificate or petition, knowing the same or any part thereof to be falsely made, or suppresses any certificate or petition or any part thereof which has been duly filed or who shall violate any provision of this statute, or who shall aid

or abet any other person in doing any of said acts; or any officer or any person, violating any provision of this statute, shall upon conviction thereof be punished by a fine of not exceeding five hundred dollars or by imprisonment in the penitentiary not exceeding two years, or by both such fine and imprisonment in the discretion of the court before which such conviction shall be had."

The last section is section 21, which is as follows:

"Sec. 21. (Sufficiency of Procedure.) The procedure herein prescribed is not mandatory, but if substantially followed will be sufficient. If the end aimed at can be attained and procedure shall be sustained, clerical and mere technical errors shall be disregarded.

"That this act take effect from and after its passage and approval.

"Approved April 16th, 1908."

This measure appears to have been amended later by the statutes of 1910. The amendment is found in chapter 66, page 121, Session Laws of 1910. Its title is as follows:

"An Act carrying into effect provisions relating to the initiative and referendum; prescribing the method of procedure for submitting and voting for proposed amendments to the Constitution and other propositions, and prescribing the method of appeal from petitions filed or from the ballot title; repealing sections 6, 7 and 16 of article one, chapter forty-four, of the Session Laws of Oklahoma, 1907-08."

Sections 6 and 7 of the original law are expressly repealed. In lieu of these sections, section 2 of the act of 1910 was enacted, and worded somewhat differently, and is as follows:

"Section 2. When a citizen or citizens desire to circulate a petition initiating a proposition of any nature, whether to become a statute law or an amendment to the Constitution, or for the purpose of invoking a referendum upon legislative enactments, such citizen or citizens shall, when such petition is prepared, and before the same is circulated or signed by electors, file a true and exact copy of same in the office of the Secretary of State, and within sixty days after the date of such filing the original petition shall be filed in the office of the Secretary of State, and no petition not filed in accordance with this provision shall be considered. When such original petition is filed in said office it shall be the duty of the Secretary of State to forthwith cause to be published in at least one newspaper of general circulation within the state, a notice setting forth the date of such filing. Any citizen of the state may, within ten days, by writ-

ten notice to the Secretary of State and to the party or parties who filed such petition, protest against the same, whereupon the Secretary of State shall fix a day, not sooner than five days thereafter, at which he will hear testimony and arguments for and against the sufficiency of such petition. A protest filed by anyone hereunder may, if abandoned by the party filing same, be revived within five days by any other citizen. After such hearing the Secretary of State shall decide whether such petition be in form as required by the statutes, and his decision shall be subject to appeal to the Supreme Court of the state, and such court shall give such cause precedence over all others. Provided, such appeal must be taken within ten days after the decision of the Secretary of State has been made. If the court be at the time adjourned, the Chief Justice shall immediately convene the same for such hearing. It shall be the duty of the appellants to serve notice upon the Secretary of State, in writing, of such appeal. Whereupon said Secretary of State shall immediately transmit all papers and documents on file in his office relating to such petition to such court. If the court shall adjudge such petition insufficient the parties responsible for same shall have the right to correct or amend their petition to conform to the opinion of the court, provided said amendment or change is made within five days. No objection to the sufficiency of a petition shall be considered unless the same shall have been made and filed as herein provided."

By this section the time for completion of petition was shortened, and changes were made with reference to examination to be made by the Secretary of State. Under the original section 6, the Secretary of State was required at once to proceed to examine into the sufficiency. Under the new section, the Secretary of State was required to forthwith cause a publication, setting forth the date of the filing. It further provides for any citizen of the state protesting the same within ten days, and it requires the secretary to fix a time when he will hear testimony and arguments, for and against the sufficiency of the petition. It further provides for an abandonment by the first protestant and a reviving within five days by anybody else. The decision of the secretary is "whether such petition be in form as required by the statutes." The provision giving this court jurisdiction is, "and his decision shall be subject to appeal to the Supreme Court of the state, and such court shall give such cause precedence over all others." A provision was inserted requiring the appeal to be taken within ten days after the decision of the Secretary of State has been made. The further provision is, if the court be ad-

journed at the time of the appeal, that "the Chief Justice shall immediately convene the same for such hearing." The secretary was required, upon receiving notice by writing of the appeal, to "immediately transmit all papers and documents on file in his office relating to such petition to such court." Under the former statute it was only such papers as were selected by the appellant or appellee. The judgment of this court is indicated by the following language:

"If the court shall adjudge such petition insufficient, the parties responsible for same shall have the right to correct or amend their petition to conform to the opinion of the court, provided said amendment or change is made within five days. No objection to the sufficiency of a petition shall be considered unless the same shall have been made and filed as herein provided."

From this statement of the law of 1910, it is clear that the Legislature never intended to confer upon the Secretary of State judicial power. It is now claimed that the Secretary of State not only had the power, but the duty, to investigate the petitions with reference to a matter that did not appear on the face, in order to determine the sufficiency. So far is this carried that complaint is made that they should have been allowed to summons witnesses from all over the state to establish forgeries and perjuries. The Legislature saw fit to make the judgment of the secretary and of this court go to the sufficiency in form. It further saw fit to require an immediate hearing in this court, laying aside everything else. It saw fit to require only five days' notice before the secretary. Most clearly the Legislature did not contemplate a trial on outside questions of fact, but did provide for an investigation of what appeared on the face of the petitions, namely the affidavits, the signatures, and the ascertaining of the numbers, and a comparison with the records in the office of the Secretary of State showing the vote cast in the last preceding state election. Most clearly, when the Legislature provided for an amendment of the petition, it thereby limited what in its estimation was to be passed on by the court to something that would not go to the absolute destruction of the proceedings. Most clearly, the Legislature, in the last requirement, section 21, was trying to advance the proposition of getting the matter of taking the sense of the people, instead of having it hindered and obstructed. Most clearly, the Legislature also recognized the the limit of its own power and the provision of the Constitution expressly denying the

Secretary of State judicial function, he being one of the executive officers named in the prohibitory provision of the Constitution. Most clearly, the Legislature also recognized the provisions of the Constitution conferring upon the Governor supreme executive authority, and the positive duty to cause the laws of the state to be faithfully executed. The Legislature recognized that the Governor, by the Constitution, was empowered to name the day for a special election, and to call it, and that his discretion in the matter was uncontrollable, and he was responsible to the electorate for any abuse of his authority in that regard. Most clearly, the Legislature recognized the power of this court, as limited by the Constitution, and it prescribed just what this court could do. It also prescribed what it should do. In other words, "No Delay" was the watchword. As to whether or not this court has performed its duty in expediting the hearing, let God and conscience be the judge.

This law of 1910 appears in the revision of 1910, with some slight changes suggested by the Commissioners who revised the laws. The original section prescribing the requirements of the petition was divided. The provision for verification for signatures was left. The provision for protest was left and the requirement of the Secretary of State to fix the date not less than five days at which time he would hear arguments for and against the sufficiency of the petition. What the secretary could decide was left, namely, "whether such petition be in form as required by the statute," and also the right of appeal to the Supreme Court was left, and its duty to give it precedence over all other matters. The duty of the Chief Justice to immediately convene the court for such hearing, and the requirement that all of the papers be sent to the Supreme Court by the Secretary of State were retained. The adjudication of the court was confined to the insufficiency of the petition, with the right to amend within five days. Most clearly, so far, a trial was not contemplated, to which witnesses should be brought from the rural regions of Oklahoma, or process should issue for witnesses from Miami to Mangum or from Cimarron to the Kiamichi.

However, during the time that the Revised Laws were being formulated in 1910 and 1911, the Legislature saw fit to make some more amendments. The cause for making them is unknown, but they were made. The amendment can be found at page 235, c. 107, Session Laws of 1910-11, and appears practically as section 6631, C. O. S.

1921. It provided for amending section 2 so as to make it read as follows:

"Section 2. When a citizen, or citizens, desire to circulate a petition initiating a proposition of any nature, whether to become a statute law or an amendment to the Constitution, or for the purpose of invoking a referendum upon legislative enactments, such citizen or citizens shall, when such petition is prepared, and before the same is circulated or signed by electors, file a true and exact copy of same in the office of the Secretary of State, and within ninety days after the date of such filing, the original petition shall be filed in the office of the Secretary of State, and no petition not filed in accordance with this provision shall be considered. When such original petition is filed in said office it shall be the duty of the Secretary of State to forthwith cause to be published in at least one newspaper of general circulation within the state, a notice setting forth the date of such filing. Any citizen of the state may, within ten days, by written notice to the Secretary of State and to the party or parties who filed such petition, protest against the same, at which time he will hear testimony and arguments for and against the sufficiency of such petition. A protest filed by any one hereunder may, if abandoned by the party filing same, be revived within five days by any other citizen. After such hearing the Secretary of State shall decide whether such petition be in form as required by the statutes, and his decision shall be subject to appeal to the Supreme Court of the state, and such court shall give such cause precedence over all others, Provided, such appeal must be taken within ten days after the decision of the Secretary of State has been made. If the court be at the time adjourned, the Chief Justice shall immediately convene the court for such hearing. It shall be the duty of the appellants to serve notice upon the Secretary of State, in writing, of such an appeal. Whereupon, said Secretary of State shall immediately transmit all papers and documents on file in his office relating to such petition to such court. If the court shall adjudge such petition insufficient the parties responsible for same shall have the right to correct or amend their petition to conform to the opinion of the court, provided said amendment or change is made within five days. No objection to the sufficiency shall be considered unless the same shall have been made and filed as herein provided."

The emergency was attached, and the date of the act was March 18, 1911. It will be observed that by the new provision it is provided that the secretary shall hear the testimony and argument for and against the sufficiency of the petitions at the time at which the protest is filed. Precedence over everything else was required.

The limitations of this court in applying judicial force are most clearly prescribed, namely, to decide on the sufficiency of the petition, with the right of amendment in the parties responsible for the same to correspond to the requirements of the court. It would be reading into the statute that which is not there to say that a right to sue out process to reach all over the state, to secure the attendance of countless witnesses, was conferred on any citizen desiring to protest. It would be preposterous in exaction for the Legislature to require this court, either by appeal or trial de novo, to sit in consideration of such things as might be brought to its attention by such witnesses, and to listen to the attorney that might be retained for the examination, while the business of all other litigants suffered the consequences, just to prevent the Governor of the state from calling the election on a petition required by the Constitution to be addressed to him, with the mandatory duty of calling the election.

There has been engrafted upon this protest the idea of enjoining the election board from providing the machinery to hold the election, and also the idea of enjoining the State Auditor from approving warrants for the expenses of the election. It appears from the records here that an application was made by the protestant for that purpose. He appeared in open court and announced that he wanted to proceed, not only as a citizen of the state, but as a taxpayer. This court one day made an order making the election board parties defendant at the request of the protestant. Some of the members of the court protested, however, but the majority made them parties. They also made the State Auditor a party. After doing this, there were expressions from members of the court that under preceding decisions, and under the Constitution, there was no authority in this court to enjoin the election officials. There does not appear in the records any request by the protestant for an order to strike the election officials as parties, but on the subsequent day, either by way of vacation or by way of correcting a mistake, a majority of this court dismissed the election officials and let them go. However, in view of the fact that the State Auditor was willing, the court retained him as a party. Most clearly, this injunctive power is not conferred by the special act of the Legislature, and on general principles it is not allowable.

The poet Shakespeare makes one of his characters say, "You take my life when you take that upon which I live." The Supreme Court of the United States says that state officials cannot by indirection evade the provisions of the federal Constitution any more than by direction. Efforts have been made from time to time to discover, even invent, means to circumvent the provisions of the federal Constitution. Mr. Cooley, in his work on Constitutional Limitations, refers to that at page 585 of the 8th Edition, as printed by Little & Brown, wherein he cites the case of White v. Hart, 13 Wall. 646, 20 L. Ed. 685, Osborn v. Nicholson, 13 Wall. 654, 20 L. Ed. 689, and Jacoway v. Denton, 25 Ark. 641. As to the right of the Legislature to deprive the executive branch of the duties conferred upon it by the Constitution, the matter is discussed also in this work in chapter 5, and according to statements therein contained, the Legislature could not confer upon the Secretary of State judicial power, as his powers were defined and he was classified in the Constitution as being an executive officer. Oklahoma decisions are cited.

Whether the case is here de novo or on appeal apparently would make very little difference. So far as an injunction is concerned, it is clear that, according to the settled practice, we cannot convert this proceeding, brought by a protestant, into an application for an injunction to restrain executive officers from the performance of their duty, whether they be willing, as expressed in statements made, like the State Auditor, to follow whatever the court might decide, or whether they be like the election board, saying nothing and being brought to the bar one day and dismissed the next.

The Legislature has declared what are the requirements to establish the validity of the petitions, on which the Governor, under the Constitutional provisions, is required to act. Under the head of evidence, throughout the statutes are found provisions making documents prima facie as well as conclusive evidence. As well might the recorder refuse to allow an instrument to be recorded, when acknowledged before a notary public and bearing the purported signature of a grantor, upon the ground that he thought perhaps the signature of a subscribing witness was not genuine, or the grantor's name was forged, or the notary had falsified, as for the court, in this case, to grant an injunction of any kind on the showing here offered.

I, therefore, concur in the proposition that the injunction should not be allowed in this case, regretting, however, that the constituted majority of the court, on a suggestion

of one of its members, followed by an application for a postponement, had decided to put the question of the sufficiency of these petitions off until after the injunction was disposed of, especially so in view of the fact that under the former decisions of this court, the petitions appearing fair on their face, and appearing overwhelmingly to have been signed by requisite numbers, make out a case that is prima facie, if not conclusive of the right of the petitioners to have a ballot prepared and submitted, in order that the voters may express their views on the proposed measures.

---

RILEY, J. (dissenting). The majority opinion of this court, speaking through Mr. Justice Hefner, is based largely upon the proposition that the writ of injunction is denied because of adequacy of some other relief. The suggested relief is an action at law upon the official bond of the State Auditor in the event this court should finally determine that the election of December 18, 1931, is invalid. That principle is error in its application, for the reason that the appropriated and now unexpended public fund is in the amount of $110,000. The official bond of the State Auditor is in the amount of $50,000. Therefore, as a mere arithmetic certainty, the suggested independent action at law would be inadequate to the extent of $60,000. Moreover, denial of right of injunction in the majority decision and finality of that promulgation of law would be a final adjudication of this ancillary cause. Therefore, the bond of the State Auditor in whatever amount would not be liable for the expenditures, for the reason that a final adjudication may be pleaded as res judicata, not only as to every issue decided, but also as to all issues that could have been properly determined.

Therefore, after finality of the judgment of the majority decision, the said State Auditor could expend this public fund, and if subsequently called to account in an independent action at law upon his official bond, successfully plead and prove that such expenditures were made in reliance upon this court's final adjudication. He could likewise establish that he, as such officer, relied in making such payments upon the presumption indulged that public officers perform their official duty, which is to say that the Secretary of State in the main action now before us found an acceptance of the petitions in the initiative measures (which in fact and in law he did not), that the Governor's executive order proclaiming the election of December 18, 1931, was lawful (which has not yet been declared by a competent tribunal); that said election is valid (a matter which the majority decision now promulgated declines now to determine); that the expenses of the election were incurred by officials in the discharge of their public duty by virtue of the law announced in executive orders of the Governor; which executive order is, in fact, a pronunciamento known only to despots and their subjects, such as orders in council issued by dictators, a decree such as promulgated by kings, commandments of God, but not known to American jurisprudence, nor to American people by reason of such provisions of fundamental law as contained in article 1, sec. 4, Constitution of Oklahoma. Consequently, if said executive order may be now or hereafter adjudged to have such force, it is omnipotent—it is eternal—it is binding upon us all, here and hereafter, now and forever; it makes precedent for future despotic rule contrary to all law. It paves the way for raid after raid upon the public treasury of this state and extraction therefrom of the people's money in payment of claims unauthorized by law and without any authority whatever save and except such an executive order. By this adjudication this court decides that it as such will not, until after the horse is stolen, close the barn door, despite the fact that each Justice assuming his office held his hand to Almighty God, and, by the most solemn of oaths, swore, as provided by the Constitution of Oklahoma, section 1, art. 15:

"That I will support, obey and defend the Constitution of the United States and the Constitution of the state of Oklahoma, and will discharge the duties of my office with fidelity; * * * that I have not knowingly violated any election law of this state. * * *"

Since every Justice has sworn that he has not knowingly violated any election law of the state, and since he has sworn that he will discharge the duties of his office with fidelity, it seems but logical that he, in the discharge of his duties, should not knowingly sanction violations of election laws. It is the Justice's duty not only to know, but as well to pronounce and declare the law, which is inclusive of the election law.

The pronouncement of law now made by this court, speaking by and through Mr. Justice Hefner, is based largely upon the decision of this court in McAlester, Secretary of the Election Board, v. State ex rel. Short, Attorney General, 95 Okla. 200, 219 P. 134, wherein this court spoke through Mr. Justice Branson. Therein it is shown that the State Auditor (paymaster) was not a party to the action, and, of course, this court was powerless to enjoin payment of public funds in that action. Whereas, in the cause at

bar, the State Auditor has been, by the vote of Mr. Justice Hefner and by the order of this court, made a party defendant in order that this court might acquire jurisdiction to enforce its judgment by the writ of injunction, if found to be necessary, against the proper state officer, in proper time, in this cause. As in that decision shown, several constitutional amendments were by the Governor's proclamation submitted to the voters at an election called for October 2, 1923. The public records show that what was known as Initiative Petition No. 79 was attempted to be submitted at the election held that day. Therein the Election Board was a party and the election itself was sought to be enjoined. Herein the Election Board is not a party and no judgment can be effectuated enjoining the holding of an election, either lawful or under color of law. That case contained no allegation of a taxpayer being a party. To the contrary, the action was shown to have been instituted by the then Governor, acting through the then Attorney General. In the cause before us the applicant for injunctive process alleges that he is a taxpayer, and there is no denial of it.

While the majority opinion herein purports to be based upon the case of McAlister v. State, supra, the real basis for the opinion is the case of City Council of McAlester et al. v. Milwee et al., 31 Okla. 620, 122 P. 173, cited and quoted from in the former case. But in the latter case, the city treasurer was not a party. The relief sought was not against payment of expenses incurred or about to be incurred in holding the election, but was to enjoin the holding of the election in the one case and calling the election in the other. It is in deference to the rule there announced that this court declined to make the members of the State Election Board parties in this case. It was thereby recognized that this court would not enjoin the holding of an election at the suit of a taxpayer, or otherwise. The cases cited and relied upon in the majority opinion are therefore not controlling. I assent to the rule there announced for the reasons stated in my views of what the law should be declared to be hereinafter set out.

I assert that the true rule governing the case is that stated in Simpson v. Hill, 128 Okla. 269, 263 P. 635. There the very questions presented were involved. There the action was brought by a citizen and taxpayer and the question of alleged illegal expenditures from the state treasury was the issue. Therein it was said:

"The above declaration of the law of the state of Oklahoma on the subject here in

question might have been evaded at this time, but this court is not unaware that it would be called upon to determine this exact question, and we have acted upon the principle that it is our duty rather to embrace than to repel the settlement of uncertainties."

Unquestionably, the same situation confronts this court in the instant case. Furthermore, the State Auditor has been made a party to this action and is now before the court. He is entitled at the earliest possible moment to have the question of his right and authority to expend public funds in payment of expenses incident to holding the election settled. It is vital to him for his protection and the protection of the sureties upon his official bond. He is entitled here and now to have the law declared. If this court should decide that the executive order of the Governor calling the election, as it was, is valid, and the election to be held thereunder valid, then the State Auditor could, with full confidence in his authority so to do, issue the warrants in payment of the necessary expenses thereof. But for this court to say merely that the election cannot be enjoined, and reserve the question as to whether the election, when held, would be so held without warrant of law until after warrants had been issued by the State Auditor, and at the same time say that the auditor would issue such warrants at his peril, is but to lay a trap for the auditor and his bondsmen. This court should have the courage here and now to say that the election has been legally called or that it has not. If the call is legal and valid, the voters, when they go to the polls on December 18th, will be performing an act which will either enact the proposed measures or some of them into law, or defeat them or some of them. If the call is illegal and void, the voters will at void elections at most be performing no legal function other than informally expressing their wishes in the matter as citizens. They ought to know in what capacity they are acting when they go to the polls. For this reason, I assert this court should declare the law on the question before it, instead of refusing so to do and in effect merely say that the election cannot be enjoined and leave this real question unsettled.

The author of the majority opinion and two of the Justices concurring concurred in Simpson v. Hill, supra. I also concurred therein. In order to show my uniform adherence to these views, it is pardonable to say that I asserted before the Senate of the state of Oklahoma sitting as a Court of Impeachment, and at a time when it was sought to

sever my official head for and on account of my actions in that case, that I had written that per curiam opinion. I thought it was correct. I still think so.

Having pointed out what I think to be the defects of the majority opinion I shall now devote myself to a statement of what I think the law to be:

For a proper determination of the questions involved, it is necessary to some extent to consider the theory upon which our state government is based.

The greatest document at any one given time penned by the hand of man contained the declaration:

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are life, liberty and pursuit of happiness. That to secure these rights governments are instituted among men, deriving their just powers from the consent of the governed."

Those enumerated are basic rights justifying the existence of government. Included within these basic rights is the individual citizen's privilege of participation in government.

Prior to the establishment of our nation as an independent government, and in order to secure basic rights, various experiments had been made in forms of government, such as the patriarchal, the clan, the feudal, the monarchial, theocratic, republican, democratic, socialistic, the communistic. There were fusions and modifications of all these.

The forms of government existing contemporaneously or before the establishment of our nation were largely centralized, so that as one governed by them the individual citizen had little or no voice in government. Our forefathers, enlightened by the experiments in government, ordained and established a nation designed to more fully protect rights, both alienable and unalienable, which was, and ever had been, neither a pure democracy nor a monarchy. They chose rather to establish one which has been termed "republican" in form. Oberholtzer says:

"That term has never been accurately or satisfactorily defined, and is indeed so vague and uncertain in meaning that it would perhaps include any government whose chief magistrate was not called eo nomine an emperor or king."

Likewise, the term may denote a government that is not in fact a pure democracy. The word "republican" was derived from the French language—"republique," and the Latin—"res publica" (having to do with things—affairs) res, and (concerning the public) publicus or publica, which means a state or commonwealth in which the sovereign power resides in a body of the people and is exercised by representatives selected by and responsible to them.

"There has never been the slightest doubt in the minds of publicists who have written of our institutions as to where sovereignty resides. It resides with the people. They are the original source of the government's authority. It is with them, as the object of its activities, that the state exists."

The word denotes the authority by which a state is governed, yet it is used to designate states differing widely in their Constitution, for there was the ancient Roman Republic, which was originally an aristocracy under the control of the patrician class, and the republics of ancient Greece; there is the modern Switzerland, which may be classed as a democracy, with the political power vested in all of the citizens. As applied to ancient Greece, the citizens consisted of a selected class, but with regard to modern Switzerland, the political power is vested in the whole body of freemen. There were medieval Italian republics, which were but limited oligarchies. The construction placed upon the word at the time of the establishment of the state of Oklahoma was exemplified, not only by the 45 states of the Union, but as well by the modern republics of the United States and France. All republics possess attributes of free democracies, by considering the citizens a unit and as paramount in the objective of government, but departure from free democracy is present in the meaning of the word, by that phase of it which relates to a body of men in whom authority is imposed and sometimes referred to as collective sovereignty. Withal, republican form denotes a state governed through agents of the people—a representative form of government. Thomas Jefferson declared that:

"Modern times have the single advantage, too, of having discovered the only device by which these rights can be secured, to wit: —Government by the people, acting not in person, but by representatives chosen by themselves."

Thus when the Constitution of the United States was formulated and adopted, the people did not, in their sovereign capacity, as individuals, meet and form a Constitution, but under rules and regulations of their own choice they selected delegates or representatives, as their agents, to formulate the Constitution for them, which, in turn, was referred, for adoption or rejection, not to the individual citizens themselves, but to

their agents or representatives selected by them, under like rules and regulations, for that purpose.

Ever since the adoption of the Constitution of the United States that government has functioned by and through agents and representatives under powers delegated by the people and not by direct action of the people.

The framers of our federal Constitution were endeavoring to establish a government which should have sway over a great territory and a large population which they knew would rapidly increase. They sought to guard against excess, not only of a centralized government, for that had foreshadowed the Revolutionary War, but as well to guard against those evils which had so often brought popular governments to destruction. They were about to consummate the most democratic movement that had ever occurred, on a grand scale, in the history of the world. They established a government which Lincoln called "of the people, by the people, for the people," and, in order effectively to create it, they adopted limitations which would make its continued existence possible. They had experienced the confederation. They knew that if the governmental energy became too much diluted and dissolved, the evils of anarchy would result and there would follow a reaction to the other extreme, with the resulting overthrow of popular rights. They saw clearly the line over which they might not pass in pretended devotion to the democratic idea without establishing government, of the demagogue, by the demagogue, and for the demagogue, with the recoil in favor of autocracy or anarchy, sure speedily to follow. (Munro p. 167.)

This, in substance, is a republican form of government—it is simply a government by representatives.

Further effectuating the theory of national government, this state, as a member of the Union, must maintain a government, republican or representative in form, for by section 4, art. 4, Const. United States, it is provided:

"The United States shall guarantee to every state in this Union a republican form of government; and shall protect each of them against invasion; and on application of the Legislature, or the Executive (when the Legislature cannot be convened) against domestic violence."

As a condition precedent to the admission of the state of Oklahoma into the Union as a member thereof, section 3 of the Enabling Act provided:

"That delegates to the (Constitutional) Convention * * * shall declare on behalf of the people of said proposed state, that they adopt the Constitution of the United States; whereupon the said convention shall, and is hereby authorized to form a Constitution and state government for said proposed state. The Constitution shall be republican in form. * * * and shall not be repugnant to the Constitution of the United States and the principles of the Declaration of Independence."

Pursuant to the authority granted in the Enabling Act, the people of the proposed state of Oklahoma selected delegates to represent them in the convention to form a Constitution and state government for the proposed state of Oklahoma.

The delegates so selected, as representatives of the people, met in convention at the time and place provided in the Enabling Act, and after adopting the Constitution of the United States (November 21, 1906) as required by the Enabling Act, formed a Constitution for the proposed state of Oklahoma, and thereafter by "ordinance irrevocable" accepted (April 22, 1907) the terms and conditions of the Enabling Act. The delegates, enlightened by the experience of the older states and profiting by the example of the more progressive western states, particularly the state of Oregon, observed that under the Constitutions of the older states, the people as individual citizens had been deprived of the right to institute legislation, to propose and adopt amendments to their Constitution, and to reject or repeal laws enacted by their representatives, which might be deemed by them, the people, to be detrimental to their interest.

These delegates, in their wisdom, in order to more fully secure basic rights, life, liberty and pursuit of happiness, deemed it necessary, and did incorporate in the Constitution of the proposed state of Oklahoma a separate article designed to reserve to the people themselves the right to propose laws and amendments to the Constitution and to enact or reject the same in elections to be held for that purpose, independent of the acts of their agents or representatives in the Legislature; also to reserve to the people the right at their own option to approve or reject by means of their vote any act of their agents or representatives in the Legislature. The right is commonly known as the initiative and referendum. The provisions therefor are found in article 5 of the Constitution of the state of Oklahoma.

With this limited power reserved to the people, the Constitution as formed by the delegates vested all other legislative au-

thority in the Legislature, consisting of a Senate and House of Representatives (section 1, art. 5, Constitution). The members of the Legislature thus created are but the agents and representatives of the people under a republican form of government.

The Constitution, thus formed, was submitted to the people of the proposed state of Oklahoma for their approval or rejection at the ballot box. By an overwhelming majority, it was adopted (September 17, 1907— 180,333 for, 73,059 against).

Another condition precedent of the Enabling Act (section 4) to the creation of the state of Oklahoma and her admission into the Union was that the Constitution of the proposed state so formed should be found by the President of the United States to be republican in form. A finding contained in the proclamation of statehood is:

"It appears that the said Constitution and government of the proposed state of Oklahoma are republican in form."

By section 1, art. 2, Bill of Rights, Constitution of Oklahoma, it is provided "all political power is inherent in the people." The component parts of political power are legislative, executive, and judicial. (Montesqui, Spirit of the Law.)

By section 1, of art. 7, Constitution, all judicial power was vested in the Senate sitting as a court of impeachment, a Supreme Court, and other courts, commissions or boards enumerated, and for which provision was made. It will thus be seen that the people, in the Constitution, reserved to themselves no judicial power whatever.

The executive authority, by section 1, art. 6, Constitution, was vested and parceled out to a Governor, Lieutenant Governor, and certain other constitutional executive officers therein named. It will thus be seen that the people did not reserve to themselves any executive power. So that all political power inherent in the people has been delegated or vested, except legislative powers reserved to the people in article 5 of the Constitution (initiative and referendum). The reserve legislative power is modified by section 7, art. 5, Constitution, wherein power is delegated to agents or representatives of the people in the Legislature to repeal or amend any law enacted under the initiative power so reserved to the people.

Furthermore, by the provisions of section 3 of the article of the Constitution in which the right stated is reserved to the people, the people delegated to their agents and representatives in the Legislature the authority, and made it their mandatory duty, to "make suitable provision for carrying into effect the provisions of this article." Thus it was recognized by the people, in the enactment of the Constitution, that the reserved power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature was not self-executing. Early in the history of the state, it was so adjudged. Ex parte Wagner, 21 Okla. 33, 95 P. 435, Williams, C. J.).

Moreover, by section 8, of art. 5, Constitution, it was made the mandatory duty of the legislative department of government to provide laws to "prevent corruption in making, procuring, and submitting initiative and referendum petitions." That duty was performed by the first Legislature of Oklahoma.

Surely this mentioned delegated legislative power in modification of the reserved legislative power is as effective and binding as any other power by the people delegated (executive and judicial power) and contained in the same instrument. These duties enjoined upon the Legislature have long since been performed by the enactment of statutes for carrying into effect the reserve legislative power. These fruits of legislative labors have likewise been considered by the courts, and ever have been adjudged suitable and reasonable. They are, therefore, as much binding upon us as a guide— as long as they exist—as the Constitution itself.

By the argument of able attorneys and officers of this court, we are urged to hold, irrespective of statutes deemed suitable for safeguarding this initiative right and so enacted under mandatory constitutional direction, that when the Governor of Oklahoma proclaims an election, it is a lawful election. The Governor, in his private capacity, appeared before this court herein, not as a party, nor as an attorney representing a party, but as an attorney and officer of this court, appearing amicus curiae, and urged that adjudication, and stated in argument:

"The first section in our Bill of Rights provides that the source of all power is with the people, and the people may alter or reform the government at their will, limited only by the Constitution of the United States."

Section 1, art. 2, Bill of Rights, uses the phrase heretofore quoted, "all political power is inherent in the people." Without doubt it has the exact meaning attributed to it. The source of all power, pertaining

234

to government, is in the people. All political power sprang from the people, and, as heretofore pointed out, in this state, a great part of it was, by the Constitution, delegated to and vested in agencies to be filled by officers. This, "in order to secure and perpetuate the blessing of liberty; to secure just and rightful government; to promote our mutual welfare and happiness." (Preamble of the Constitution.) And in order to conform to the requirements of the federal Constitution, so as to have a government republican or representative in form. "Our," as in the Preamble used, most emphatically refers to the people and not to any officeholder who is a mere servant of the people. The Governor in said capacity stated before this court as substance of a part of section 1, art. 2, Constitution, "and the people may alter or reform the government at their will, limited only by the Constitution of the United States." It is true that the people "have the right to alter or reform the same whenever the public good may require it," but it is thought that the right to alter or reform the government is limited to the manner, means, and time within the Constitution and supporting laws by the people provided. Otherwise, the act would be antigovernment. It is revolution. It was likewise urged that the people "may * * * abolish the government." If by that statement is meant the Constitution and government, such action would be self-destruction. Anarchy! Neither anarchy nor revolution can long exist within this state, for, as heretofore pointed out, the federal government guarantees to the state of Oklahoma, not only a government, but also a republican form of government, and provision is made for enforcing that guaranty by protecting this state against domestic violence upon application of the Legislature or its substitute.

It is the accepted law of the land that so long as the Legislature confines "suitable provisions" for carrying into effect, and so long as laws are adequate "to prevent corruption in making, procuring, and submitting 'initiative and referendum petitions'," these mandates may not properly be disobeyed. They are binding upon all, because enacted by the people, through their agents and representatives, under the authority of the Constitution. As much so as are the laws regulating the manner of election of the Governor. As much so as are the laws regulating the election of Justices of the Supreme Court of Oklahoma, whose duty it is to decide this issue. Such laws are binding. Otherwise, as officers, we would not be, either de facto or de jure, much less act.

The first section of the statute dealing with initiative (section 6625, C. O. S. 1921 [1907-8]) provides for the form of such a petition. The first Legislature deemed it necessary to provide forms for uniformity —that is reasonable. It is suitable. A subsequent Legislature enacted (1910-11, sec. 6631, C. O. S. 1921), providing as a condition precedent to circulation of such a petition that "when any citizen, or citizens, desire to circulate a petition initiating a proposition of any nature, * * * such citizen or citizens shall, when such petition is prepared, and before the same is circulated or signed by electors, file a true and exact copy of same in the office of the Secretary of State, and within 90 days after the date of such filing, the original petition shall be filed in the office of the Secretary of State, and no petition not filed in accordance with this provision shall be considered."

These provisions are reasonable. It cannot logically be said that the Governor would have a right to call an election upon copies of petitions which had not been so filed, nor upon original petitions not filed, nor upon original petitions filed subsequent to the 90-day period of time prescribed. Within common knowledge many initiative measures have failed because not signed by a sufficient number of citizens or not filed within the prescribed 90-days period.

Copies of the initiative petitions here involved have been filed as by law prescribed. The original petitions, purporting to have been signed by the requisite number of citizens, have likewise been filed within the 90-day period (Oct. 31, 1931—No. 112).

"When such original petition is filed in said office it shall be the duty of the Secretary of State to forthwith cause to be published * * * a notice setting forth the date of such filing."

This is a suitable provision, for it is notice to the citizenship not represented by and upon such petition and fixes the date of the running of the time within which to protest the sufficiency of the petition.

This duty has been performed by the Secretary of State by causing to be published in the "Blue Valley Farmer," in its issue of November 5, 1931, said notice of said filing.

Said section (6631) further provides:

"Any citizen of the state may, within ten days, by written notice to the Secretary of State and to the party or parties who filed such petition, protest against the same."

That privilege has been exercised (Nov. 9, 1931) by S. P. Freeling, a citizen, who

filed written notice of protest to said questions and petitions, with the Secretary of State (No. 112).

Thereupon by the provisions of said section it became the mandatory duty of the Secretary of State "to hear testimony and arguments for and against the sufficiency of such petition" at the time of protest.

Presumably such a hearing was commenced, for it is a presumption of law that public officers do their duty, and "in contemplation of law, this hearing, when begun, is always open until finally concluded." Russell v. Harrison, 33 Okla. 225, 124 P. 762.

The question whether the hearing provided for in section 6631, supra, has been finally concluded or whether same is yet open is one of the questions necessarily involved in this action. For said section further provides that:

"After such hearing the Secretary of State shall decide whether such petition be in form as required by the statutes, and his decision shall be subject to appeal to the Supreme Court of the state. * * * Such appeal must be taken within ten days after the decision of the Secretary of State has been made. * * * It shall be the duty of the appellants to serve notice upon the Secretary of State, in writing of such appeal, whereupon said Secretary of State shall immediately transmit all papers and documents on file in his office relating to such petition to such court."

Notice of appeal has been given in each of the cases before us in the manner and time provided by law. The papers and documents in the Secretary of State's office relating thereto have been transmitted by the Secretary of State to this court (Nov. 24, 1931) so as to confer jurisdiction of the subject-matter upon this court.

These regulatory provisions of the statute were deemed suitable by the Legislatures enacting them. They were deemed suitable by the executive branch of government by the Governors' approvals. They have been adjudged suitable and reasonable by the judicial branch of government in the opinions of this court, written largely by former members of the Constitutional Convention regarded by lawyers and all citizens as jurists possessed of thorough understanding of the provisions of the Constitution of Oklahoma. They have been considered suitable by the people in their long acquiescence in their existence. They have existed as now for 15 years without effort on the part of the people to amend or repeal them by any initiative measure, which might have during the years been available.

Whereupon, the Chief Justice of the Supreme Court immediately convened this court for a hearing of said protest, whereupon a motion by petitioners was presented to this court to dismiss the protests upon the ground of insufficiency. This motion was considered and denied, and this court set the protest for hearing on December 9, 1931.

Thereafter and on December 4, 1931, the Governor of Oklahoma promulgated an "Executive Order" which, among other things, proclaimed that "* * * the proposed measures (No. 112) shall be submitted to the qualified electors of the state of Oklahoma, for their approval or rejection, at an election to be held on the 18th day of December, 1931." Thereafter similar executive orders promulgated by the Governor purported to submit three other involved initiated measures.

On December 7, 1931, protestant, as party to the causes then pending in this court, filed and presented an application for an order of this court to have Hon. Frank C. Carter, State Auditor of the state of Oklahoma, and the members of the State Election Board made parties defendant in causes Nos. 23082, 23084, 23087, and 23088, involving Initiative Petitions Nos. 112, 114, 117, and 118. In said application recitation was made in substance of proceedings had up to that time, and charging in substance that the executive order proclaiming said election "was without authority of law, void and of no legal effect," and setting forth that by act of the Legislature of Oklahoma (S. L. 1931, pp. 296-7) an appropriation in the sum of $110,000 existed, unexpended, for the purpose of "defraying the expenses of any special election which the Governor might call during the biennium thereof," and alleged that the Election Board was threatening to and would use said sum so appropriated, or a portion thereof for the purpose of holding said election, and alleged that said Frank C. Carter, State Auditor, "has threatened to and will unless enjoined * * * issue warrants * * * against said appropriation * * * to pay said illegal claims as above set out," and prayed for a proper order of this court to prevent the alleged illegal expenditures from said appropriation. Subsequently, protestant asked, in open court, leave to amend his protest so as to allege that he was a taxpayer. Such leave was by the court granted.

Upon consideration by this court the application to make the Election Board a party was denied, and the application was sustained so as to make Honorable Frank C.

Carter, State Auditor, a party defendant in said causes. (Dec. 10, 1931.)

The questions involved in said ancillary proceedings are the ones now before this court.

"Every officer under a constitutional government must act according to law and subject to its restrictions, and every departure therefrom or disregard thereof must subject him to the restraining and controlling power of the people, acting through the agency of the judiciary; for it must be remembered that the people act through the courts, as well as through the executive or the Legislature. One department is just as representative as the other, and the judiciary is the department which is charged with the special duty of determining the limitations which the law places upon all official action." McConaughy v. Sec. of State, 106 Minn. 416, 119 N. W. 417.

See, also, 12 R. C. L. 1010.

It is necessary to determine whether the proceeding in this court provided by law is one of review of the action and proceedings before the Secretary of State, or whether the action and proceedings are transferred to this court for hearing evidence thereon precisely as they were filed in the office of the Secretary of State. Are they in fact a proceeding de novo? This question was decided by this court (1912) in Re Initiative Petition No. 23, State Question No. 38, 35 Okla. 49, 127 P. 862, in an opinion by Justice Dunn, at a time when a majority of the Supreme Court was composed of men who had been members of the Constitutional Convention, and concurred in by all the Justices. It was therein said:

"We hold * * * that the jurisdiction taken under the so-called appeal to this court is not appellate in its character, but that on the Secretary of State transmitting to the clerk of this court the petition, protest and papers and documents on file in his office relating thereto, the case was transferred to this court for an original investigation and hearing, and the evidence and proceedings are to be taken de novo."

A trial de novo in an appellate court is a trial had as if no action whatever had been instituted in the court below. Karcher v. Green (Del.) 32 Atl. 225; Shultz v. Lempert, 55 Tex. 273.

"An appeal which brings up the entire cause for trial de novo in the appellate court operates to annul the judgment, in the absence of a statute providing otherwise." 2 R. C. L. 118. Bank of N. A. v. Wheeler, 28 Conn. 433, 73 Am. Dec. 683; Stalbird v. Beattie, 36 N. H. 455, 72 Am. Dec. 317; Fort

v. Fort, 118 Tenn. 103, 101 S. W. 433, 11 Ann. Cas. 964.

It is observed that this court has held, as stated in Re Initiative Petition No. 23, supra:

"That the proceeding in this court, while denominated by the statute an appeal, was in fact a proceeding de novo, and that the petition and protest and other documents were filed here for the purpose of hearing evidence thereon precisely as they were filed in the office of the Secretary of State."

The proceeding when filed in this court operated to annul the decision of the Secretary of State, for there is no statute to the contrary.

Section 800, C. O. S. 1921, to be applicable to stay proceedings, is dependent upon a proceeding in error. As heretofore pointed out, this is not a proceeding in error, but a trial de novo.

Section 779, C. O. S. 1921, is not applicable, for "an appeal to some other court" (rather than the district court) is specifically "provided by law" (sec. 6631).

Section 794, C. O. S. 1921, is not applicable, for it applies only to judgments or final orders rendered in the county, superior, or district courts.

Section 780, C. O. S. 1921, is not applicable, for it applies only to judgments or intermediate orders of county, superior or district courts.

Section 818, C. O. S. 1921, is not applicable, for by it the provisions of the article, are limited to courts of record, and the Secretary of State is not a court of record, for even assuming the Secretary of State to be a court for the purposes specified in the statute, he is not thereby made a "court of record," and by the text of the section the entire article is restricted to "so far as the same may be applicable to judgment or final order of such courts," meaning courts of record.

It is appropriate to again call attention to the statement of Chief Justice Turner, speaking for this court in Russell et al. v. Harrison et al., supra, "In contemplation of law, this hearing, when once begun, is always open until finally concluded." When may the hearing be said to be finally concluded? Are the duties of the Secretary of State finally completed when he transmits the papers and documents on file in his office relating to the petition to this court? So far as any further hearing is concerned, they are. But has the hearing contemplated

by law been concluded? Clearly not, for under the decisions of this court, cited above, the cases are "transferred to this court for an original investigation and hearing, and the evidence and proceedings are to be taken de novo." The hearing, the right to which is given to protestant by law, is yet open and had never been finally concluded. As a court, we are not concerned, at this time, with what may be the final decision at the conclusion of the final hearing on the sufficiency of the petitions.

The Governor in his executive order of December 4, 1931, proclaimed, that:

"Whereas, said petition having been accepted and said ballot titles having been decided upon, the said Secretary of State having, in writing, notified me thereof, it becomes my duty as Governor of the State of Oklahoma, to issue my proclamation" for "the date of the referendum vote thereon."

This proclamation is in error, for on November 23, 1931, the said Secretary of State transmitted to this court all documents and papers on file in his office relating to said petitions, and as disclosed thereby the said notice of the Secretary of State certified to the Governor that he (the Secretary of State) "did transmit all papers and documents on file in my office, relating to such petition, to the Supreme Court of Oklahoma, pursuant to notice of appeal served upon me, as by law provided."

The Secretary of State did not certify that the petition had been accepted, but to the contrary, on the face thereof, the certificate shows that the petition had not been finally accepted as is required by law, but that an appeal had been perfected to this court.

This court has already decided how and when the Secretary of State and Governor, respectively, are to act in such cases, for in Re Initiative Petition No. 23, supra, Mr. Justice Dunn, speaking for this court, in the body of the opinion, in explaining how the judgment of this court must operate and be carried out, said:

"In other words, upon holding a petition valid, and upon the remission to the Secretary of State of the papers and documents relating to such petition, it would then, under section 3680, Comp. Laws 1909, be his duty to notify the Governor, in writing. whose duty **then** is to issue a proclamation setting forth the substance of the measure and the date of the vote thereon. Herein. in accord with the terms and intent of the statute, is afforded a complete remedy and procedure for carrying it out."

Directions could not be plainer. Under the foregoing decisions, the Secretary of State was clearly without and continues to be without authority of law to notify the Governor that the petition had been accepted until a decision of this court shall have been rendered and the remission shall have been made to him of the papers and documents relating to such petition. If and when the petition is finally found sufficient, by his court, it will **then, and not until then,** be the duty of the Secretary of State to notify the Governor.

Likewise, the Governor was without power or authority of law to issue the executive order proclaiming the election on December 18, 1931, for by section 6635, C. O. S. 1921, it is specifically provided that:

"Whenever a petition **is accepted** * * * the Secretary of State shall, in writing, notify the Governor, who **forthwith** shall issue a proclamation setting forth the substance of the measure and the date of the referendum vote."

If the hearing on the sufficiency of the petition were pending, undetermined before the Secretary of State, could it be rightfully contended that the Governor possessed authority to proclaim an election on the undetermined petition? Certainly not. The decision of the Secretary of State being annulled by the proceeding in this court and the whole matter being before this court for hearing evidence and argument thereon and for judgment, precisely as they were filed in the office of Secretary of State, the matter is yet pending and it cannot be contended successfully that the Governor possessed authority of law to call said election at such time. No valid election can be held under the executive orders so promulgated and no public funds of the state of Oklahoma can lawfully be expended on account of any claim or expense in connection therewith.

However, the defendant Frank O. Carter, State Auditor, having pleaded in this court that in the event this court should hold that the executive order proclaiming said election is illegal he would not expend any of said funds for an election held under such executive order, it is unnecessary to issue an injunction at this time. It should be withheld.

The right of the people to peaceably assemble (Bill of Rights) at their respective precincts on December 18, 1931, to consider by discussion (Bill of Rights-Free Speech) or to petition by their views in writing, expressed by ballot or otherwise, for or against

the enactment of these proposed measures as laws and constitutional amendment, cannot be questioned, for this is an unalienable right of man (Declaration of Independence). That the result will be merely a petition and not an enactment, is no longer an open question in the state of Oklahoma. (Simpson v. Hill, supra; Looney v. Election Board, 145 Okla. 23, 291 P. 565). For the people no longer, under this republican form of government, have the inherent right, themselves, to meet as a Legislature or constitutional convention upon spontaneous call of a citizen (Hon. Wm. H. Murray), but only upon the constitutional, and therefore lawful, call of the Legislature or Governor of Oklahoma. (Section 3, art. 5, Constitution.) As stated, no lawful call was, or could have been, made for an election, until such time as a final hearing in all of its legal signification (due process of law) had been had upon the petitions, the basis therefor.

There has not been a substantial compliance with law (section 6652, C. O. S. 1921). These are not technical or clerical errors, but substantial, fundamental, jurisdictional, and vital to the rights of the people of the state of Oklahoma. Ex parte Smith, 49 Okla. 716, 154 P. 521.

We, as Justices, in the discharge of duty, dare not waver, though it draw the whole artillery of libels—all falsehood and malice can invent or a deluded populace can swallow, for:

"The Safety of the State is the Highest Law." Justinian.

---

SWINDALL, J. (dissenting). I must dissent. Owing to the importance of the issue, I think we should now declare whether or not the election is legally called.

On November 24, 1931, the Secretary of State of the state of Oklahoma transmitted to the Supreme Court of the state of Oklahoma all the papers and documents on file in his office relating to State Question No. 167, Initiative Petition No. 112, and advised the Governor of the state of Oklahoma of the action of the Secretary of State on said petitions and notified the Governor that notice of appeal had been served on the Secretary of State within the time and in the manner provided by law, and that in obedience to the notice of appeal he had transmitted all the papers and documents on file in his office to the Supreme Court as required by law. The notice from the Secretary of State to the Governor was in the nature of a certificate and is as follows:

"In the Matter of State Question No. 167, Initiative Petition No. 112.

"To His Excellency,

"Honorable Wm. H. Murray,

"Governor of the State of Oklahoma:

"I, R. A. Sneed, the undersigned Secretary of State of the state of Oklahoma, do hereby certify that on the 31st day of October, 1931, there was filed in the office of the Secretary of State of the state of Oklahoma, Initiative Petition No. 112, State Question No. 167.

"I further certify that after said initiative petition was filed, I caused due and legal notice of the filing thereof to be published as required by law, and that thereafter I found that said petition was in all things sufficient and in compliance with the Constitution and laws of the state of Oklahoma relating to such proceedings.

"I further certify that I found 121,401 legal signers on said petition and that the same constituted more than the percentage of legal voters, voting at the last general election held in the state of Oklahoma, required by law for the submission of said state question, and found that the said initiative petition was, therefore, sufficient.

"I further certify that on the 24th day of November, 1931, I did transmit all the papers and documents on file in my office, relating to such petition, to the Supreme Court of Oklahoma, pursuant to notice of appeal served upon me, as by law provided.

"I further certify that on the 23rd day of November, 1931, the Attorney General of the state of Oklahoma caused to be filed in my office, the attached ballot title of said Initiative Petition No. 112, State Question No. 167, as the ballot title approved for such state question.

"I further certify that there is also attached a true and correct copy of the said initiative bill.

"In witness whereof, I have hereunto set my hand and caused the Great Seal to be attached this 25th day of November, 1931.

(Great Seal of the)
(State of Oklahoma)

"R. A. Sneed
"Secretary of State."

The Secretary of State is under no legal duty, nor has he any authority, to certify the acceptance of an initiative petition until the time for appeal has expired without an appeal having been taken, or, in case an appeal has been taken, until he has received the mandate of the Supreme Court upholding its validity and directing him to act accordingly. In Re Initiative No. 23, State Question No. 38, 35 Okla. 49, 127 Pac. 862. Under section 2 of article 5 of the Con-

stitution of Oklahoma, the first power reserved by the people is the initiative, and eight per centum of the legal voters shall have the right to propose any legislative measure and 15 per centum of the voters shall have the right to propose amendments to the Constitution by petition. It requires eight per centum of the legal voters to propose any legislative measure and 15 per centum of the legal voters to propose amendments to the Constitution by petition, and it must be determined by the Secretary of State under the statutes enacted to carry the constitutional provision into force that the petitions contain eight per centum of the legal voters to propose any legislative measure and 15 per centum of the voters to propose amendments to the Constitution by petition. Until this question is determined by the Secretary of State, in the first instance, or by the Supreme Court in the event a protest is filed and a decision is made by the Secretary of State and an appeal is taken to the Supreme Court by either party, then the sufficiency of the initiative petition must be determined by the Supreme Court before the same can legally be submitted to all of the voters at an election as provided for by law. Section 8 of article 5 provides that laws shall be provided to prevent corruption in making, procuring, and submitting initiative and referendum petitions. The Supreme Court of this state has declared that the initiative and referendum sections of the Constitution are not self-executing (Ex parte Wagner, 21 Okla. 33, 95 Pac. 435 and Atwater v. Hassett, 27 Okla. 292, 111 P. 802), and that the laws enacted by the Legislature to prevent corruption in making, procuring, and submitting initiative and referendum petitions were not repugnant to the Constitution and are constitutional. (Initiative State Question No. 10, 26 Okla. 554, 110 Pac. 657.) The petitions in this case were filed in accordance with section 6631, C. O. S. 1921, which provides that:

"When a citizen, or citizens, desire to circulate a petition initiating a proposition of any nature, whether to become a statute law or an amendment to the Constitution, or for the purpose of invoking a referendum upon legislative enactments, such citizen or citizens shall, when such petition is prepared, and before the same is circulated or signed by electors, file a true and exact copy of same in the office of the Secretary of State, and within 90 days after the date of such filing, the original petition shall be filed in the office of the Secretary of State, and no petition not filed in accordance with this provision shall be considered. When such original petition is filed in said office it shall be the duty of the Secretary of State to forthwith cause to be published in at least one newspaper of general circulation within the state a notice setting forth the date of such filing. Any citizen of the state may, within ten days, by written notice to the Secretary of State and to the party or parties who filed such petition, protest against the same, at which time he will hear testimony and arguments for and against the sufficiency of such petition. A protest filed by any one hereunder may, if abandoned by the party filing same, be revived within five days by any other citizen. After such hearing, the Secretary of State shall decide whether such petition be in form as required by the statutes, and his decision shall be subject to appeal to the Supreme Court of the state, and such court shall give such cause precedence over all others, Provided, such appeal must be taken within ten days after the decision of the Secretary of State has been made. If the court be at the time adjourned, the Chief Justice shall immediately convene the same for such hearing. It shall be the duty of the appellants to serve notice upon the Secretary of State, in writing, of such an appeal. Whereupon, said Secretary of State shall immediately transmit all papers and documents on file in his office relating to such petition to such court. If the court shall adjudge such petition insufficient, the parties responsible for same shall have the right to correct or amend their petition to conform to the opinion of the court, provided said amendment or change is made within five days. No objection to the sufficiency shall be considered unless the same shall have been made and filed as herein provided."

The Secretary of State complied with the duty enjoined upon him. When the notice of appeal was filed, he immediately transmitted all papers and documents on file in his office relating to such petition to the Supreme Court. The Chief Justice of the Supreme Court immediately convened the court, and upon the matter being called for hearing a motion was presented by the petitioners to dismiss the appeal upon the ground and for the reason that the protest was insufficient. Upon consideration of the motion a majority of the court was of the opinion that the same was not well taken and the motion was denied, and thereupon this court set the cause for hearing on the 9th day of December, 1931. On December 7, 1931, an application was presented to the court in which the protestant represents and shows to the court, among other things:

"1. That on the 31st day of October, 1931, Honorable Baxter Taylor, a citizen of Oklahoma, filed with the Honorable R. A. Sneed, Secretary of State of the state of Oklahoma, an original petition designated

as Initiative Petition No. 112, purported to have been signed by numerous citizens and legal voters of the state of Oklahoma, requesting that 'the same shall be submitted to the legal voters of the state for approval or rejection at the next election held throughout the state.'

"2. That thereafter, on the 9th day of November, 1931, and within ten (10) days of the filing of said petition, said protestant, a citizen of Oklahoma, filed his written notice of protest to said question and petition, with the said Secretary of State, which is filed in this cause, and which is embodied herein the same as if entirely rewritten.

"3. That on the 20th day of November, 1931, the said R. A. Sneed, Secretary of State, after an alleged hearing, made a finding and ruling that 'said petition is in due form of law and sufficient in all things.

"4. That on the 23rd day of November, 1931, the protestant herein perfected an appeal to the Supreme Court of Oklahoma by filing with the Secretary of State a written notice thereof, which said appeal was duly filed in this court.

"5. That on the 28th day of November, 1931, the petitioner, Baxter Taylor, filed a motion to dismiss said appeal, alleging that the same was insufficient in law, and on said day and date, the court took the same under advisement and thereafter the court made its finding and ruling on said motion, overruling said motion and holding the said protest to be sufficient in law, and set December 9, 1931, as a proper time and date for the court to hear evidence on the protest challenging the validity of said petition. That ever since said appeal was filed in this court, the said cause has been pending therein, and is now pending in said court awaiting the hearing as above ordered and the final determination of the cause.

"6. The protestant further says that after the filing of said appeal, and after the transmission of all the documents and papers relating to said cause by the Secretary of State to this court, the said Secretary of State had no other or further duties to perform in connection therewith until the final determination of said cause by this court, and any act or deed performed by the said Secretary of State during the pendency of said cause undetermined in this court would be and is unlawful and void. That notwithstanding, the said Secretary of State, on the 25th day of November, 1931, transmitted to the Honorable William H. Murray, Governor of Oklahoma, and to Honorable J. Wm. Cordell, Secretary of the State Election Board, each an attested copy of the pending proposition, including therewith the alleged approved ballot title, all of which acts were illegal, void, unauthorized by law, and of no legal effect.

"7. The protestant further says that on the 4th day of December, 1931, the said Honorable William H. Murray, as Governor of the state of Oklahoma, issued over his signature and the seal of the state of Oklahoma, his public proclamation, setting out the acts and things above mentioned herein, and proclaiming that the ballot title of said measure was as stated therein, and further proclaiming the substance of said proposed measure, and further proclaiming that said proposed measure 'shall be submitted to the qualified electors of the state of Oklahoma for their approval or rejection at an election to be held on the 18th day of December, 1931,' and authorizing and directing the regular election officials whose duty it is to hold and conduct such elections, to hold said election on said State Question No. 167, Initiative Petition No. 112, on said date, to wit, December 18, 1931. That said proclamation was issued at a time when this cause was pending and undetermined in this court, all of which act and proclamation was without authority of law, void and of no legal effect.

"8. The protestant further says that the Legislature of Oklahoma, in its 1931 session, at pages 296 and 297 of said Session Laws, made an appropriation to and in favor of the State Election Board, in the sum of $110,000, to be used by it in defraying the expenses of any special election which the Governor might call during the biennium thereof. That said sum of money is now in the treasury of the state of Oklahoma, has not been used for any election or other expense, and is subject to the orders of the State Election Board, when legally made.

"9. That the Election Board of the state of Oklahoma consists of Hon. J. Wm. Cordell, Secretary, of Oklahoma City, Oklahoma; Hon. John W. Hayson, of Oklahoma City, Oklahoma; and Hon. Reford Bond of Chickasha, Grady county, Oklahoma, and that since the action of the Secretary of State in illegally certifying said measure, together with its ballot title, to the Governor, and since the unlawful issuance of the proclamation of the Governor, calling said election, and the said election board has threatened and is threatening, and will unless enjoined, restrained or otherwise prohibited by this court, use said sum or a portion thereof for the purpose of holding said election, the printing of the ballots in connection therewith, including the printing of this measure thereon, and also in transmitting ballots to the various voting precincts of the state, paying the officers of said election, canvassing the returns thereof, and all other incidental and necessary expenses in connection with holding said election.

"That said acts and things so threatened, if carried into effect, would be illegal, without authority of law, and a violation of the

rights of this protestant and all other citizens of the state similarly situated.

"That said election board has already advertised for bids for the printing of approximately 1,250,000 ballots, and will proceed to receive and accept bids on said printing, and incur other expenses in connection with said election unless prohibited by the process of this court.

"10. That Hon. Frank C. Carter is the duly elected, qualified and acting auditor of the state of Oklahoma, and that his duties consist in issuing warrants for the payment of legal claims against the state of Oklahoma, and that the said Hon. Frank C. Carter has threatened to and will unless enjoined, restrained, or otherwise prohibited by this court, issue warrants drawn by said election board against appropriations of the state of Oklahoma now in its treasury, to pay said illegal claims as above set out."

Upon motion of protestant, this court made Honorable Frank C. Carter, as State Auditor of the state of Oklahoma, a party to this action. The hearing on the protest has been continued by the court pending a determination of the ancillary proceedings on the motion or application of the protestant to enjoin Honorable Frank C. Carter, as State Auditor, from paying out any funds of the state of Oklahoma for expenses incurred in holding an election in accordance with the proclamation of the Governor, dated the 4th day of December, 1931, for the reason and upon the grounds that the Governor was without authority to call an election while an appeal was pending on the petition before this court. I recognize and appreciate to the fullest extent the very great importance of this issue in the case, not only to the parties now before the court, but also to the great mass of the citizens of this state, all of whom are interested in the practical working of the courts of justice throughout the land, both federal and state, and in the proper exercise of the jurisdiction of the Supreme Court as controlled by the Constitution and laws of the state of Oklahoma, and the duty of the three co-ordinate branches of the state government to function within the limits prescribed by the Constitution.

"Every officer under a constitutional government must act according to law and subject to its restrictions, and every departure therefrom or disregard thereof must subject him to the restraining and controlling power of the people, acting through the agency of the judiciary; for it must be remembered that the people act through the courts, as well as through the executive or the Legislature. One department is just as representative as the other, and the judiciary is the department which is charged with the special duty of determining the limitations which the law places upon all official actions." McConaughy v. Sec. of State, 106 Minn. 416, 119 N. W. 417.

This court in Re Initiative Petition No. 23, State Question No. 38, 35 Okla. 49, 127 Pac. 862, decided October 8, 1912, when the membership of this court was composed of Justices Turner, Hayes, Williams, Kane, and Dunn, three of whom were members of the Constitutional Convention that framed the Constitution of the state of Oklahoma, in the first and second syllabus paragraphs, held that:

"The appeal from a decision of the Secretary of State to the Supreme Court under the provisions of chapter 107, Sess. Laws 1910-11, p. 235, is a transference of the proceedings to this court for a trial de novo, and it has jurisdiction to hear and determine the same.

"Under the provisions of chapter 107, Sess. Laws 1910-11, p. 235, an appeal being taken, this court secures jurisdiction of the Secretary of State by virtue of the notice served as provided for therein, and, on finding an initiative or referendum petition sufficient, it may by its own mandate compel said officer to comply with statutory requirements."

In the body of the opinion Mr. Justice Dunn, speaking for the court, said:

"In the case of In re Petition No. 3, known as the Woman's Suffrage Petition, 26 Okla. 487, 109 Pac. 732, in the absence of a challenge by either party in this court, it was assumed that an appeal would lie from the action of the Secretary of State, and the court took appellate jurisdiction and rendered judgment upon the errors which were asserted existed in the action of the Secretary. The question, however, was raised in a recent case involving Initiative Petition No. 21, State Question No. 36, commonly known as the Aiken Bill, and without an opinion being written, this court, on objection being made to its jurisdiction, considered the matter and came to the conclusion that the proceeding in this court, while denominated by the statute an appeal, was in fact a proceeding de novo, and that the petition and protest and other documents were filed here for the purpose of hearing evidence thereon precisely as they were filed in the office of the Secretary of State. The case of United States v. Ritchie, 17 How. 525, 15 L. Ed. 236, is cited and seems in point on this question. Therein the Supreme Court of the United States had before it for consideration an appeal from a decree of the District Court of the Northern District of California, involving proceedings taken before certain commissioners appointed to settle private land claims in Cali-

fornia under the Act of March 3, 1851, 9 St. at L. 631. The commissioners, after hearing proofs in the case before them, ordered the title confirmed in the claimants. Thereafter a transcript of the proceedings before the board with their decision was filed with the clerk of the United States District Court of the Northern District of California. On a hearing had before the said court, the decision of the board of commissioners was confirmed, and the cause was taken on appeal to the Supreme Court of the United States. On the appeal there taken, a motion was made to dismiss the same by reason of the alleged lack of jurisdiction of the district court to entertain an appeal from the board of commissioners for the reason that the said board was not organized as a court and lacked authority to exercise judicial power, and hence an appeal would not lie from it to the court. Considering this objection, the Supreme Court of the United States said:

" 'It is also objected that the law prescribing an appeal to the district court from the decision of the board of commissioners is unconstitutional, as this board, as organized, is not a court under the Constitution, and cannot, therefore, be invested with any of the judicial powers conferred upon the general government. Am. Ins. Co. v. Canter, 1 Pet. 511 (7 L. Ed. 242); Benner v. Porter, 9 How. 235 (13 L. Ed. 119); United States v. Ferreira, 13 How. 40 (14 L. Ed. 42). But the answer to the objection is that the suit in the district court is to be regarded as an original proceeding, the removal of the transcript, papers, and evidence into it from the board of commissioners being but a mode of providing for the institution of the suit in that court. The transfer, it is true, is called an appeal. We must not, however, be misled by a name, but look to the substance and intent of the proceeding. The district court is not confined to a mere re-examination of the case as heard and decided by the board of commissioners, but hears the case de novo upon the papers and testimony which had been used before the board—they being made evidence in the district court—and also upon such further evidence as either party may see fit to produce.'

"This case is cited approvingly and followed by a number of later state and federal cases, and, so far as our investigation goes, the doctrine therein announced seems never to have been departed from. We hold, therefore, in accordance therewith, that the jurisdiction taken under the so-called appeal by this court is not appellate in its character, but that on the Secretary of State transmitting to the clerk of this court the petition, protest, and papers and documents on file in his office relating thereto, the case was transferred to this court for an original investigation and hearing, and the evidence and proceedings are to be taken de novo.

This holding on our part is in consonance with the doctrine that, where a statute is susceptible to two reasonable constructions, under one of which it would be constitutional, and the other would render it invalid, it is the duty of the court to give such construction as will sustain, rather than one which will destroy, the statute. Rakowski v. Wagoner, 24 Okla. 282, 103 Pac. 632."

A trial de novo in an appellate court is a trial had as if no action whatever had been instituted in the court below. Karcher v. Green (Del.) 32 Atl. 225. A trial de novo must be a trial of the entire case anew, hearing the evidence, whether additional or not, and not a trial on appeal and on nothing but the record to correct errors. Shultz v. Lempert, 55 Tex. 273. A trial de novo must be a trial anew in the appellate tribunal according to the usual or prescribed mode of procedure in other cases involving similar questions, whether of law or fact. Lewis v. Baca (N. M.) 21 Pac. 343, Words & Phrases (First Series) vol. 8, p. 7108.

In his argument as attorney on behalf of the petitioners, Honorable William H. Murray, Governor of the state of Oklahoma, urged this court to carefully review the former decisions of this court dealing with the initiative and referendum sections of the Constitution and the statutes enacted for the purpose of giving vitality to and protecting the rights of the people under the constitutional provisions. He said:

"* * * The first thing you want to do is ask yourselves the question: First, if this position is right? Second, does it harmonize with fundamentals? Third, is it logical?"

We have complied with the request of the attorney and have carefully reread and considered all of the authorities cited by either party and many more. Some confusion seems to have arisen in the argument relative to the common-law writ of error and the word "appeal" as used in many statutes.

"The remedy by appeal, which was unknown to the common law, was employed for the review of causes in equity, ecclesiastical, and admiralty jurisdictions. Now, both in England and in the United States, the whole matter of appellate review is regulated almost entirely by the statute law." 3 C. J. page 299.

"Owing to the diversity of the statutory provisions regulating appellate procedure, the word 'appeal' is used in many different senses. The term is sometimes used to denote the nature of the appellate jurisdiction, without regard to the particular mode by which a cause is transmitted from one tribunal to another; but, in its original and

strictly technical sense, an appeal was a proceeding, introduced into equity practice from the civil law, by which the whole cause was removed from a lower to an appellate court, and there tried de novo upon evidence newly introduced, being subjected to a new and final determination as if it had not been tried before, and without any reference to the conclusion of the inferior court. The statutory appeal differs so greatly in the various jurisdictions, in consequence of the dissimilarity of the statutes, that it is impossible to give a descriptive definition which will hold good in the various states; it is only possible to indicate in a general way the different forms which the remedy has assumed." 3 C. J. pages 314-315.

"In the absence of constitutional limitation, the Legislature may prescribe the mode and specify the manner in which a question shall be brought up from the lower court to the appellate court for review." 3 C. J. page 299.

So, the Legislature of this state deemed it wise to prescribe the mode and specify the manner in which an initiative petition may be brought up from the Secretary of State to the Supreme Court for review. The statute provides that this may be done simply by the appellant's serving notice in writing upon the Secretary of State of such an appeal. No bond is required. This shows it was evidently the intent of the Legislature to permit any citizen or citizens who desired to circulate a petition initiating a proposition of any nature, whether to become a statute law or amendment to the Constitution, and have the same heard in event of protest by the Secretary of State in the first instance and by the Supreme Court on appeal, as free from technicality and burdens of any character as possible. An examination of the subject "Appeal and Error," vol 2, R. C. L., in discussing writs of error and appeals, used very similar language to that found in Corpus Juris, and, among other things, the writer of the text states that:

"At common law the process for reviewing the judgments of the lower courts was the writ of error. The appeal which was borrowed from the civil law, and was unknown to the common law, was the appropriate method of obtaining a review of the decisions of the equity, admiralty, and ecclesiastical courts. The right to an appeal at law is and always has been statutory. It is a remedy which the Legislature may in its discretion grant or take away, and it may prescribe in what cases, and under what circumstances, and from what courts appeals may be taken; and, unless the statute expressly or by plain implication provides for an appeal from a judgment of a court of inferior jurisdiction, none can be taken. The writ of error, however, does not owe its origin to any statute, and in the United States has always been a writ of right, both in civil and criminal cases, though in England the writ of error in cases of treason or felony would not lie without the consent of the king. In some jurisdictions writs of error have been expressly abolished, while in others the statutes providing for appeals have been considered to abolish by implication the writ of error in cases in which an appeal may be taken." 2 R. C. L., pages 27-28.

And again, at page 118, we find this language:

"An appeal which brings up the entire cause for trial de novo in the appellate court operates to annul the judgment, in the absence of a statute providing otherwise."

Cited in support thereof are: Bank of North America v. Wheeler, 28 Conn. 433, 73 Am. Dec. 683; Stalbird v. Beattie, 36 N. H. 455, 72 Am. Dec. 317; Fort v. Fort, 118 Tenn. 103, 101 S. W. 433, 11 Ann. Cas. 964.

In the Bank of North America Case the court, in an opinion delivered by Storrs, C. J., says:

"The effect of that appeal depends upon the character of the jurisdiction of that court. If, by the laws of New York, a case carried before it by appeal is to be retried by it as upon original process in that court, and it has jurisdiction to settle the controversy by a judgment of its own, and to enforce that judgment by its own process, the appeal, like an appeal under our statutes from a justice of the peace to the superior court, would vacate the judgment of the inferior tribunal; Curtiss v. Beardsley, 15 Conn. 518; Campbell v. Howard, 5 Mass. 376. But if the appeal is in the nature of a writ of error, and only carries up the case to the court of appeals as an appellate court for the correction of errors which may have intervened on the trial of the case below, and for its adjudication upon the question whether the judgment appealed from should be affirmed, reversed, or modified, and that court has no other powers or duties than to affirm, reverse, or modify that judgment, or remit the case to the inferior tribunal, that it may conform its judgment to that of the appellate tribunal, then such appeal, like an appeal under our laws from the probate court to the superior court, does not vacate or suspend the judgment appealed from; and the removal of the case to the appellate court would no more bar an action upon the judgment than the pendency of a writ of error at common law, when that was the proper mode of correcting errors which may have occurred in the inferior tribunal."

Curtiss v. Beardsley, cited in the Bank of North America Case, supra, holds:

"An appeal from a judgment of the justice of the peace to the county court, allowed, but not duly entered in that court, not merely suspends such judgment, but vacates it, so that an action of debt thereon cannot be sustained."

Campbell v. Howard, supra, holds that:

"Where an appeal is duly made from a judgment of the common pleas, such judgment ceases to have any force."

In Fort et al. v. Fort et al., supra, the Tennessee case, that court said:

"Under our statute (Shannon's Code, sec. 4910) the bond required of appellants and the proceedings in the appellate court are the same on an appeal in the nature of a writ of error as upon a simple appeal, yet the distinction in effect upon the judgment of the lower court appealed from is maintained and kept clear in all our decided cases—in the one case merely suspending, and in the other vacating, the judgment pending the appeal."

From the text quoted and authorities cited sustaining the same, I am of the opinion that under section 6631, C. O. S. 1921, supra, this court in Re Initiative Petition No. 23, State Question No. 38, 35 Okla. 49, supra, announced the correct rule of law and we are duty bound to follow the same. The statute is clear that upon the appellant's serving notice upon the Secretary of State in writing of such appeal the proceedings come to this court to try the cause de novo and to hear testimony and arguments, and to determine and decide the questions that it was the duty under the law for the Secretary of State to decide in the first instance. We are not finding any fault with the Secretary of State in notifying the Governor of his decision, as it clearly and truthfully stated the facts and notified the Governor of the state of Oklahoma that an appeal had been taken from his findings and decision to the Supreme Court. The Governor in his proclamation of December 4, 1931, recites that:

"Whereas on the 25th day of November, 1931, the said Secretary of State transmitted to me, the under-signed Governor of the state of Oklahoma, and to the Secretary of the State Election Board, each, an attested copy of the pending proposition, including such approved ballot titles; and whereas, said petition having been accepted and said ballot titles having been decided upon, the said Secretary of State having, in writing, notified me thereof, it becomes my duty as Governor of the state of Oklahoma to issue my proclamation setting forth the substance of said measure and the date of the referendum vote thereon. * * *"

This is where the Governor fell in error and made a mistake. The Secretary of State did not transmit to the Governor an attested copy of the pending proposition and did not advise the Governor that the same had been accepted. The Secretary of State notified the Governor by the certificate hereinbefore set out of the action of the Secretary of State upon the pending proposition, and further notified the Governor of the state of Oklahoma on the 24th day of November, 1931, the Secretary of State transmitted all the papers and documents on file in his office relating to such petition to the Supreme Court of Oklahoma pursuant to notice of appeal served upon the Secretary of State as by law provided. In his proclamation the Governor seems to base it upon the good intentions of the petitioners in requesting that said proposition be submitted to the voters. He also urges in his argument as counsel before the court the great need for the adoption of the pending measure. We think this argument is very forcefully answered by the Supreme Court of Wisconsin in the case of Bonnett v. Vallier, 116 N. W. 885, 17 L. R. A. (N. S.) 486, wherein the court said:

"The appeal is often made to courts directly or indirectly to look favorably upon a law because of the worthy purpose in the minds of the promoters in securing its place upon the statute books. That cannot go to the extent of causing hesitancy or failure to condemn a legislative act which clearly exceeds the lawmaking power. Courts have their duty to perform in a case like this, and, however unpleasant it may be, they cannot turn aside on any account whatever, even in the face of manifestly the very best of intentions upon the part of the lawmakers and promoters. The greatest constitutional lawyer of our country during its early history aptly said: 'Good intentions will always be pleaded for every assumption of power, but they cannot justify it. The Constitution was made to guard the people against the dangers of good intentions. When bad intentions are boldly avowed the people will promptly take care of themselves. They will always be asked why they should resist or question the exercise of power which is so fair in its object, so plausible and patriotic in appearance, and which has the public good alone confessedly in view. Human beings, we may be assured, will generally exercise power when they get it, and they will exercise it most undoubtedly under a popular government under the pretense of public safety or high public interest. * * * They think there need be little restraint upon themselves.'

"Again, they sometimes, it seems, lose sight of the fact that there are such re-

straints, and so it becomes necessary for the courts, in the performance of their constitutional duty, to call that to mind. The fathers foresaw that in writing into the Constitution those significant words: 'The blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality, and virtue, and by frequent recurrence to fundamental principles.' Const. art. 1, sec. 22."

It was also urged that it is necessary that the measure proposed in the initiative petition should be submitted without further delay owing to the importance of the proposed act. This court did not delay the filing of the petitions in the office of the Secretary of State. It has been many months since the legislative branch of the state government adjourned, and if the act is of such vital importance to the people of the state of Oklahoma, we see no good reason why the filing of the same was delayed until so late in the year. These were matters over which the petitioners alone had control, and we know of no reason why the petitions could not have been filed sooner in the event they desired the petitions finally determined in order that they might be voted upon before the end of the year 1931. They petitioned the Governor to submit the initiative bill at the next election, and the Governor, exercising the power vested in him by the Constitution to call a special election, issued the proclamation of December 4, 1931. The only question for us to determine at this time is, Did the Governor have legal authority to issue a proclamation before the sufficiency of the petitions was finally determined in substantial compliance with the laws of this state? The law seems to be well settled that the appeal brings up all the proceedings and the case is tried de novo and is a trial of the entire case anew; the words of the statute are:

"It shall be the duty of the appellants to serve notice upon the Secretary of State, in writing, of such appeal. Whereupon, said Secretary of State shall immediately transmit all papers and documents on file in his office relating to such petitions to such court."

The statute further provides that:

"After such hearing the Secretary of State shall decide whether such petition be in form as required by the statutes, and his decision shall be subject to appeal to the Supreme Court of the state. * * *"

If the hearing on the petition was pending in the office of the Secretary of State, would it be seriously contended that the Governor had power and authority to issue a proclamation calling an election upon the question submitted by the petition? We think not. If not, how can it be seriously contended the Governor has such power and authority where an appeal has been taken as provided by law and the Secretary of State has transmitted all papers and documents on file in his office relating to such petition to the Supreme Court and the cause is now here pending for a trial de novo, that is, a trial of the entire case anew?

An appeal in such a proceeding bringing up the entire proceedings for a trial de novo in the appellate court and operates to annul the findings, conclusions, and decision of the Secretary of State relative to the sufficiency or insufficiency of initiative petitions, in the absence of a statute providing otherwise.

When an initiative petition is filed with the Secretary of State by a citizen or citizens and notice has been given and a protest has been filed, and a hearing is held, all in accordance with section 6631, C. O. S. 1921, it is "accepted" when it has passed successfully the scrutiny of examination as to the proposition offered for submission and it is determined that it is the same in the petition circulated as in the copy filed in the office of the Secretary of State before the original was circulated, and the evidence as to the sufficiency of valid petitioners has been heard by the Secretary of State and he has decided such petition is sufficient as required by the statutes, and has made and announced his findings and decision to the parties, representing the petitioners and the protestant, and the time to appeal has expired and no notice of appeal has been served as required by law, or if notice of appeal is served as required by law, then when the Supreme Court has heard said proceedings de novo and has issued its mandate sustaining the sufficiency of said initiative petition.

An initiative question cannot be legally submitted to the qualified electors of the state or legally voted upon until the sufficiency of the initiative petitions has been finally determined and the petitions found to substantially comply with the law.

For the reasons hereinbefore stated, I am forced to the conclusion that, under the statute, where an appeal has been taken from the findings and decision of the Secretary of State to the Supreme Court and all papers and documents on file in his office relating to such petition have been transmitted to the Supreme Court for a trial de novo, then the Governor is without power or authority to issue a legal proclamation calling for an election upon the bill or constitution-

al amendment submitted by such petition un_til the Supreme Court has finally acted and its mandate has been issued to the Secretary of State holding that there has been a substantial compliance with the law and that the petitions are valid.

There is but one other issue presented for determination at this time.

We have, by order, permitted the protestant to amend his ancillary pleadings so as to allege that "he is a taxpayer in Oklahoma," and, by order, made the State Auditor a party to this proceeding so that the court might issue an injunction against him illegally paying out any public funds in his custody and under his control in the event the court should hold that the calling of the election is illegal.

It is well settled that the district courts and the Supreme Court have jurisdiction to enjoin state officers, other than the Governor, from applying public funds contrary to law. It is equally well settled that courts do not favor a multiplicity of suits.

I think it is our duty to protect the public funds of the state which have been appropriated by the legislative branch of the government for a specified purpose and prevent the same from being illegally expended. The State Auditor has filed an answer in these proceedings and has made no objection to being made a party and has requested the court to announce the law advising him of his rights and assuring the court that he will obey the law as announced and declared by the court, without an injunction being granted. The majority opinion does not pass upon a single issue in the proceedings, simply denies an injunction, which the State Auditor, a high state official of a co-ordinate branch of the state government, advises us he will obey without a writ of injunction being issued. The majority opinion advises him, in substance, Beware! If you pay out any money, you do so at your peril. I do not know what course the State Auditor will pursue, but I anticipate he or some one in his behalf will return again and knock at the door of this court for an opinion announcing the law in the case. He may come as a public officer or some taxpayer may come to protect his property rights, and when they or either of them come all clad in an injunction suit, I assume the court will recognize them and declare the law. In my opinion the court has not done so in the majority opinion.

It is the duty of the court to declare the law and the State Auditor to obey the law. He has signified his willingness to do so and prayed the court in his answer to announce the law. The Governor shall cause the laws of the state to be faithfully executed. The law as declared by this court is binding upon the Governor and every other official and the people of the state. I am of the opinion that we should declare that the special election called for December 18, 1931, was called while a hearing was pending de novo in this court on the sufficiency of the petition initiating a proposition to become a statute law and was therefore illegal and that it is the duty of the Governor to recall his proclamation and not issue another until the sufficiency of the petition is finally determined by this court. In my opinion, when the law is so declared by this court, it would be his duty to obey and execute the law. The law presumes that as a public officer he will perform his duties.

For the foregoing reasons, I most respectfully dissent from the majority opinion.

---

In re Initiative Petition No. 112, State Question No. 167.

No. 23082.

ANDREWS, J. (dissenting). From the order of the Secretary of State made on the 20th day of November, 1931, as to the sufficiency of an initiative petition filed with him on the 31st day of October, 1931, an appeal was taken by the protestant to this court by notice, in writing, on the 23rd day of November, 1931. The papers were transmitted to this court by the Secretary of State on the 24th day of November, 1931. While the cause was pending in this court for a trial de novo and after this court had set the same for trial on the 9th day of December, 1931, the Governor of the state, on the date of December 4, 1931, issued an executive order and election proclamation calling an election on the proposed measure for the 18th day of December, 1931. Thereafter an application was made to this court by the protestant for a writ of prohibition, injunction, or other order to preserve the jurisdiction of this court of the subject-matter before it. This court ordered that the trial as to the sufficiency of the petition be continued until a determination of the application for a writ of prohibition, injunction, or other order. The issue before this court for determination at this time is whether or not such an order should be granted.

The Constitution of the state provides for a plan of government by which the powers of the state are to be exercised by three de-

partments, the legislative, the executive, and the judicial; by which the three departments shall be separate and distinct, and by which, except as otherwise provided therein, neither department shall exercise the power properly belonging to either of the other departments. It is therein provided that the legislative power should be divided between a Legislature, to be composed of representatives of the people, acting through a Senate and a House of Representatives, and the people themselves, acting through the provisions therein made for initiative and referendum and suitable provisions made by the Legislature for carrying into effect the provisions of the initiative and referendum. The power of the Legislature is therein prescribed and limited and, as the people thought it necessary to impose restrictions upon the power of the Legislature, so did they think it advisable to impose restrictions upon their right to exercise the initiative and referendum, and such restrictions are imposed.

Much has been said as to the rights of the people to initiate legislation, and much that has been said has been without regard to the decisions of this court. In Ex parte Wagner, 21 Okla. 33, 95 Pac. 435, Mr. Chief Justice Williams, speaking for the court, held that the initiative provisions of the Constitution were not self-executing. We quote from this opinion as follows:

"The initiative and referendum provisions, relating, not only to the affairs of the state, but also to counties and cities, are taken substantially from the Constitution of Oregon. The Supreme Court of that state, in the case of Kadderley v. Portland, 44 Or. 119, 74 Pac. 710, 75 Pac. 222, has held that the same are not in conflict with section 4, art. 4, Const. U. S., guaranteeing to every state a republican form of government.

"The next question is: Were said provisions self-executing on the 18th day of December, A. D. 1907? The Supreme Court of Oregon, in the case of Stevens v. Benson (Or.) 91 Pac. 577, held that the initiative and referendum provisions as contained in the Oregon Constitution were self-executing. The only difference between the provisions in that Constitution and those of this state is that in the former it is provided that, in submitting such petitions to the people, the Secretary of State and all other officers shall be guided by the general laws and the act submitting the initiative and referendum amendment to the people for adoption or rejection until legislation shall be especially provided therefor, clearly indicating that it was the intention in adopting the Oregon amendment that the same should then and there become self-executing. This clause does not appear in the Oklahoma Constitution. Substantially such provision was contained therein prior to the time that the constitutional convention reassembled after the proposed Constitution had been provided to be submitted to the people for adoption or rejection. When the convention reconvened, in order to obviate any possible objection that might be made by the President of the United States to the same, wherein it was required by section 4, art. 4, Const. U. S., and the terms of the enabling act (Act June 16, 1906, c. 3335, 34 Stat. 267), to be republican in form, and not in conflict with the provisions of said act, that part was eliminated, leaving it to the Legislature to carry same into effect. There was undoubted wisdom and precaution in that act. If the enemies of the principle of the initiative and referendum in popular government had been able to convince the department of justice of the federal government that such provisions of the initiative and referendum, when adopted by a state, rendered such state government unrepublican in form, still it remained that until the Legislature acted the principle was not self-executing in the Oklahoma Constitution. And, until the Legislature enacted measures carrying it into effect, the federal government had less right or reason to complain and that was one of the reasons for such action assigned at the time; for, if that contention against the provisions of the Constitution or to the initiative and referendum had been sustained, yet, as the same were not self-executing in that Constitution, reason and consideration of the rights of the people of the proposed state should certainly have impelled the promulgation of the proclamation of the admission of the state into the Union. For, when the act of the Legislature had been passed carrying same into effect, then the question could in due and proper time have been raised that such act was in conflict with section 4, art. 4, Const. U. S., and been declared void, and by such course preserved the supremacy of the Constitution of the United States, and at the same time vouchsafe the right of local self-government to over one million of citizens."

—and:

"Section 3, art. 5, Const. (Bunn's Ed. sec. 55) relating to the initiative and referendum provision, provides that 'the Legislature shall make suitable provision for carrying into effect the provisions of this article.' This especially indicates that it was not the intention of the constitutional convention that said articles should become effective until made so by act of the Legislature. In determining whether or not a provision of the Constitution is self-executing, we should consider the language in the light of the surrounding circumstances and conditions under which it was adopted, with a view of ascertaining the intention of the parties framing it. We accordingly conclude that on the 18th day of December, A. D.

248

1907, the provisions in our Constitution relating to the initiative and referendum were not self-executing, and that they did not become effective until the 16th day of April, A. D. 1908, when the act of the Legislature heretofore referred to was approved by the Governor of the state."

It is apparent from that statement of facts and law that, although the people had the authority to provide in their Constitution for the right of initiative and referendum and to make the provisions therefor self-executing, they declined to do so, and imposed upon the Legislature the duty of making suitable provisions for carrying into effect the provisions with reference thereto. Had the Legislature not made such provisions, the constitutional provisions would have been inoperative and ineffective. The right of the people, therefore, to the initiative and referendum is dependent upon legislative provisions. Another restriction imposed is one limiting the right of the people to initiate and adopt laws and amendments to the Constitution, requiring as a condition precedent thereto that such legislative measures be proposed by not less than eight per centum of the legal voters and that such amendments to the Constitution must be proposed by not less than 15 per centum of the legal voters. The exact language of the provision is as follows:

"The first power reserved by the people is the initiative, and eight per centum of the legal voters shall have the right to propose any legislative measure, and 15 per centum of the legal voters shall have the right to propose amendments to the Constitution by petition, and every such petition shall include the full text of the measure so proposed. * * *" Section 2, article 5, of the Constitution.

Since the power of the people to initiate legislation and constitutional amendments was expressly limited by them by that provision, it cannot be said that they may initiate or adopt laws in violation of the limitations imposed upon themselves by the adoption of the limitation. The right of the people to initiate and adopt laws is limited to not less than eight per centum of the legal voters. Without a petition addressed to the Governor of the state, no election may be called, and without the signatures of eight per centum of the legal voters to such a petition, no election may be called. It is evident that the constitutional provisions require a determination by some authority of whether or not such a petition is signed by eight per centum of the legal voters. The Constitution provides:

"The Legislature shall make suitable provisions for carrying into effect the provisions of this article." Section 3, article 5, of the Constitution.

Under the power so granted, the Legislature provided for a determination of that question. It provided that when a petition is filed in the office of the Secretary of State it shall be the duty of the Secretary of State to forthwith cause to be published a notice of the filing thereof, and any citizen of the state is authorized to protest against the same, within ten days, by notice to the Secretary of State and to the party or parties who filed the petition. The Secretary of State is authorized to hear testimony and argument for and against the sufficiency of the petition and to decide whether the petition be in form as required by the statute. Section 6631, C. O. S. 1921. However, the Legislature thought it advisable that the decision of the Secretary of State should be subject to an appeal to this court, and it provided that "his decision shall be subject to appeal to the Supreme Court of the state." Section 6631, supra. The Legislature further provided that a notice, in writing, of such an appeal should be served upon the Secretary of State, "Whereupon, said Secretary of State shall immediately transmit all papers and documents on file in his office relating to such petition to such court." The Legislature had the constitutional authority to provide the method provided for the determination of the sufficiency of the petition, if the provision made therefor was a suitable one for carrying into effect the provisions of article 5 of the Constitution. The Legislature made the provision, and, having done so, this court must presume that the Legislature thought the provision was a suitable one. The legislative enactment had the approval of the Governor of the state acting in a legislative capacity and, since the Governor approved the same, this court must presume that the Governor considered the provision a suitable one. The provision had the approval of the judicial branch of the government in a number of cases, in each of which the provision was sustained as a suitable one. After the long time during which the legislative act has been in force, this court is now asked to say that the legislative, the executive, and the judicial branches of the government have each been in error as to the suitableness of the provision and that a determination of the sufficiency of the petition by the Secretary of State, although an appeal from his order has been taken to this court is sufficient authority to authorize the Governor of the state to call an election. I

decline to so hold. While the question of the sufficiency of the petition is pending before this court on appeal from an order of the Secretary of State, the sufficiency of the petition has not been determined. Until the sufficiency of the petition has been determined in the manner provided and until it has been found in the manner provided that the petition has been signed by eight per centum of the legal voters, the Governor has no constitutional or other power to call an election or to submit the proposed measure to the people for their action. His authority to call such an election is dependent upon the filing of a petition sufficient in form and signed by not less than eight per centum of the legal voters. He has no authority to determine either the sufficiency of the petition or that the petition has been signed by eight per · centum of the legal voters. The determination of those questions by the Secretary of State is ineffective where an appeal is taken from his order to this court. Until the determination of those questions by this court, where an appeal is taken to this court from the order of the Secretary of State, there is no authority in the Governor to call an election or to submit the proposed petition to the voters, and an executive order or proclamation calling such an election is void for want of authority.

While the question of the sufficiency of the petition was pending before this court, the Governor of the state, with the knowledge implied from the records of this court and with the knowledge imparted to him by the certificate of the Secretary of State of the state of Oklahoma, on the 4th day of December, 1931, issued an executive order in words and figures as follows, to wit:

"State of Oklahoma, Department of State.

"R. A. Sneed, Secretary of State.

"(Seal)

"To All to Whom These Presents Shall Come, Greeting:

"I, R. A. Sneed, Secretary of State, of the state of Oklahoma do hereby certify that the following and hereto attached is a true copy of Executive Order Election Proclamation Initiative Petition 112, State Question No. 167 Filed December 4, 1931, the original of which is now on file and a matter of record in this office.

"In testimony whereof, I hereto set my hand and cause to be affixed the Great Seal

of State. Done at the City of Oklahoma City, this ninth day of December, A. D. 1931.

"R. A. Sneed
"Secretary of State.
"--------------------

"(Seal)

"Executive Order.
"Election Proclamation.

"Whereas, on the 31st day of October, 1931, Baxter Taylor, a citizen of the state of Oklahoma, filed with the Hon. R. A. Sneed, Secretary of State, an original petition, designated as 'State Question No. 167', 'Initiative Petition No. 112', signed by more than 115,000 citizens and legal voters of the state of Oklahoma, requesting that the same 'shall be submitted to the legal voters of the state for their approval or rejection, at the next election held throughout the state'; and

"Whereas, on the 2nd day of November, 1931, the said Secretary of State caused said question and petition to be published, as required by law, in a newspaper of general circulation, giving notice to any and all who might wish to protest the same; and said question and petition was duly published in the 'Blue Valley Farmer,' in its issue of November 5, 1931; and

"Whereas, on the 9th day of November, 1931, S. P. Freeling, a citizen of Oklahoma, filed his written notice of protest to said question and petition with the said Secretary of State; and

"Whereas, on the 20th day of November, 1931, the said R. A. Sneed, Secretary of State after hearing testimony and argument in support of said protest, found that 'said petition is in due form of law and amply sufficient in all things'; and

"Whereas, on the 20th day of November, 1931, the said petitioner, Baxter Taylor, prepared and filed with the Secretary of State of Oklahoma, and with the Attorney General of Oklahoma, one copy each of a proposed ballot title, not exceeding 100 words, and containing a gist of the proposition proposed to be submitted; and

"Whereas, on the 23rd day of November, 1931, the said Attorney General notified the said Secretary of State that, in his judgment, the said ballot title so submitted was not in legal form and in harmony with law and he thereupon, prepared and filed a ballot title which, in his judgment, did conform to law; and

"Whereas, on the 25th day of November, 1931, the said Secretary of State transmitted to me, the undersigned, Governor of the state of Oklahoma, and to the Secretary of the State Election Board, each, an attested copy of the pending proposition, including such approved ballot title; and

"Whereas, said petition having been accepted and said ballot title having been decided upon, the said Secretary of State having, in writing, notified me thereof, it becomes my duty, as Governor of the State of Oklahoma to issue my Proclamation, setting forth the substance of said measure and the date of the referendum vote thereon:

"Now therefore, I, William H. Murray, Governor of the state of Oklahoma, by virtue of the power and authority vested in me by the Constitution of the state of Oklahoma and laws thereof, as such Governor, do hereby proclaim that the ballot title of said proposed measure is as follows:

" 'An act repealing existing State Income Tax Laws and money and credits tax law; providing for the levying of an annual net income tax on the income of persons, firms, associations, and corporations derived from property owned and business done in Oklahoma, and fixing the rate thereof; exempting certain persons, institutions, companies, associations, and corporations from the provisions of act; classifying certain taxpayers; providing for collection of tax with penalties for nonpayment or for failure to make returns; providing apportionment of revenue between expense of collection, cost of state government, and support of common schools.'

"And I do also hereby proclaim that the substance of said proposed measure is as follows: (Initiative petition deleted as unnecessary to a determination of the issues herein.)

"And I do also hereby proclaim that said proposed measure shall be submitted to the qualified electors of the state of Oklahoma, for their approval or rejection, at an election to be held on the 18th day of December, 1931; and the regular election officials whose duty it is to hold and conduct such elections, as provided by law, are hereby authorized and directed to hold and conduct such election on said 'State Question No. 167,' 'Initiative Petition No. 112, on said date.

"In view of the fact that the protestant, S. P. Freeling, has appealed to the Supreme Court of Oklahoma from the decision of the Secretary of State, holding that such petition was, in all things, sufficient and in compliance with the Constitution and laws of the state of Oklahoma, relating to such proceedings, I deem it advisable to set forth my reasons as a part of this proclamation, for issuing the same at this time.

"Section 6631, C. O. S. 1921, provides:

" 'After such hearing, the Secretary of State shall decide whether such petition be in form as required by the statutes, and his decision shall be subject to appeal to the Supreme Court of the state, and such court shall give such cause precedence over all others. * * * If the court be at that time adjourned, the Chief Justice shall immediately convene the same for such hearing. * * *'

"The appeal of the said protestant, S. P. Freeling, was filed in the Supreme Court on November 23, 1931; and, after a preliminary hearing at which the petitioner, Baxter Taylor, and his attorneys urged that said appeal be heard and disposed of without delay, the said petitioner, on November 28, 1931, filed a motion to dismiss said protest, alleging that said protest was legally insufficient. After hearing argument upon said motion, on behalf of said petitioner and protestant, the said court thereafter overruled said motion and fixed December 9, 1931, eleven days thereafter, as the date for a hearing upon said protest.

"The said 'State Question No. 167', 'Initiative Petition No. 112', shows, upon its face, that it is a proposed 'act providing for relief from ad valorem taxation by levying an annual tax upon the net income of persons, firms, associations, and corporations, derived from property owned and business done in Oklahoma'; and that one-fourth of the revenue derived thereunder shall be used for the expenses of state government and three-fourths of such revenue shall be used for support of common schools, to be distributed upon a scholastic enumeration per capita basis; and that the quota of each school district, under said proposed act, may be received only after it has reduced its ad valorem levy for school taxes in an amount equal to its quota.

"Said proposed act also levies an income tax upon the net income of individuals and corporations 'for the taxable year 1931 and for each taxable year thereafter'.

"The state and its people are sorely in need of the revenues imposed and collectible under this act, in order that there may be a reduction in the rate of ad valorem taxation; and if said proposed measure is not voted upon in the year 1931, serious legal questions will arise, resulting in vexatious and hazardous litigation, affecting not only the right of the state to tax the 1931 income of taxpayers, but the very life of this important measure.

"Because of the momentous and far-reaching consequences that may result from a failure to hold the election on this proposed measure in the year 1931, I feel that I would be derelict in my duty, as Governor of the state of Oklahoma, if I failed to issue my Proclamation in time to permit the holding of such election prior to the expiration of the present year.

"While, by this action, no disregard to the Supreme Court, a co-ordinate branch of the state government, is intended, yet the facts which impel me, as the Chief Executive of the state, to act, are undisputed and

clearly appears from the records. The original petition was filed with the Secretary of State on the 31st day of October, 1931. The appeal of the protestant was filed in the Supreme Court on the 23rd day of November, 1931. At all times, during the 24 intervening days, the protestant and his attorneys and experts had full and free access to the petition. Then, from the filing of the appeal to the hearing, on the 28th day of November, 1931, five more days elapsed. Then, the protestant has been given eleven additional days' delay and the hearing has been fixed for December 9, 1931. Every move of the protestant and his attorneys has meant nothing but delay, no more or no less.

"In the meantime, the few remaining days of the precious month of December and the precious year 1931, are passing; and I cannot and will not permit the life of this important proposed act to be jeopardized or destroyed, and the resultant loss to the people of many millions of dollars, in sorely needed revenues, if it is within my legal and constitutional power, as Chief Executive of the state, to prevent it. I hold that the Constitution and laws of the state clearly vest this power and authority in me and that the way is open for me to proceed; and, as Chief Executive of the state, I will then have discharged, to the fullest extent, the duties and responsibilities imposed upon me, by Constitution and law.

"By the terms of section 1, art. 5, of the Constitution, the people of the state have reserved unto themselves the right to legislate, independent of the Legislature:

" 'Section 1. The legislative authority of the state shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature.'

"The said state question and initiative petition complies fully and completely with the Constitution, as expressed in section 2, of the same article, as follows:

" 'Section 2. The first power reserved by the people is the initiative, and eight per centum of the legal voters shall have the right to propose any legislative measure, and 15 per centum of the legal voters shall have the right to propose amendments to the Constitution by petition, and every such petition shall include the full text of the measure so proposed. The second power is the referendum and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health or safety), either by petition signed by five per centum of the legal voters or by the Legislature as other bills are enacted. The ratio and per centum of legal voters hereinbefore stated shall be based upon the total number of votes cast at the last general election for the state office receiving the highest number of votes at such election.'

"The aforesaid reservations, under said sections 1 and 2, art. 5, of the Constitution, as above set out, create a Legislature, supreme and final, made up of the qualified voters of the state, for the enactment of laws; and in the exercise of the powers therein reserved to themselves, the supreme legislative body of the state, their rights cannot be denied by any power exercised by any branch of the state government, legislative, executive, or judicial.

"Under section 3, art. 5, of the Constitution only the Governor of the state, or the Legislature thereof, can call a special election upon any state question referred to the people; and, when so referred, the people become, in truth and in fact, the supreme Legislature for the state.

"When any such election is called, either by the Legislature or by the Governor, the same cannot be interfered with; and these rights are guaranteed to the people under section 7, art. 3, of the Constitution, as follows:

" 'Section 7. The election shall be free and equal. No power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage, and electors shall, in all cases, except for treason, felony, and breach of the peace be privileged from arrest during their attendance on elections and while going to and from the same.'

"These rights are also guaranteed and made secure by sections 1, 4 and 33, art. 2, of the 'Bill of Rights', as follows:

" 'Section 1. All political power is inherent in the people; and government is instituted for their protection, security, and benefit, and to promote their general welfare; and they have the right to alter or reform the same whenever the public good may require it; Provided, such change be not repugnant to the Constitution of the United States.'

" 'Section 4. No power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage by those entitled to such right.'

" 'Section 33. The enumeration in this Constitution of certain rights shall not be construed to deny, impair, or disparage others retained by the people.'

"In addition thereto, the political rights of the people, in the holding of elections and in their immunity from interference with such elections, are made secure by many decisions of the Supreme Court of

our own state and the decisions of the Supreme Courts of other states throughout the land are to the same effect; and it is made plain, in such decisions, that even courts of equity cannot by injunction, interfere with the 'political powers' and rights of the people in the holding of elections.

"It is thus shown that elections may not be interfered with by either the civil or military power of any branch of the government unless it be to protect the people in their right of suffrage; and to protect them, as the supreme legislative body of the state, in the exercise of their rights, under the Constitution, to legislate for themselves.

"If, by any process of reasoning, an election officer could be enjoined or interfered with, by any court, while exercising the functions of an officer of the supreme legislative body, the sovereign people of the state, then, by the same process of reasoning, a court would have the power to interfere with the Legislature by enjoining the reading clerk from calling the roll or the journal clerk from making an entry thereof or by enjoining a vote upon any bill under consideration; and the power to enjoin a legislative body is universally denied to any court.

"No court, having respect for the will of a sovereign people or any regard for its oath or for the Constitution and laws of the state, could, in good conscience, so violate the fundamental principles which underlie the whole structure of our state government.

"These are some of the reasons why I, as Governor of the state of Oklahoma, deem it to be my solemn duty to proclaim an election, on the 18th day of December, 1931, for the acceptance or rejection, by the people of Oklahoma, of 'State Question No. 167,' 'Initiative Petition No. 112'; and, fully understanding my duties and responsibilities, as such Chief Executive, and being conscious of no motive except to discharge those duties and to assume those responsibilities, with such wisdom and courage as Providence has endowed me, I take this action.

"Executed on this, the 4th day of December, A. D. 1931.

"By the Governor of the State of Oklahoma:

"Wm. H. Murray."

"(Seal)

"Attest:

"R. A. Sneed,
"Secretary of State of Oklahoma.

"1472

"Executive Order

"Election Proclamation

"Initiative Petition 112

"State Question No. 167

"Secretary's Memorandum

"Oklahoma City, State of Oklahoma

"Secretary's Office

"This instrument was filed for record this 4th day of December, A. D. 1931 at 8:32 o'clock a. m.

"Recorded in Executive Record

"No. 40 at page 311-319

"R. A. Sneed
"Secretary of State
"By Josephine Shanafelt."

At the time of the issuance of the executive order on December 4, 1931, the question of the sufficiency of the petition was pending before this court for a trial de novo on appeal from the order of the Secretary of State, and nothing had been said herein as to the enjoining of an election. It had not been necessary to say anything herein as to the enjoining of an election, for no election had been called; there was no authority under the Constitution and laws of this state for the calling of an election while the question of the sufficiency of the petition was undetermined, and no one could assume that there would be a violation of the law. Notwithstanding that fact, it was asserted in the executive order that when an election is called by the Governor the same cannot be interfered with; and "even courts of equity cannot, by injunction, interfere with the 'political powers' and rights of the people in the holding of elections"; that "elections may not be interfered with by either the civil or military power of any branch of the government," and that "No court, having respect for the will of a sovereign people or any regard for its oath or for the Constitution and laws of the state, could, in good conscience, so violate the fundamental principles which underlie the whole structure of our state government." Those were the conclusions of law of the executive branch. They were doubtless stated therein as an excuse for the calling of the election which was therein called. In justification of the order it was therein said: "Every move of the protestant and his attorneys has meant nothing but delay, no more or no less." That statement is not supported by the record. The petition was filed in the office of the Secretary of State on the 31st day of October, 1931. By the provisions of section 6631, supra, it became "the duty of the Secretary of State to forthwith cause to be published in at least one newspaper of general circulation within the state, a notice setting forth the date of such filing." If the word "forthwith," as used therein,

is to be given effect, it should be given the usual and ordinary construction. Yet, notwithstanding that fact and notwithstanding the fact that there are many papers in this state published daily, that notice was not published until the 5th day of November, 1931, a delay for which neither the protestant nor his attorney is responsible. Under the provisions of section 6631, supra, the protestant was given ten days in which to protest against the petition. The protestant in this case did not take advantage of the ten days given him under the provisions of the statute, but filed his protest with the Secretary of State on the 9th day of November, 1931, four days after the publication of the notice. It cannot be said that there was any intention on the part of the protestant to delay, when he filed his protest within less than one-half of the time given him by law in which to file the same. The Secretary of State fixed November 18, 1931, as the time for the hearing of the protest and the testimony and argument for and against the sufficiency of the petition. The provision of section 6631, supra, with reference to the time for the hearing is as follows:

"Any citizen of the state may, within ten days, by written notice to the Secretary of State and to the party or parties, who filed such petition, protest against the same, at which time he will hear testimony and arguments for and against the sufficiency of such petition."

Doubtless, the Secretary of State considered the time given a reasonable time for preparation for the hearing. The finding of the Secretary of State was made on the 20th day of November, 1931. The protestant, by the provisions of section 6631, supra, had ten days after the decision of the Secretary of State in which to appeal to this court. Upon the service of such a notice, the Secretary of State is required to transmit all the papers and documents on file in his office relating to the petition to this court. That notice was served upon the Secretary of State on the 23rd day of November, 1931, and upon the 24th day of November, 1931, the Secretary of State transmitted the papers and documents on file in his office relating to the petition to this court. It is apparent therefrom that the protestant and his attorneys used only three of the ten days allowed in which to serve upon the Secretary of State the notice of appeal to this court. It is true that the protestant and his attorneys asked this court to grant them time in which to prepare for trial and

in which to examine the more than 6,000 sheets of signatures attached to the petition and that this court set December 9, 1931, as the day for the trial of the cause. That was 15 days from the time the papers and documents were transmitted to this court by the Secretary of State. In the argument in this case it was stated, and not denied, that this was the shortest time granted by this court to prepare for trial in any of the many appeals involving initiative matters that have been presented to this court. This court, in the exercise of its discretion, made the order fixing the date for the trial. Its order is not subject to review by the Governor of this state and may not be disregarded or made ineffective though the Governor thinks that it is an improper one. The executive order recites:

"The original petition was filed with the Secretary of State on the 31st day of October, 1931. The appeal of the protestant was held in the Supreme Court on the 23rd day of November, 1931. At all times, during the 24 intervening days, the protestant and his attorneys and experts had full and free access to the petition."

The papers and documents transmitted to this court by the Secretary of State consist, in part, of a letter from the protestant to the Secretary of State and a letter from the Secretary of State to the protestant, which are as follows:

"November 14, 1931.
"To Hon. R. A. Sneed,
"Secretary of State,
"State Capitol,
"Oklahoma City, Okla.

"Dear Sir:

"For the purpose of assembling the names of witnesses for information for Freeling & Box, attorneys, to assist them in preparing the list of witnesses to be subpoenaed for the hearing on the sufficiency of Initiative Petition No. 112, which hearing has been set for November 18th, this request is made:

"Will you kindly instruct your custodian of records to furnish our force, headed by D. C. Patterson as we call for them, all the petitions on the seven questions for Oklahoma, Kay, Choctaw and Creek counties, and such other various and separate petitions as may be annexed, to get the addresses of signers, circulators and notaries that may be called as witnesses in this hearing, and all other data and petitions which Mr. Patterson may request, and which are now on file as public records in your office.

"S. P. Freeling,
"Protestant.

"State of Oklahoma, Oklahoma County, ss.

"S. P. Freeling of lawful age, being duly sworn, on oath says: That he signed the above for the uses and purposes therein set forth.

"S. P. Freeling.

"Subscribed and sworn to before me this 14th day of November, 1931.

"Hallie Whitaker,
(Seal)                    "Notary Public
"My commission expires Mar. 2, 1933.

"Service of the above and foregoing notice is hereby acknowledged to have been received by me this, the 14th day of November, 1931, at the hour of 12.4' o'clock p. m.

"R. A. Sneed,
"Secretary of State."

"November 14, 1931.
"Mr. S. P. Freeling, Protestant,
"Cotton Grain Exchange Building,
"Oklahoma City, Oklahoma.

"Dear Sir:

"This is in response to your letter of the 14th instant, requesting me to furnish to your force all petitions on all seven initiative petitions for Oklahoma, Kay, Choctaw and Creek counties, and such other varied and separate petition sheets as may be needed to get addresses, etc.

"You will please be advised that these petitions are matters of public record in this office and, as such, are available to reasonable public inspection. In an opinion to Mr. H. B. Cordell, President of the Board of Agriculture, dated November 13, 1929, the Attorney General stated:

" 'It is unquestionably the law that the public has the right to inspect all public records provided, of course, that the request to do so is made in reasonable time and that the work of inspection will not interfere with the proper functioning of the department.'

"This office is now engaged in performing its statutory duties in regard to these petitions and shall not be interfered with in its functioning.

"I have permitted your employees to inspect the petitions in this office and will continue to do so. However, in availing yourself of this privilege, it will be necessary for you to make such examinations as you desire to make without disturbing the regular order or arrangement of them by this office, and to follow this department in its work on each petition.

"The hearing on Initiative Petition No. 112 will be commenced November 18, 1931, and the protests to the other petitions will be taken up in regular order, according to their number. For that reason, it will be necessary for you to complete your examination of Petition No. 112 before November 18th, and on each of the others prior to the time of the hearing on that particular petition.

"It is only in this manner that your inspection will not operate to interfere with the functioning of this department.

"Very truly yours,
"R. A. Sneed,
"RAS:BR                    Secretary of State."

There were more than 6,000 sheets of signatures. The finding of the Secretary of State is that there were 121,401 signatures thereon. The "statutory duties" of the Secretary of State in regard to the petition had not been completed by the 14th day of November, 1931, and were to be continued thereafter. The volume of work required that length of time. If it required the Secretary of State that length of time to perform his statutory duties in regard to the petition, the protestant should not be condemned for asking for a reasonable time for the exercise of his statutory rights in regard to the petition. The order of the Secretary of State made on the 20th day of November, 1931, recites that "unless the protestant can show enough forgeries, duplications, or entire lack of addresses or other fatal incorrectness of the petition at this hearing, the Secretary of State need continue this hearing no further." The effect of that order was to deprive the protestant of his statutory right to present testimony and arguments against the sufficiency of the petition, and such an order made on the 20th day of November, 1931. after a hearing commenced on November 18, 1931, at 1:00 o'clock p. m., and after the Secretary of State had held that he had no authority to cause the issuance of subpoenas for witnesses and has refused to do so, could have no other effect.

It has been stated that "This question is whether or not the Governor of this state has a right to call this election under the Constitution." I agree to the correctness of that statement, but I think that the Governor of this state had no authority to call this election under the Constitution, for there had not been a legal determination, in the manner provided by the Legislature pursuant to its constitutional authority, of the sufficiency of the petition. The Governor, in his argument to the court, stated:

"Again, when the power of the initiative or referendum is exercised by the people, the people become a Legislature, and the supreme legislature, and the Governor is presiding officer of that legislature. He calls

them to order for the purpose of legislating."

That statement is in accordance with the rule stated by this court in Peebly v. Childers, State Auditor, 95 Okla. 40, 217 Pac. 1049, wherein this court held:

"While engaged in considering bills which have passed both houses of the Legislature and which are presented to him for approval or disapproval, the Governor is acting in a legislative capacity and not as an executive.

"While exercising this function the Governor is a special agent with powers limited by the Constitution and he can only act in the specified mode and can exercise only the granted powers. If he attempts to exercise them in a different mode, or to exercise powers not given, his act will be wholly ineffectual for any and every purpose."

The Governor is a part of the legislative department when the people are engaged in the exercise of the initiative power reserved by them under the provisions of the Constitution, but before the Governor can become the "presiding officer of that legislature," that "legislature" must be in session and that "legislature" may be called in session only in the manner provided by the Constitution and the Legislature, which is by the filing with the Secretary of State of a petition sufficient in form and signed by not less than eight per centum of the legal voters. Until that has been done, the legislature is not in session and the Governor is not the presiding officer thereof. While the Governor calls the people "to order for the purpose of legislating," he may not "call them to order" until eight per centum of the legal voters have petitioned him to do so, and the power has not been conferred upon him to determine whether or not the petition filed with the Secretary of State is sufficient.

"The filing of a petition for a referendum is not a legislative act, but merely a matter preliminary to the legislative act; and hence an investigation into its sufficiency is not beyond the jurisdiction of the courts." State ex rel. McNary, Dist. Atty., v. Olcott, Secy. of State, 62 Ore. 277, 125 Pac. 303.

Therein the action was to enjoin the Secretary of State from placing upon the ballot a referendum petition as to an appropriation for the benefit of the State University. The Legislature of Oregon provided by statute for an injunction against the Secretary of State and other officers upon a showing that an initiative or referendum petition was not legally sufficient. It was contended that "legally sufficient," as used therein, meant "regular upon its face," and that the court could not go beyond its apparent regularity to inquire into its genuineness. That view was not adopted by the court. The court said:

"It is conceded that there is no power granted to the Secretary of State to call witnesses and examine into the facts to determine the validity of any petition. His powers are not judicial, but ministerial; and if this power does not reside in the courts, a petition, consisting wholly of forged names, can be presented, and the public put to the expense of printing the measure and submitting it to a vote. This would be giving a forced and unnatural construction of the law in favor of fraud. The Legislature never contemplated such a vicious construction. We are of the opinion that by the term, 'legally sufficient' the Legislature meant to describe a valid petition, signed by legal voters, and complying substantially, not necessarily technically, with the requirements of the law."

Our Legislature has made no such provision, but has provided for an appeal from the order of the Secretary of State to this court. The language quoted from the Supreme Court of Oregon is applicable to the proceedings before this court.

It was contended before the Supreme Court of Oregon that the filing of a petition was a legislative act and consequently beyond the jurisdiction of the court to investigate. That contention was not adopted by the court. It said:

"The signing and filing of a petition is a matter preliminary to the legislative act. It is that which calls the legislative power into action. It is more a legislative act than the placing of a candidate's name for the state Legislature upon the ballot is a legislative act. If the candidate for legislative honors, presents a petition, signed by the required number of legal voters, and in other respects complying with the law, his name is entitled to go upon the ballot. If the partisan of a referendum measure presents a like petition, the measure is entitled to go upon the ballot."

The Supreme Court of Oregon held:

"Where referendum petitions contain evidence of forgeries, perpetrated either by the circulators, or with their connivance, the prima facie case in favor of the genuineness of the petitions is overcome; and the burden is on those upholding the validity of the petition to establish the genuineness of each signature."

But though the Legislature is in session, the powers of the Governor as a member of the Legislature are limited and he can exercise only the power granted to him. The power granted to him is to call an election

when the sufficiency of the petition has been determined in the manner provided by law, and when he attempts to call an election prior to that time, his act is wholly ineffectual for any and every purpose. The authority of this court to determine whether or not a Legislature is in session was exercised in the case of Simpson v. Hill, 128 Okla. 269, 263 Pac. 635, in which this court held that article 4 of the Constitution "* * * is an inhibition against the Legislature, or any members thereof, undertaking to perform a prerogative given by the Constitution to another department of state government." That statement is applicable herein, and while the Governor is authorized to call an election by the provisions of section 3, article 5, supra, he may do so only when the petition provided by section 2, article 5, supra, has been filed with the Secretary of State, and the sufficiency of the petition is to be determined by this court where an appeal has been taken to this court from an order of the Secretary of State. The Governor is without authority to determine the sufficiency of such a petition.

In Simpson v. Hill, supra, it was held that the Legislature had no inherent power to convene. In the case at bar the inherent power of the people to convene for legislative purposes was surrendered by the adoption of section 2, article 5, supra, and after the adoption of that provision they had no inherent right to convene for legislative purposes. Thereafter they could be called together for legislative purposes only in the manner provided in the Constitution and by legislation suitable for carrying into effect the provisions of the Constitution.

To the same effect is Marsden v. Harlocker, 48 Ore. 90, 85 Pac. 328, wherein an election was held to be invalid for the reason that it was not called in accordance with the provisions of the Constitution and statutes of the state of Oregon. It was therein held that it is the duty of the county court, and not the clerk, to inspect the petition for an election and examine its records to ascertain whether it complies with statutory requirements, and if so, to order an election, and that that order is a condition precedent to a valid election and that there was no valid election where the members of the court did not meet or assemble and make the proper investigations, but merely signed a memorandum purporting to authorize an election.

That holding was in direct conflict with the theory of the Governor, stated by him, as follows:

'* * * Admitting that the Secretary of State, for a moment, had no right to certify to the Governor, nevertheless it has been done here, and the court cannot undo that act by way of injunction."

The evident purpose of the statement was to contend that the Governor acted upon a certificate of the Secretary of State and, having so acted, his action may not be controlled by this court. In the executive proclamation, it was said:

"Whereas, on the 25th day of November, 1931, the said Secretary of State transmitted to me, the undersigned, Governor of the state of Oklahoma, and to the Secretary of the State Election Board, each, an attested copy of the pending proposition, including such approved ballot title."

There is nothing in that language to indicate that any notice of acceptance had been given by the Secretary of State to the Governor, but the Governor concluded that the petition had been accepted and coupled the statement of that conclusion with the statement of fact that the Secretary of State had notified him, in writing, of the ballot title having been decided upon, in such manner as to permit the inference that the Secretary of State had notified him that the petition had been accepted. The language used was as follows:

"Whereas, said petition having been accepted and said ballot title having been decided upon, the said Secretary of State having, in writing, notified me thereof, it becomes my duty, as Governor of the state of Oklahoma, to issue my proclamation, setting forth the substance of said measure and the date of the referendum vote thereon."

In view of the statement, I set out the certificate of the Secretary of State, which is in words and figures as follows, to wit:

"In the Matter of State Question No. 167, Initiative Petition No. 112.

"To His Excellency,
  "Honorable Wm. H. Murray,
    "Governor of the State of Oklahoma:

"I, R. A. Sneed, the undersigned Secretary of State of the state of Oklahoma, do hereby certify that on the 31st day of October, 1931, there was filed in the office of the Secretary of State of the state of Oklahoma, Initiative Petition No. 112, State Question No. 167.

"I further certify that after said initiative petition was filed, I caused due and legal notice of the filing thereof to be published as required by law, and that thereafter I found that said petition was in all things sufficient and in compliance with the Con-

stitution and laws of the state of Oklahoma relating to such proceedings.

"I further certify that I found 121,401 legal signers on said petition and that the same constituted more than the percentage of legal voters voting at the last general election held in the state of Oklahoma, required by law for the submission of said state question, and found that the said initiative petition was, therefore, sufficient.

"I further certify that on the 24th day of November, 1931, I did transmit all the papers and documents on file in my office, relating to such petition, to the Supreme Court of Oklahoma, pursuant to notice of appeal served upon me, as by law provided.

"I further certify that on the 23rd day of November, 1931, the Attorney General of the state of Oklahoma caused to be filed in my office, the attached ballot title of said Initiative Petition No. 112, State Question No. 167, as the ballot title approved for such state question.

"I further certify that there is also attached a true and correct copy of the said initiative bill.

"In witness whereof, I have hereunto set my hand and caused the Great Seal to be attached this 25th day of November, 1931.

"R. A. Sneed,
"Secretary of State."

(Seal)

It will be noted from the certificate that the Secretary of State certified that all of the papers and documents on file in his office relating to the initiative petition in question had been transmitted by the Secretary of State to the Supreme Court of Oklahoma on the 24th day of November, 1931, pursuant to notice of appeal served upon him, as by law provided. The Governor was thereby given the information that the question of the sufficiency of the petition in question was before this court on appeal and his action in making an executive order calling an election was without authority of law and is void. He cannot justify it on the certificate of the Secretary of State, for the reason that the Secretary of State never at any time notified him that the petition had been accepted, as required by section 6635, C. O. S. 1921. On the contrary, that certificate certified to him that the petition had not been accepted, that the sufficiency thereof had been questioned, and that the determination of that question was pending before this court.

It is contended that "accepted," as used in section 6635, supra, refers to acceptance by the Secretary of State, and Mr. Humphrey, in his discussion, said:

"Whenever a petition is accepted, that is, by the Secretary of State, its title has been decided upon, then the Secretary of State shall in writing notify the Governor, and who forthwith shall issue a proclamation setting forth the substance of the measure."

Such is not the meaning of the word. An initiative petition is not "accepted" within the meaning of the act so long as the sufficiency thereof is being contested before the Secretary of State or, upon an appeal from his order, before this court.

In his argument to this court, the Governor said:

"The source of all power being the people, the people have reserved unto themselves the right to make laws independent of the Legislature, and on referendum to nullify the act of both houses and the signature of the Governor."

I do not agree with that conclusion. The source of all power is the people, but the people exercised that power in the adoption of the Constitution, and with the adoption of that Constitution they surrendered that power. They did not therein reserve unto themselves the right to make laws, independent of the Legislature. They therein reserved unto themselves the right to make laws in the manner provided by the Constitution and by legislative acts suitable for carrying into effect the provisions of the Constitution. They specifically provided that:

"The Legislature shall make suitable provisions for carrying into effect the provisions of this article." Section 3, article 5, supra.

That authority granted by the people to the Legislature was not an idle gesture. It was for the purpose of making the constitutional provisions effective and for carrying into effect the initiative and referendum provisions of the Constitution. The people could have made suitable provisions for carrying into effect the provisions of the article and could have included them in the Constitution as a part thereof, but, in the exercise of their discretion, they elected not to do that, but to confer that power upon the Legislature, and, since they so elected and acted, this court must give effect to their action, and this court is not authorized to strike down suitable provisions enacted by the Legislature for carrying into effect the provisions of the article. Mr. Humphrey, in his argument before this court, took the position that the decisions of this court, holding that an initiative petition was ineffective where it was not properly submitted, "were wrong." He said:

"The people had all the authority in the beginning. The people did not give that authority to anybody. I say any day in the week, any month in the year, if the people step out here to the polls and say by a majority vote this or that should be the law, that is it, because the people have never so tied their hands that they cannot do that."

That conclusion is erroneous. While the people had all the authority in the beginning, they did not retain all the authority, but they prescribed limitations upon themselves and they authorized the Legislature to make suitable provisions for carrying into effect those limitations.

In referring to "the people," due regard must be had to all of the people, although it is the custom for classes of people to refer to themselves as "the people" and, in some instances, for individuals to refer to themselves as "the people." The petitioners in this case do not constitute the people any more than the protestant constitutes the people. All of the people adopted the Constitution, and the Constitution is legally effective as to all of the people. The initiative provisions of the Constitution do not require a majority vote of the people. They require, as to initiative measures, the approval of only "a majority of the votes cast in such election." Section 3, article 5, supra. By the adoption of the Constitution the people agreed that the majority of the votes cast in an initiative election should be sufficient to make effective an initiative measure. Majority rule was thereby dispensed with. The right of eight per centum of the legal voters to propose a legislative measure was granted: Section 2, article 5, supra. But the rights of those who were not petitioners thereon must be considered. We are not authorized to say that the rights of not less than eight per centum of the legal voters to propose a legislative measure are any more sacred to them or controlling upon this court than the rights of the remainder of the citizens to have the initiative proceedings conducted in the manner and form and at the time provided by the Constitution and the legislative provisions suitable for carrying the same into effect. This court does not sit as a court to protect the rights of some while destroying the rights of others. Under the theory of our government, all of the people are entitled to have their rights protected. Where a controversy is presented to this court between the people, some of whom insist that certain proceedings are sufficient and some of whom insist that those proceedings are not sufficient, it becomes the duty of this court to determine the rights

of the parties. The petitioners herein say: We have presented a valid petition, the Governor has called an election, we are entitled to have the election conducted, and this court is without authority to prevent the conducting of the same. That contention overlooks the rights of the protestants, who insist that no sufficient petition was filed, that the calling of the election by the Governor was without authority of law, and that the public funds of the state are about to be wrongfully and illegally used for the purpose of paying the costs of the conducting of an illegal and unauthorized election. This court must determine which of those contentions is correct. Responsibility rests upon it under the Constitution of this state. I cannot, should not, and will not attempt to evade that responsibility.

The position of the Governor in this case is defined by his statement:

"Admitting that you have a case before your Honors, whatever your Honors may find, if you do not find that less than 8 and 15 per cent. signed, it cures everything"

—and:

"Suppose the court finds later that there was not 8 and 15 per cent., then the bill fails, notwithstanding the election. But any other effect is cured by the election, because it follows the meaning and demand of the Constitution itself; 8 and 15 per cent. That is the key to the whole question."

I cannot agree with that contention. To do so would permit the Governor of the state to call an election at any time, and if, thereafter, it appeared that the petition filed was sufficient in form, the election would be valid and the legislation voted on would be enacted if it received the necessary majority. Such is not the law of this state. This court held to the contrary in Simpson v. Hill, supra, when it held:

"An affirmative vote by the people of the state, at a special election, gives no force and effect to an initiated measure, unless the same is ordered submitted at such special election by the Legislature or the Governor of the state. (Section 3, art. 5, Oklahoma Constitution.)"

—and in Looney v. Leeper, Secy. of State, et al., 145 Okla. 202, 292 Pac. 365, when it held:

"There was no authority for the submission of the proposed amendment at said special election, and the affirmative vote thereon, by a majority of those voting at said election, gave the same no legal force or effect."

The basis of those decisions is that the

defect in the calling of the election was not cured by the election, and though the majority of the voters voting at the election voted for the initiative measure, the same was ineffective and of no force. In the latter case the record shows that there were 173,262 votes for the adoption of the measure as against 86,445 votes for the rejection thereof. Notwithstanding the majority in favor of the measure, it was held not to have been legally adopted. The Supreme Court of Oregon, in Marsden v. Harlocker, supra, so held. In support of its holding it said:

"As the right to vote upon the question of prohibiting the sale of intoxicating liquors is inaugurated by filing a petition, the election held in pursuance thereof is special, and hence the making of an order therefor by a county court, which in this particular respect at least requires an exercise of discretion and judgment, is mandatory and becomes a condition precedent to the holding of a valid election."

It is stated in the executive order that:

"The state and its people are sorely in need of the revenues imposed and collectible under this act, in order that there may be a reduction in the rate of ad valorem taxation; and if said proposed measure is not voted upon in the year 1931, serious legal questions will arise, resulting in vexatious and hazardous litigation, affecting not only the right of the state to tax the 1931 income of taxpayers, but the very life of this important measure"

—and that:

"Because of the momentous and far-reaching consequences that may result from a failure to hold the election on this proposed measure in the year 1931, I feel that I would be derelict in my duty, as Governor of the state of Oklahoma, if I failed to issue my proclamation in time to permit the holding of such election prior to the expiration of the present year."

The state may be sorely in need of the revenues imposed and collectible under the proposed legislative measure, but the people of the state are sorely in need of a reduction in governmental expenses rather than in the payment of taxes to the state in an increased amount. The effect of the proposed legislative measure is to increase the amount of revenue to be paid by the people in the form of taxes to the state. The "momentous and far-reaching consequences" spoken of may or may not result from a failure to hold the election on the proposed legislative measure in the year 1931. Section 1, article 10, of the Constitution provides that the fiscal year should commence on the 1st day of July in each year, unless otherwise provided by law, and it has not been otherwise provided by law. Section 2, article 10, of the Constitution provides that the Legislature shall provide by law for an annual tax sufficient with other resources to defray the estimated ordinary expenses of the state for each fiscal year. Those and other constitutional provisions must be applied to the proposed legislative measure and, when so applied, the language thereof, "A tax is hereby levied, for the taxable year 1931 and for each taxable year thereafter," must be construed and the meaning of "the taxable year 1931" determined. What is the meaning of the language, "the taxable year 1931?" If it means the fiscal year commencing July 1, 1931, the act could be adopted by the people with the same effect prior to June 30, 1932. If it means the fiscal year ending June 30, 1931, it could be adopted by the people at any time prior to June 30, 1932, with the same effect as though it were adopted by the people now. I express no opinion as to the meaning. I know of no reason why constitutional and valid legislative provisions as to the holding of initiative elections should be abrogated or disregarded. The emergency, if any, arose from a failure to file the petition in the office of the Secretary of State in sufficient time for an orderly hearing thereof, as provided by the Constitution and the laws of this state. The result of such failure could have been foreseen. The petitioners may not delay the filing of an initiative petition until the closing weeks of the year and then demand an election be held before the closing of the year, in violation of the plain provisions of the Constitution and applicable statutes and over the protest of qualified voters who did not petition. In other words, they may not create an emergency and claim an advantage by reason of having created it. The power of this court and the duties of the members thereof remain the same whether or not there is an emergency. There is no power in the petitioners to have an election on an initiative petition prior to the next election held throughout the state. By the provisions of section 3, article 5, supra, the people provided that such measure should be referred to the people at the next election held throughout the state, except when the Legislature or the Governor shall order a special election for the express purpose of making such reference. The right of the petitioners to have an election during the year 1931, therefore, is not an issue in this case. The issue here is the right of the Governor to call the elec-

tion during the year 1931. While this court is not authorized to control the discretion of the Governor as to when he shall call an election which he is authorized by law to call, this court is authorized by law, and it is the duty of this court to hold that an election called by the Governor without authority of law is of no force and effect.

I cannot agree with the conclusions of the Governor that the Constitution and laws of the state clearly vest in him the power and authority to call an election in the manner and at the time in which it was done. The power is not given to him to construe the Constitution and provisions or laws of the state. That power is vested in the judicial branch of the government. He will have discharged to the fullest extent the duties and responsibilities imposed upon him when he executes the laws of the state of Oklahoma as construed and applied by the courts of this state.

This court has the highest respect for the will of the sovereign people of Oklahoma and, under the oath of the members thereof and out of respect for the will of the sovereign people, it is its duty to construe and apply the provisions of the Constitution and the laws of the state. The people adopted that Constitution. They are entitled to its protection and to the protection of each and every provision thereof, and this court cannot abjectly surrender power clearly granted to it by the provisions of the Constitution in order that the executive department of the state may function as the executive head of the state desires to have it function.

In Simpson v. Hill, supra, this court said:

"The above declaration of the law of the state of Oklahoma on the subject here in question might have been evaded at this time, but this court is not unaware that it would be called upon to determine these exact questions, and we have acted upon the principle that it is our duty rather to embrace than to repel the settlement of uncertainties. This is not novel in the jurisprudence of the states, for, on a similar occasion, in the case of State ex rel. Postel v. Marcus, 152 N. W. 419, the Supreme Court of Wisconsin, in part, said:

" 'While dealing with the subject suggested might be avoided at this particular time, it does not seem best to do so; but rather to face the situation and solve it. Much harm may come by uncertainty as to an important constitutional question being permitted to exist until affairs, public and private, shall have been adjusted to a condition apparently legitimately created by a legislative effort. * * * The policy and duty here is rather to embrace than to repel opportunity to remove such uncertainties.

" 'No feature of the judicial function is of equal dignity with that which requires dealing with what is and what is not, really, a part of the Constitution. * * * None requires an equal degree of care to reach a right conclusion and courage to pronounce it. The court may, and should, and must, on such great occasions, look to effects and consequences. Not to do so with the thought of hesitation, much less omission to do what duty to here and to the public requires; but as an inspiration to reach the highest attainable degree of certainty of the right being vindicated in the end.'

"The law of Oklahoma is as we have stated it. It does not follow, however, that this court will direct an injunction be issued against private citizens from coming to Oklahoma City. If the members of the Legislature come to the Capitol, they come as individuals. They can incur no obligation; they can perform no official functions, until the Chief Executive of the state exercises the discretion vested in him by the said section 7 of article 6, and calls the said body into extraordinary session. Otherwise the Legislature of Oklahoma convenes in regular biennial session the first Tuesday after the first Monday in January, 1929, and for no purposes can function until then."

This cause came to this court in the way provided by the Constitution and laws of this state for a trial de novo as to the sufficiency of the petition filed with the Secretary of State. It is said that this court should follow the opinion of the Supreme Court of Oregon in State ex rel. Carson v. Hoss, Secretary of State, 292 Pac. 324, in which it was held that the circulation of a referendum petition was proper, notwithstanding an appeal was pending from the ballot title prepared by the Attorney General. It is evident that the facts in that case were different from the facts in this case, for here the appeal presents the question of the sufficiency of the petition, and not the correctness of the ballot title prepared by the Attorney General. In the Oregon case there was no question presented as to the sufficiency of the petition. In the case at bar it is contended before this court that the petition is not sufficient. This court acquired jurisdiction of the subject-matter for the purpose of determining that question, and set the cause for trial. In that fact is the difference between this case and McAlister, Secy. of State, v. State ex rel. Short, 95 Okla. 200, 219 Pac. 134, McAlister v. State ex rel. Walton, 96 Okla. 143, 221 Pac. 779, City of McAlester v. Milwee, 31 Okla. 620, 122 Pac. 173, and Lowry v. Town

of Meeker, opinion filed July 7, 1931, 151 Okla. 264, 1 P. (2d) 378, for therein the court did not have jurisdiction, and it was so held by this court. In those cases it was sought to have the courts acquire jurisdiction of the subject-matter for the purpose of interfering with an election. In the case at bar the court has jurisdiction of the subject-matter by virtue of the plain provisions of the statute. The issue here is whether or not this court should protect that jurisdiction. If the Governor of the state of Oklahoma can call an election while an appeal is pending in this court from the order of the Secretary of State as to the sufficiency of the petition filed with him, the mayor of a city may call an election while an appeal is pending in this court from the order of the city clerk. The statement of that proposition shows the absurdity thereof. To permit such action would be to defeat the power of this court to exercise jurisdiction conferred upon it by the statutes of this state. The decision by the Supreme Court of Kansas in the case of Duggan v. City of Emporia, 84 Kan. 429, 114 Pac. 235, was a determination of an appeal from an order of the district court refusing a temporary injunction, and under the facts in that case, as disclosed by the opinion, the action was an independent one and the order sought was not ancillary to the jurisdiction of the court. Before the trial had begun, the Governor of the state declared that the petition filed with the Secretary of State was sufficient and called an election. This court, having jurisdiction of the subject-matter and of the parties, has the power to preserve that jurisdiction. I know of no authority to the contrary. The Governor has declared that he will hold the election on the 18th day of December, 1931, and that this court is without authority to prevent the holding of the same. Personally, I shall not attempt to prevent the holding of the same. I have given my views of the law. The responsibility of the election rests on the Governor.

In my opinion, it is the duty of this court to inform the Governor and the people of the state as to the law with reference to the issues involved in this case in order that the people may know whether or not the election called for December 18, 1931, is to be a valid election and if, in the opinion of this court, that election is not to be a valid one, that the Governor of the state, after having been informed by this court as to the law, may have an opportunity to withdraw his order and election proclamation and thereby save the taxpayers of the state the cost of holding an invalid election or save the State Auditor the embarrassment of being compelled to refuse to pay the claims of the election officials holding the election. I cannot agree with the majority that the question of the legality of the proposed election should not be determined until after the election is held. To postpone the decision of that question can accomplish no good. If the election will be illegal and the result thereof ineffective, it seems to me that it should be so held at this time, that the people may have that information before the election is held. On the other hand, if the election will be a valid one and the result thereof effective, I think the people should have that information before the election is held.

Since the members of this court have not agreed upon an opinion stating the law with reference to the validity of the proposed election, I consider it to be my duty to inform the people of the state as to what I consider the law of the state to be. I refuse to so act that anyone may have the opportunity of saying that I waited to express my views as to the law in this cause until after the people of the state had spoken at the election.

For the reasons stated, I am filing herein my views, after having dissented from the opinion of the majority.

---

In re Initiative Petition No. 114, State Question No. 169.

No. 23084.

ANDREWS, J. (dissenting). I dissent from the opinion of the majority in this case. The views I expressed in cause No. 23082, In re Initiative Petition No. 112, State Question No. 167, are applicable herein. For the purpose of avoiding unduly incumbering the record, I desire to make them my views herein by reference.

---

In re Initiative Petition No. 117, State Question No. 172.

No. 23087.

ANDREWS, J. (dissenting). I dissent from the opinion of the majority in this case. The views I expressed in cause No. 23082, In re Initiative Petition No. 112, State Question No. 167, are applicable herein. For the purpose of avoiding unduly incumbering the record, I desire to make them my views herein by reference.

262

## In re Initiative Petition No. 118, State Question No. 173.

### No. 23088.

ANDREWS, J. (dissenting). I dissent from the opinion of the majority in this case. The views I expressed in cause No. 23082, In re Initiative Petition No. 112, State Question No. 167, are applicable herein. For the purpose of avoiding unduly incumbering the record, I desire to make them my views herein by reference.

Note.—See under (1) R. C. L. Perm. Supp. p. 1595.